No. 20-15662

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

Axon Enterprise, Inc.,

Plaintiff-Appellant,

v.

Federal Trade Commission, et al.,

Defendants-Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
(CV 20-00014-DWL)

_____

## PLAINTIFF-APPELLANT'S AXON ENTERPRISE, INC.'S
## EXCERPTS OF RECORD

_____

Pamela B. Petersen
Axon Enterprise, Inc.
17800 N. 85th Street
Scottsdale, AZ 85255
Tel. No: (623) 326-6016
Fax No: (480) 905-2027
Email: ppetersen@axon.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

| Date | Document | Page |
|---|---|---|
| 4-13-20 | Notice of Appeal [Doc. 43] | 1 |
| 4-08-20 | Judgment [Doc. 42] | 4 |
| 4-08-20 | Order Dismissing Complaint [Doc. 41] | 5 |
| 4-01-20 | Oral Argument Transcript [Doc. 44] | 34 |
| 1-09-20 | Section 5 Revisited: Time for the FTC to Define the Scope of Its Unfair Methods of Competition Authority [Doc. 15-2, Ex. 1A] | 93 |
| 1-09-20 | Declaration of Anthony Kim [Doc. 15-3, Ex. 2] | 115 |
| 1-09-20 | Chart of Federal Trade Commission Adjudicative Proceedings [Doc. 15-3, Ex. 2A] | 118 |
| 1-03-20 | Complaint for Declaratory and Injunctive Relief [Doc. 1] | 124 |
| 4-22-20 | District Court Docket | 153 |

Pamela B. Petersen
Arizona Bar No. 011512
**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
Secondary: legal@axon.com

Garret G. Rasmussen
Antony P. Kim
Jonathan A. Direnfeld
Thomas Fu
**Orrick, Herrington & Sutcliffe LLP**
1152 Fifteenth Street N.W.
Washington D.C. 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
grasmussen@orrick.com
akim@orrick.com
jdirenfeld@orrick.com
tfu@orrick.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Axon Enterprise, Inc., | No. 2:20-cv-00014-PHX-DWL |
| Plaintiff, | |
| v. | **NOTICE OF APPEAL** |
| Federal Trade Commission, et al., | |
| Defendants. | |

NOTICE IS HEREBY GIVEN THAT, Plaintiff Axon Enterprise, Inc. hereby appeals to the United States Court of Appeals for the Ninth Circuit, the District Court's

**ER 1**

1   Order (Doc. 41) and the Judgment of Dismissal (Doc. 42) entered thereupon in this action

2   on April 8, 2020.

3

4

5   Dated: April 13, 2020                    Respectfully submitted,

6

7                                            */s/ Pam Petersen*
                                             Pamela B. Petersen
8                                            Arizona Bar No. 011512
9                                            **Axon Enterprise, Inc.**
                                             17800 N. 85th Street
10                                           Scottsdale, AZ 85255-9603
                                             Telephone: (623) 326-6016
11                                           Facsimile: (480) 905-2027
12                                           ppetersen@axon.com
                                             Secondary: legal@axon.com
13

14                                           Garret G. Rasmussen (*pro hac vice*)
15                                           Antony P. Kim (*pro hac vice*)
                                             Jonathan A. Direnfeld (*pro hac vice*)
16                                           Thomas Fu (*pro hac vice*)
17                                           **Orrick, Herrington & Sutcliffe LLP**
18                                           1152 Fifteenth Street N.W.
                                             Washington D.C. 20005
19                                           Telephone: (202) 339-8400
                                             Facsimile: (202) 339-8500
20                                           grasmussen@orrick.com
21                                           akim@orrick.com
                                             jdirenfeld@orrick.com
22                                           tfu@orrick.com
23
                                             *Attorneys for Plaintiff Axon Enterprise, Inc.*
24

25

26

27

28

2

**ER 2**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2020, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's CM/ECF system upon all counsel of record in the above-captioned case.

*/s/ Pam Petersen*

**ER 3**

1
2
3
4
5
6          **IN THE UNITED STATES DISTRICT COURT**
7            **FOR THE DISTRICT OF ARIZONA**
8
9  Axon Enterprise Incorporated,     **NO. CV-20-00014-PHX-DWL**
10          Plaintiff,
                       **JUDGMENT OF DISMISSAL IN A**
11  v.                       **CIVIL CASE**
12  Federal Trade Commission, et al.,
13         Defendants.
14

15      **Decision by Court.**  This action came for consideration before the Court.  The

16 issues have been considered and a decision has been rendered.

17      IT IS ORDERED AND ADJUDGED that pursuant to the Court's order filed April

18 8, 2020, Plaintiff to take nothing, and the complaint and action are dismissed without

19 prejudice.

20                     Debra D. Lucas
                      Acting District Court Executive/Clerk of Court
21

22 April 8, 2020

23                    s/ G. Puraty
               By   Deputy Clerk

24
25
26
27
28

**ER 4**

1   **WO**

2

3

4

5

6   **IN THE UNITED STATES DISTRICT COURT**

7   **FOR THE DISTRICT OF ARIZONA**

8

9   Axon Enterprise Incorporated,              No. CV-20-00014-PHX-DWL

10              Plaintiff,                      **ORDER**

11   v.

12   Federal Trade Commission, et al.,

13              Defendants.

14

15                          **INTRODUCTION**

16          Pending before the Court is Plaintiff Axon Enterprise, Inc.'s ("Axon") motion for

17   preliminary injunction.  (Doc. 15.)

18          Axon sells various technological tools, including body-worn cameras, to police

19   departments.  In May 2018, Axon acquired one of its competitors.  This acquisition

20   prompted the Federal Trade Commission ("FTC") to conduct an antitrust investigation.  In

21   January 2020, just as the FTC was about to initiate a formal administrative proceeding to

22   challenge the acquisition, Axon filed this lawsuit, which seeks to enjoin the administrative

23   proceeding based on three constitutional claims: *first*, that the FTC's structure violates

24   Article II of the Constitution because its commissioners are not subject to at-will removal

25   by the President and its administrative law judges ("ALJs"), who are appointed by its

26   commissioners, are also insulated from at-will removal; *second*, that the FTC's combined

27   role of "prosecutor, judge, and jury" during administrative proceedings violates the Due

28   Process Clause of the Fifth Amendment; and *third*, that the FTC and the Antitrust Division

1    of the U.S. Department of Justice, which are both responsible for reviewing the antitrust

2    implications of acquisitions but employ different procedures and substantive standards

3    when conducting such review, utilize an arbitrary and irrational "clearance" process when

4    deciding which agency will review a particular acquisition, in violation of the Equal

5    Protection Clause of the Fifth Amendment. (Doc. 15 at 6-15.)[1]

6        The constitutional claims Axon seeks to raise in this case are significant and topical.

7    Indeed, the Supreme Court recently held oral argument in a case that raises similar issues.

8    *Seila Law LLC v. Consumer Fin. Prot. Bureau*, No. 19-7.  This Court, however, is not the

9    appropriate forum to address Axon's claims.  It is "fairly discernable" from the FTC Act

10   that Congress intended to preclude district courts from reviewing the type of constitutional

11   claims Axon seeks to raise here—instead, Axon must raise those claims during the

12   administrative process and then renew them, if necessary, when seeking review in the Court

13   of Appeals.  Thus, this Court lacks subject matter jurisdiction over this action, Axon's

14   request for a preliminary injunction must be denied, and this action must be dismissed.

15                              **BACKGROUND**

16   I.    <u>Factual Background</u>

17       Axon, which was formerly known as TASER International, Inc., is a Delaware

18   corporation that sells various technological tools, including body-worn cameras and cloud-

19   computing software, to police departments.  (Doc. 1 ¶¶ 13, 19-21; Doc. 15-2 ¶ 2.)  In May

20   2018, Axon acquired one of its competitors, Vievu.  (Doc. 1 ¶ 24.)  The next month, the

21   FTC notified Axon that it was investigating the acquisition.  (*Id.* ¶ 25.)  Axon cooperated

22   with the investigation over the next 18 months.  (*Id.* ¶ 26.)  Axon contends that it "spent in

23   excess of $1.6 million responding to the FTC's investigational demands, including attorney

24   and expert fees, ESI production and related hosting and third-party vendor fees and

25   expenses."  (Doc. 15-2 at 3 ¶ 5.)

26   _____

27   [1]    In its reply, Axon clarifies that it "is not challenging the mere fact of concurrent
      jurisdiction, but rather the arbitrary way in which the agencies determine which of two
28   vastly different (and often outcome-determinative) procedures will be applied to a
      particular company."  (Doc. 21 at 2 n.1.)

                                    - 2 -

Axon contends that, at the conclusion of the investigation, the FTC gave it a choice. First, it could agree to a "blank check" settlement that would rescind its acquisition of Vievu and transfer some of its intellectual property to the newly restored Vievu.  (Doc. 1 ¶ 27.)  According to Axon, the FTC's "vision" was to turn Vievu into a "clone" of Axon— "something Vievu never was nor could be without impermissible government regulation." (*Id.*)  Second, if Axon declined those terms, the FTC would pursue an administrative complaint against Axon.  (*Id.*)

II.   Procedural History

On January 3, 2020, Axon filed this lawsuit.  (Doc. 1).  In its complaint, Axon outlines the factual history discussed above and alleges a violation of its Fifth Amendment rights to due process and equal protection (*id.* ¶¶ 57-60), alleges that the FTC's structure violates Article II of the Constitution (*id.* ¶¶ 61-62), and seeks a declaration that its acquisition of Vievu didn't violate any antitrust laws (*id.* ¶¶ 63-69).

Also on January 3, 2020 (but later that day), the FTC filed an administrative complaint challenging Axon's acquisition of Vievu.  (Doc. 15 at 2 n.1.)   An evidentiary hearing in the administrative proceeding was originally scheduled for May 19, 2020.  (Doc. 22 at 2.)  That hearing has now been continued until late June 2020.

On January 9, 2020, Axon filed a motion for a preliminary injunction, seeking to enjoin further FTC proceedings against it.  (Doc. 15.)

On January 23, 2020, the FTC filed an opposition to Axon's motion.  (Doc. 19.) The FTC relegated the merits of Axon's constitutional claims to a footnote and instead focused on whether the Court possesses subject matter jurisdiction. (Doc. 19 at 1, 14 n.12.)

On January 30, 2020, Axon filed a reply.  (Doc. 21.)  That same day, Axon filed a motion for expedited consideration.  (Doc. 22.)  Over the FTC's opposition (Doc. 23), the Court granted the motion and scheduled oral argument for April 1, 2020.  (Doc. 24.)

On March 10, 2020 the Court issued a tentative order.  (Doc. 29.)

On March 27, 2020, the New Civil Liberties Alliance ("NCLA") filed a motion for leave to submit an amicus brief in support of Axon.  (Doc. 32.)  That motion was granted.

- 3 -

**ER 7**

1    (Doc. 33.)

2         On April 1, 2020, the Court heard oral argument.  (Doc. 39.)[2]

3         On April 2, 2020, Axon supplemented the record by filing certain documents

4    generated during the administrative proceeding.  (Doc. 40.)

5                                   **ANALYSIS**

6         "Subject-matter limitations on federal jurisdiction serve institutional interests. They

7    keep the federal courts within the bounds the Constitution and Congress have prescribed."

8    *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  "[C]ourts have an

9    'independent obligation' to police their own subject matter jurisdiction."  *Animal Legal*

10   *Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 866 (9th Cir. 2019) (citation omitted).  *See*

11   *also* Fed. R. Civ. Proc. 12(h)(3) ("If the court determines at any time that it lacks subject-

12   matter jurisdiction, the court must dismiss the action.").

13        In general, district courts "have original jurisdiction of all civil actions arising under

14   the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This includes

15   the authority to "declare the rights and other legal relations of any interested party seeking

16   such a declaration."  *Id.* § 2201.  "This grant of jurisdiction, however, is not absolute."

17   *Kerr v. Jewell*, 836 F.3d 1048, 1057 (9th Cir. 2016).  Among other things, Congress can

18   "preclude[] district court jurisdiction" over claims pertaining to the conduct of an

19   administrative agency by creating a review framework that evinces a "fairly discernable"

20   intent to require such claims "to proceed exclusively through the statutory review scheme."

21   *Id.* at 1057-58 (citation omitted).  *See also Bennett v. SEC*, 844 F.3d 174, 178 (4th Cir.

22   2016) ("Congress can . . . impliedly preclude jurisdiction by creating a statutory scheme of

23   administrative adjudication and delayed judicial review in a particular court.").

24        The issue here is whether Congress, by enacting the FTC Act, intended to require

25   constitutional challenges to the FTC's structure and processes to be brought via the FTC

26   Act's adjudicatory framework.  If so, this Court lacks subject matter jurisdiction to

27   ───────────────

28   [2]      Due to the COVID-19 pandemic, the Court allowed counsel for the FTC and NCLA
     to attend the hearing telephonically.  (Docs. 31, 34.)  Additionally, the Court allowed media
     organizations and members of the public to listen to the hearing telephonically.  (Doc. 37.)

- 4 -

**ER 8**

entertain Axon's claims.

I.    Background Law

On three occasions between 1994 and 2012, the Supreme Court addressed whether Congress's enactment of a scheme of administrative adjudication should be interpreted as an implicit decision by Congress to preclude district court jurisdiction.  Although none of those decisions involved the FTC Act, they control the analysis here.  *Cf. Bennett*, 844 F.3d at 178-81 (identifying these cases as "the trilogy").

The first decision, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), addressed the preclusive effect of the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act").  Thunder Basin, a coal company, objected to a Mine Act regulation that required it to post the names of certain union representatives.  *Id.* at 203-04.  Rather than seek review of the regulation through the Mine Act's judicial-review scheme, which contemplates that "[c]hallenges to enforcement [will be] reviewed by the Federal Mine Safety and Health Review Commission . . . and by the appropriate United States court of appeals," Thunder Basin filed a lawsuit in federal district court in which it argued that the Mine Act's review scheme violated its due process rights under the Fifth Amendment.  *Id.* at 204-06.  The district court issued an injunction in Thunder Basin's favor but the Supreme Court reversed, concluding that the district court lacked subject matter jurisdiction over the action.  *Id.* at 205-07.

The Court held that when a statutory scheme, such as the Mine Act, "allocate[s] initial review to an administrative body" and authorizes only "delayed judicial review," courts must analyze three factors—(1) "the statute's language, structure, and purpose," (2) "its legislative history," and (3) "whether the claims can be afforded meaningful review"— when assessing whether Congress's intent to "preclude initial judicial review" can be "fairly," if impliedly, "discerned" from the statutory scheme.  *Id.* at 207.  The Court then analyzed these factors and concluded that all three supported a finding of preclusion.

First, the Court noted that the Mine Act creates a "detailed structure" for regulated parties to seek review of enforcement activity under the Act—a mine operator is entitled

to challenge an adverse agency order before an ALJ, then seek review of the ALJ's order before the Federal Mine Safety and Health Review Commission, and then, if necessary, seek review of any adverse decision by the Commission in a federal Court of Appeals. *Id.* at 207-08. This structure, the Court concluded, "demonstrates that Congress intended to preclude challenges such as the present one." *Id.* at 208. The Court also noted that the Mine Act contains provisions that enable the Secretary of Labor (who is responsible for enforcing the Mine Act) to file an action in district court when seeking certain types of relief. *Id.* at 209. Because "[m]ine operators enjoy no corresponding right," the Court concluded these provisions served as further proof of Congress's intent to preclude. *Id.*

Second, the Court stated that "[t]he legislative history of the Mine Act confirms this interpretation." *Id.* at 209-11.

Third, the Court addressed whether a finding of preclusion would result, "as a practical matter," in the elimination of Thunder Basin's ability "to obtain meaningful judicial review" of its claims. *Id.* at 213 (quotation omitted). The Court concluded that no such risk was present because Thunder Basin's "statutory and constitutional claims . . . can be meaningfully addressed in the Court of Appeals." *Id.* at 215. In reaching this conclusion, the Court observed that "[t]he Commission has addressed constitutional questions in previous enforcement proceedings" but clarified that, "[e]ven if this were not the case," the availability of eventual review by an appellate court was sufficient. *Id.*

The second component of the trilogy, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*, 561 U.S. 477 (2010), addressed the preclusive effect of the Sarbanes-Oxley Act of 2002 ("the Sarbanes–Oxley Act") and its interaction with the Securities Exchange Act. Among other things, the Sarbanes–Oxley Act created an entity called the Public Company Accounting Oversight Board ("PCAOB"), which was tasked with providing "tighter regulation of the accounting industry." *Id.* at 484. The PCAOB was composed of five members who were appointed by the Securities and Exchange Commission ("the Commission"). *Id.* The PCAOB's broad regulatory authority included enforcing not only the Commission's rules, but also "its own rules," and it possessed the

authority to "issue severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of $15 million." *Id.* at 485.

The plaintiff in *Free Enterprise Fund* was a Nevada accounting firm that been investigated by the PCAOB and then criticized in a report issued by the PCAOB. *Id.* at 487. In a lawsuit filed in federal district court, the accounting firm argued that the PCAOB's structure was unconstitutional because its board members, as well as the Commission members who appointed them, were shielded from Presidential control. *Id.* The district court concluded it had subject matter jurisdiction over the lawsuit but rejected the accounting firm's constitutional claim on the merits. *Id.* at 488. The Supreme Court reversed, agreeing with the district court's jurisdictional analysis but concluding that, on the merits, the PCAOB's structure was unconstitutional.

When addressing the jurisdictional issue, the Court cited *Thunder Basin* as supplying the relevant standards but concluded that, under those standards, jurisdiction was not precluded. *Id.* at 489-91. Central to the Court's analysis was the fact that the relevant adjudicatory framework didn't provide for judicial review over all of the PCAOB's activities. Specifically, the Commission was only empowered "to review any [PCAOB] rule or sanction." *Id.* at 489. Commission action, in turn, could receive judicial review under 15 U.S.C. § 78y. *Id.* This structure was underinclusive, the Court stated, because it "provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule." *Id.* Put another way, the Court did "not see how [the accounting firm] could meaningfully pursue [its] constitutional claims" because the conduct it wished to challenge (*e.g.*, the PCAOB's release of the critical report) "is not subject to judicial review." *Id.* at 489-90. Thus, the Court concluded that Congress did not intend to "strip the District Court of jurisdiction over these claims." *Id.* at 491.

The final component of the trilogy, *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), addressed the preclusive effect of the Civil Service Reform Act of 1978 ("CSRA"). The CSRA is a "comprehensive system for reviewing personnel action taken against federal

- 7 -

1    employees." *Id.* at 5 (quotation omitted).  Under the CSRA, an employer seeking to
2    terminate (or pursue certain other adverse employment actions against) a covered employee
3    must provide notice, representation, an opportunity to respond, and a reasoned decision.
4    *Id.* at 5-6.  An employee who disagrees with the agency's decision may seek review by the
5    Merit Systems Protection Board ("MSPB").  *Id.* at 6.  And an employee who disagrees with
6    the MSPB's decision may seek judicial review in the Federal Circuit.  *Id.*

7        In *Elgin*, a male employee was terminated because he hadn't registered with the
8    Selective Service. *Id.* at 6-7.  The employee appealed to the MPSB, arguing that the statute
9    requiring men (but not women) to register with the Selective Service is unconstitutional,
10   but the employee didn't seek further review in the Federal Circuit after the MSPB rejected
11   his claim—instead, he (and others) filed a lawsuit in federal district court raising the same
12   constitutional challenge and requesting various forms of equitable relief, including
13   reinstatement.  *Id.*  The district court concluded it had jurisdiction to resolve the
14   constitutional claim but the Supreme Court reversed, holding that "the CSRA precludes
15   district court jurisdiction over petitioners' claims even though they are constitutional
16   claims for equitable relief."  *Id.* at 8.

17       The Court began by reaffirming that, under *Thunder Basin*, "the appropriate
18   inquiry" when evaluating whether Congress intended to preclude district court jurisdiction
19   "is whether it is 'fairly discernible' from the [statute] that Congress intended [litigants] to
20   proceed exclusively through the statutory review scheme, even in cases in which the
21   [litigants] raise constitutional challenges to federal statutes."  *Id.* at 8-10.  Next, the Court
22   "examined the CSRA's text, structure, and purpose."  *Id.* at 10-11.  After discussing the
23   various forms of review available under the statute, the Court concluded that "[g]iven the
24   painstaking detail with which the CSRA sets out the method for covered employees to
25   obtain review of adverse employment actions, it is fairly discernible that Congress intended
26   to deny such employees an additional avenue of review in district court."  *Id.* at 11-12.  The
27   Court also noted that the CSRA expressly allows employees to assert one particular type
28   of claim in federal district court.  *Id.* at 13 (citing 5 U.S.C. § 7702(b)(2)). The existence of

- 8 -

**ER 12**

this provision, the Court stated, "demonstrates that Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim.  That Congress declined to include an exemption . . . for challenges to a statute's constitutionality indicates that Congress intended no such exception."  *Id.*

The Court also addressed whether a preclusion finding would effectively "foreclose all meaningful judicial review" of the plaintiffs' constitutional claim.  *Id.* at 15-21 (citing *Free Enterprise Fund*, 561 U.S. at 489).  The Court concluded that such a risk was not present, even though "the MSPB has repeatedly refused to pass upon the constitutionality of legislation," because the Federal Circuit, "an Article III court fully competent to adjudicate [constitutional] claims," could address those constitutional claims during the final stage of the statutory review process.  *Id.* at 16-18. The Court also rejected the notion that the Federal Circuit would be hamstrung by an inadequately developed record when conducting this review, explaining that "[e]ven without factfinding capabilities, the Federal Circuit may take judicial notice of facts relevant to the constitutional question" and noting that "we see nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question to which the facts pertain."  *Id.* at 19-21.

II.     Whether It Is "Fairly Discernable" From The FTC Act That Congress Intended To Preclude District Court Jurisdiction Over Axon's Constitutional Challenges

With this backdrop in mind, the Court will turn to the FTC Act.  Nothing in the FTC Act expressly divests district courts of jurisdiction to entertain constitutional claims of the sort raised by Axon in this action, but *Thunder Basin*, *Free Enterprise Fund*, and *Elgin* all recognize that Congress may implicitly preclude such jurisdiction through the enactment of an administrative review scheme.  The question here is whether such intent is "fairly discernable" from the FTC Act.  *Thunder Basin*, 510 U.S. at 207 (citation omitted).

A.     **Text, Structure, And Purpose Of The FTC Act**

Under *Thunder Basin* and its progeny, the first factor to consider when assessing "[w]hether a statute is intended to preclude initial judicial review" is "the statute's

language, structure, and purpose." *Thunder Basin*, 510 U.S. at 207.  This factor strongly supports a finding of preclusion in this case.

The text and structure of the FTC Act closely resemble those of the Mine Act, which was the statutory scheme at issue in *Thunder Basin*.  The FTC Act sets out a detailed scheme for preventing the use of unfair methods of competition.  15 U.S.C. § 45(a)-(b).  Additionally, the FTC Act's enforcement provisions create timelines and mechanisms for adjudicating alleged violations that are similar to those outlined in the Mine Act.  *Compare* 15 U.S.C. § 45(b) *with* 30 U.S.C. § 815.  Finally, and most important, the FTC Act's judicial review process is similar to the Mine Act's, up to and including conferring "exclusive jurisdiction" upon the relevant Court of Appeals to affirm, modify, or set aside final agency orders.  *Compare* 15 U.S.C. § 45(c)-(d) *with* 30 U.S.C. § 816(a).  In *Thunder Basin*, the Supreme Court held that this type of "detailed structure" suggested "that Congress intended to preclude challenges such as the present one."  510 U.S. at 208.  Similarly, in *Elgin*, the Supreme Court held when a statutory scheme sets out in "painstaking detail" the process for aggrieved parties to obtain review of adverse decisions, "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court."  567 U.S. at 11-12.  The FTC Act has a "detailed structure" that includes "painstaking detail" concerning how to seek review, so the same inference arises here.  *Cf. Hill v. SEC*, 825 F.3d 1236, 1242 (11th Cir. 2016) (concluding that a review scheme "materially indistinguishable" from that in *Thunder Basin* demonstrated congressional intent to preclude district court jurisdiction).[3]

The FTC Act also contains a provision authorizing the FTC (but not regulated parties) to file a lawsuit in federal district court.  *See* 15 U.S.C. § 53(a) (authorizing the FTC to "bring suit in a district court of the United States" when certain conditions are satisfied).  In *Thunder Basin*, the Supreme Court stated that an inference of preclusive

---

[3]    In its reply, Axon points out several ways in which the text, structure, and purpose of the FTC Act arguably differ from the text, structure, and purpose of the CSRA.  (Doc. 21 at 4-5.)  However, Axon does not attempt to make such a showing with respect to the Mine Act.

- 10 -

1    effect arose because the Mine Act allowed the Secretary of Labor to file certain claims in

2    district court but "[m]ine operators enjoy no corresponding right."  510 U.S. at 209.  *See*

3    *also Elgin*, 567 U.S. at 13 (provision allowing employees to file claims in district court

4    showed that "Congress knew how to provide alternative forums for judicial review based

5    on the nature of an employee's claim.   That Congress declined to include an

6    exemption . . . for challenges to a statute's constitutionality indicates that Congress

7    intended no such exception.").  So, too, here.

8          Finally, the purpose of the FTC Act suggests that Congress intended to preclude

9    district court jurisdiction.  Congress intended the FTC to act as a successor to the Interstate

10   Commerce Commission and enforce "its broad mandate to police unfair business conduct."

11   *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018).  To that end, "Congress

12   deliberately gave the FTC broad enforcement powers."  *Id.*  This is similar to the Mine

13   Act's purpose of "strengthen[ing] and streamlin[ing] health and safety enforcement

14   requirements," *Thunder Basin*, 510 U.S. 221, as well as the CSRA's purpose of introducing

15   an "integrated scheme of administrative and judicial review" to "replace an outdated

16   patchwork of statutes and rules," *Elgin*, 567 U.S. at 13-14 (citation omitted).  In other

17   words, where Congress acts to introduce a statutory scheme that brings order from chaos,

18   it indicates that Congress intended to preclude district court jurisdiction.  The FTC Act was

19   such an attempt.[4]

20          …

21          …

22

---

23   [4]     This conclusion is bolstered by the slate of recent cases concluding that the SEC's
      authorizing legislation precludes district court jurisdiction over constitutional challenges
24   to the SEC's structure.  *See, e.g., Bennett*, 844 F.3d at 181-82; *Hill*, 825 F.3d at 1242-1245;
      *Tilton v. SEC*, 824 F.3d 276, 282-81 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9, 16-17
25   (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015).  Although those decisions are
      not binding here, their logic is persuasive.  The review provisions of the FTC Act are
26   "materially indistinguishable," *Hill*, 825 F.3d at 1242, and "nearly identical," *Jarkesy*, 803
      F.3d at 16, to those contained in 15 U.S.C. § 78y, which itself resembles the review
27   provisions in the Mine Act.  Thus, the Court is not persuaded by the NCLA's colorful
      argument that *Bennett, Hill, Tilton, Jarkesy,* and *Bebo* were all wrongly decided and this
28   Court should not "follow the herd of courts off the cliff in disregarding the jurisdictional
      significance of *Free Enterprise*."  (Doc. 32-2 at 21.)

1          B.      **Legislative History Of The FTC Act**

2          *Thunder Basin* suggests the second relevant preclusion factor is the underlying

3    statute's legislative history.  510 U.S. at 207.  However, Justice Scalia, joined by Justice

4    Thomas, issued a concurring opinion in *Thunder Basin* objecting to the consideration of

5    legislative history as part of the preclusion analysis, stating that such consideration only

6    "serve[d] to maintain the illusion that legislative history is an important factor in this

7    Court's deciding of cases, as opposed to an omnipresent makeweight for decisions arrived

8    at on other grounds."  *Id.* at 219 (Scalia, J., concurring).

9          The Supreme Court's subsequent decisions in this area, *Free Enterprise Fund* and

10   *Elgin*, did not address (much less focus on) legislative history, and the Supreme Court has

11   issued subsequent opinions in other contexts that reject the use of legislative history as a

12   legitimate interpretative tool.  *See, e.g., Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631

13   (2018) ("[L]egislative history is not the law.  It is the business of Congress to sum up its

14   own debates in its legislation, and once it enacts a statute [w]e do not inquire what the

15   legislature meant; we ask only what the statute means.") (citations and internal quotation

16   marks omitted).  Thus, it is unclear whether this portion of *Thunder Basin* retains validity.

17   Indeed, the FTC does not mention legislative history in its response brief (Doc. 19) and

18   Axon barely mentions it its reply (Doc. 21 at 4 [criticizing the FTC for failing to "point to

19   legislative history for the FTC Act that is similar to the CSRA's"]).

20         In any event, to the extent legislative history remains a relevant consideration, and

21   to the extent it is possible to draw any meaningful conclusions from the FTC Act's

22   legislative history (which the Court doubts), it tends to support the inference that Congress

23   sought to preclude district court jurisdiction over the type of claims presented here.  Judicial

24   review of final, and only final, FTC actions was a component of the FTC Act from its

25   earliest iterations.  *See* Marc Winerman, *The Origins of the FTC: Concentration,*

26   *Cooperation, Control, and Competition*, 71 Antitrust L. J. 1, 4 (2003).  The debate focused

27   on the breadth of judicial review and settled on the standard contained in § 45 to this day:

28   deference to the FTC's findings of fact, but otherwise silent.  *Id.* at 5, 76-77, 80 (discussing

- 12 -

the FTC Act's proponents' "essential faith in the workings of a commission"), 90-92.  It does not appear Congress ever considered amending the FTC Act to route complaints through any process other than administrative proceedings.  *Id.*

C.    **Availability Of Meaningful Review And Associated Considerations**

In *Thunder Basin*, the Supreme Court identified the third preclusion factor as "whether the claims can be afforded meaningful review" and then addressed—in the portion of the opinion concerning this factor—whether the claims were "wholly collateral" to the statute's review provisions and whether the claims fell outside the agency's expertise.  510 U.S. at 207, 212-15.  However, in both *Elgin* and *Free Enterprise Fund*, the Supreme Court seemed to frame the third factor as a conjunctive, three-part test involving consideration of (1) whether a finding of preclusion would foreclose all meaningful judicial review; (2) whether the suit is "wholly collateral" to a statute's review provisions; and (3) whether the claims are "outside the agency's expertise."  *Elgin*, 567 U.S. at 15-16; *Free Enterprise Fund*, 561 U.S. at 489-90.  It is therefore unclear whether these are distinct factors or simply different ways of addressing the same thing.

Although the Ninth Circuit has not resolved this issue, other appellate courts have recognized its "unsettled" nature and concluded that "the most critical thread in the case law is . . . whether the plaintiff will be able to receive meaningful judicial review without access to the district courts."  *Bebo,* 799 F.3d at 774.  *See also Hill*, 825 F.3d at 1245 ("We agree with the Second and Seventh Circuits that the first factor—meaningful judicial review—is 'the most critical thread in the case law.'") (citation omitted).  The Court agrees and will follow the same approach here.

1.    Availability Of Meaningful Review

Axon's overarching argument is that this case "is materially indistinguishable" from *Free Enterprise Fund* and that "the FTC Act affords no meaningful review of Axon's claims outside this lawsuit."  (Doc. 21 at 2-5.)   This argument is unavailing.

As noted, *Free Enterprise Fund* focused on the fact that the PCAOB could engage in some forms of regulatory activity, including the issuance of reports, that were effectively

- 13 -

1    immune from judicial review due to a mismatch in the administrative review scheme—the

2    SEC could only review a "rule or sanction" promulgated by the PCAOB, "and not every

3    Board action is encapsulated in a final Commission order or rule."  561 U.S. at 489.

4        This sort of mismatch is not present under the FTC Act, at least with respect to the

5    constitutional claims Axon seeks to raise here.[5]  Fundamentally, Axon believes the FTC

6    shouldn't be allowed to investigate or challenge its acquisition of Vievu.  Yet these are

7    claims that Axon can present during the pending administrative proceeding—indeed, Axon

8    has now presented them[6]—and then renew, if necessary, when seeking review of the FTC's

9    final cease-and-desist order in a federal appellate court.  Critically, Axon acknowledges

10   that it "could, in theory, raise its constitutional claims on appeal from an adverse

11   Commission order" and merely argues that the availability of such review "is irrelevant"

12   because "the Commission rules do not allow Axon to depose the DOJ officials who

13   participated in the clearance process without first getting the permission of the FTC-

14   appointed ALJ" and "there will be no guarantee of an administrative record that will allow

15   a reviewing court to decide those claims."  (Doc. 21 at 7-8.)  But these are essentially the

16   same arguments the Supreme Court rejected in *Thunder Basin* and *Elgin*, which hold that

17   the eventual availability of review in a federal appellate court—even if preceded by

18   litigation before administrative bodies that refused to consider or develop the constitutional

19   claims—is sufficient.  *Thunder Basin*, 510 U.S. at 213-15 (finding of preclusion warranted

20   because Thunder Basin's "statutory and constitutional claims . . . can be meaningfully

21   addressed in the Court of Appeals," "[e]ven if" the agency has a track record of refusing to

22   consider such claims during the administrative proceeding); *Elgin*, 567 U.S. at 16-21 (no

23   risk that finding of preclusion would foreclose meaningful review, even though "the MSPB

24   _____

25   [5]     During oral argument, Axon emphasized that the Court must conduct an
     independent preclusion analysis as to each of its three constitutional claims.  The Court has
26   done so and concludes, for the reasons discussed below, that Axon may obtain meaningful
     review of each claim through the FTC's administrative framework, that none of the three
27   claims is wholly collateral to the FTC Act's review provisions, and that the FTC's agency
     expertise could be brought to bear on each claim.

28   [6]     *See* FTC Doc. No. D9389, Answer and Defenses of Respondent Axon Enter. Inc.,
     Affirmative Defenses 14-18.  This document is available here.

1   has repeatedly refused to pass upon the constitutionality of legislation," because the Federal

2   Circuit, "an Article III court fully competent to adjudicate [constitutional] claims," could

3   address those claims during the final stage of the statutory review process or remand to the

4   MSPB with instructions to receive the necessary evidence).

5          Similarly, here, if the FTC issues an adverse decision and Axon seeks further

6   review, the Ninth Circuit can take judicial notice of facts that bear upon Axon's

7   constitutional claims.  *Singh v. Ashcroft*, 393 F.3d 903, 905 (9th Cir. 2004) (holding that,

8   even though a statute limited the Ninth Circuit to reviewing the administrative record, "it

9   is nonsense to suppose that we are so cabined and confined that we cannot exercise the

10  ordinary power of any court to take notice of facts that are beyond dispute").  And if the

11  facts needed by the Ninth Circuit are beyond judicial notice, the FTC Act specifically

12  provides that "the court may order such additional evidence to be taken before the [FTC]

13  and to be adduced upon the hearing in such manner and upon such terms and conditions as

14  to the court may seem proper."  15 U.S.C. § 45(c).  In other words, "there is nothing

15  extraordinary in a statutory scheme that vests reviewable authority in a non-Article III

16  entity that has jurisdiction over an action but cannot finally decide the legal question to

17  which the facts pertain."  *Elgin*, 567 U.S. at 19.  *See also Bank of La. v. FDIC*, 919 F.3d

18  916, 925-928 (5th Cir. 2019) (rejecting claim that statute did not provide for meaningful

19  judicial review because the administrative proceedings only allowed "limited discovery").

20         Axon attempts to escape this conclusion by narrowly focusing on particular aspects

21  of the FTC's conduct and arguing that those aspects are effectively immune from judicial

22  review.  For example, Axon argues that "the clearance decision, which put the FTC, rather

23  than the DOJ, in charge of the Axon/Vievu merger," was an effectively unreviewable

24  decision that "caused real harm before any administrative action was filed."  (Doc. 21 at

25  6.)  Axon also contends in a footnote that the mere fact of "being regulated" by the FTC is

26  a cognizable injury.  (*Id.* at 6 n.4.)

27         The problem with these arguments is that they are divorced from the facts of this

28  case.  Even assuming *arguendo* that a company that was investigated by the FTC for

- 15 -

1   acquiring a competitor, spent money complying with the FTC's investigative demands, and

2   ultimately persuaded the FTC not to oppose the acquisition might lack an effective

3   mechanism for challenging the constitutionality of the FTC's investigatory effort (because

4   there would be no administrative proceeding in which to raise those claims), Axon stands

5   in different shoes here.  It didn't file this lawsuit in mid-2018, upon the FTC's initiation of

6   the investigation.  Instead, it filed suit 18 months later, mere hours before the FTC initiated

7   an administrative proceeding against it (which Axon was apparently racing to the

8   courthouse to beat).  Thus, unlike the accounting firm in *Free Enterprise Fund*, which had

9   its reputation impugned by a critical report issued by the PCAOB but could not challenge

10  that report in any subsequent administrative proceeding, here Axon can raise (and has

11  raised) all of its constitutional challenges, including its challenge to the clearance process,

12  during the FTC administrative proceeding[7] and may renew those challenges when seeking

13  review by a federal appellate court.  *See* 15 U.S.C. § 45(c)-(d) (an entity dissatisfied with

14  an FTC cease-and-desist order may seek review in the court of appeals "within any circuit

15  where the method of competition or the act or practice in question was used or where such

16  person, partnership, or corporation resides or carries on business," and the appellate court

17  thereafter has exclusive jurisdiction to "affirm, enforce, modify, or set aside orders of the

18  Commission").

19        Axon also contends that the absence of effective judicial review is demonstrated by

20  the fact that it (like the accounting firm in *Free Enterprise Fund*) filed this lawsuit before

21  the initiation of administrative proceedings.  (Doc. 21 at 3 & n.3.)  This argument overlooks

22  that the plaintiff in *Thunder Basin* also filed a pre-enforcement challenge, yet the Supreme

---

23  [7]        Following oral argument, Axon filed documents showing that the attorneys
24  representing the FTC in the administrative proceeding have refused to comply with Axon's
    requests for discovery pertaining to the FTC/DOJ clearance process.  (Doc. 40.)  These
25  documents do not alter the "meaningful review" analysis for two reasons.  First, the
    documents only reflect the existence of a discovery dispute between counsel that has not
26  yet been brought to the ALJ's attention.  The ALJ could, at least theoretically, side with
    Axon and order the FTC's counsel to produce the requested discovery materials.  Second,
27  even if Axon is barred from seeking clearance-related discovery during the administrative
    proceeding, *Thunder Basin* and *Elgin* hold that the appellate courts' eventual ability to
28  consider constitutional claims during the final stage of the review process and, if necessary,
    remand for additional fact-finding means that "meaningful review" remains available.

- 16 -

**ER 20**

1   Court still concluded that conferring jurisdiction upon the district court would "be inimical
2   to the structure and purpose" of the comprehensive statutory review scheme. *Thunder*
3   *Basin*, 510 U.S. at 781. *Free Enterprise Fund* did not overrule *Thunder Basin* on this point.
4   561 U.S. at 490-91. *See also Hill*, 825 F.3d at 1249 ("[I]t makes no difference that the
5   Gray respondents filed their complaint in the face of an impending, rather than extant,
6   enforcement action. The critical fact is that the Gray respondents can seek full
7   postdeprivation relief under § 78y."); *Great Plains Coop v. Commodity Futures Trading*
8   *Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000) ("Great Plains's complaint is an impermissible
9   attempt to make an 'end run' around the statutory scheme. Allowing the target of an
10  administrative complaint simply to file for an injunction in a federal district court
11  would . . . allow the plaintiff to short-circuit the administrative review process and the
12  development of a detailed factual record by the agency.").

13      Finally, the NCLA identifies three cases—(1) *Lucia v. SEC*, 138 S. Ct. 2044 (2018),
14  (2) *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), and (3) *Veterans for*
15  *Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012)—as purportedly showing that
16  district courts possess jurisdiction to resolve the sort of constitutional challenges Axon
17  seeks to raise here (Doc. 32-2).[8] All three decisions are easily distinguishable.

18      In *Lucia*, the petitioner had been charged with securities law violations by the SEC.
19  138 S.Ct. at 2049-50. During the ensuing administrative proceeding, Lucia sought to raise
20  a constitutional challenge—he argued the SEC ALJ presiding over his case hadn't been
21  appointed in the manner required by the Appointments Clause of Article II of the
22  Constitution. *Id.* This challenge went nowhere during the administrative proceeding
23  (which resulted in the imposition of a $300,000 fine and a lifetime ban from the securities
24  industry), but Lucia renewed it when seeking review by the D.C. Circuit (which also
25  rejected it) and again when seeking review in the Supreme Court. *Id.* at 2050-51. The
26  Supreme Court agreed with Lucia on the merits of his Appointments Clause claim, *id.* at

27

28  _____
    [8]    Axon did not cite *Lucia* or *Shinseki* in its motion or reply but did include one citation
    to *McNary*. (Doc. 15 at 11.)

- 17 -

**ER 21**

2051-55, and then stated that "[t]he only issue left is remedial." *Id.* at 2055. Because Lucia had raised a "timely challenge" by "contest[ing] the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and [the Supreme Court]," the Court concluded he was entitled to a new hearing before a different, properly-appointed ALJ. *Id.* at 2055-56.

It is curious that the NCLA views *Lucia* as supporting Axon's jurisdictional claims. Unlike Axon, the petitioner in *Lucia* didn't file a preemptive lawsuit in federal court when he learned the SEC would be pursuing an administrative proceeding against him. Instead, he raised his constitutional claims during the administrative proceeding and then renewed them when seeking review of the agency's final decision in an appellate court. Indeed, the Supreme Court identified his conscientious compliance with the requirements of the administrative-review scheme as a reason why he was entitled to relief. Although Lucia and his counsel may, understandably, view the relief that was ultimately granted in *Lucia* as less-than-meaningful in practice,[9] the *Lucia* decision itself—to the extent it says anything about implicit preclusion—tends to reaffirm the Supreme Court's holdings in *Thunder Basin* and *Elgin* that eventual review in an appellate court is meaningful review.

Next, in *McNary*, a group of undocumented aliens filed an action in district court asserting that the Immigration and Naturalization Service had committed a pattern and practice of constitutional violations when administering a particular immigration benefit program. 498 U.S. at 483-84. The question presented in *McNary* was whether section 210(e) of the Immigration and Nationality Act ("INA"), "which bars judicial review of individual determinations except in deportation proceedings, also forecloses this general challenge to the INS'[s] unconstitutional practices." *Id.* at 491. The Supreme Court concluded the district court possessed jurisdiction over the pattern-and-practice lawsuit

---

[9]     The NCLA, which "now represents Ray Lucia," argues that his "odyssey belies blithe statements that eventual, possible appellate review is 'meaningful review' for [a claim alleging] a defect in the tribunal itself." (Doc. 32-2 at 14.) Likewise, Axon's counsel stressed during oral argument that a years-long administrative and appellate process that might result in a redo of the entire process couldn't possibly amount to meaningful review. Although the Court doesn't discount these sentiments, they find no support in *Lucia*, *Elgin*, and *Thunder Basin*, which the Court must follow.

- 18 -

because: (1) the plain language of section 210(e) only barred jurisdiction over lawsuits challenging "the denial of an individual application" and thus did not, by implication, encompass "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications" (*id.* at 491-92): (2) the statute also contained a provision requiring appellate courts to limit their review to the administrative record, yet the type of administrative record created in an individual case[10] would be meaningless in a pattern-and-practice case (*id.* at 492-94); and (3) Congress could have mirrored "more expansive" language from other statutes, so its choice to use narrower language in section 210(e) was suggestive of an intent to allow the plaintiffs' claim to proceed (*id.* at 494). Additionally, the Court noted:

> [B]ecause there is no provision for direct judicial review of the denial [of the requested benefit] . . . unless the alien is later apprehended and deportation proceedings are initiated, most aliens denied [the requested benefit] can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation.  Quite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens.

*Id.* at 496-97.

There are at least four reasons why this case is different from, and not controlled by, *McNary*.  First, because *McNary* addressed whether an affirmative jurisdiction-stripping statute encompassed a certain type of claim, the Court performed a textual analysis that turned on the wording of the statutory provision in question.[11]  Here, the question isn't whether Axon's claims fall within some provision of the FTC Act that attempts to strip district courts of jurisdiction over certain categories of claims.  Instead, the question is whether the existence of the regulatory scheme itself evinces an implicit judgment by

---

[10]	Specifically, that record would "consist[] solely of a completed application form, a report of medical examination, any documents or affidavits that evidence an applicant's agricultural employment and residence, and notes, if any, from [a Legalization Office] interview."  *Id.* at 493.

[11]	The provision at issue in *McNary*, codified at 8 U.S.C. § 1160(e)(1), provides: "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection."

Congress that district court jurisdiction should be precluded.  Second, and in a related vein, *McNary* was decided before *Thunder Basin*, *Free Enterprise Fund*, and *Elgin*, which are the key cases addressing the topic of implicit preclusion.  To the extent there is any conflict between *McNary* and the trilogy, the later-decided cases control.  Third, the appellate-review provisions of section 210(e) of the INA and the FTC Act are materially different—the former requires appellate courts to limit their review to the administrative record while the latter specifically allows appellate courts to remand for additional fact-finding.[12]  *Cf. Elgin*, 567 U.S. at 21 n.11 (distinguishing *McNary* because it involved "a statutory review scheme that provided no opportunity for the plaintiffs to develop a factual record relevant to their constitutional claims before the administrative body and then restricted judicial review to the administrative record created in the first instance," whereas "the CSRA review process is not similarly limited").  Fourth, and finally, an adverse jurisdictional ruling in *McNary* would have required the plaintiffs to voluntarily surrender for deportation in order to pursue their claims.  Axon, in contrast, does not have to "bet the farm" to obtain review—it can raise its constitutional claims during the existing administrative proceeding.  *See, e.g., Jarkesy*, 803 F.3d at 20-21 (distinguishing *McNary* on this ground); *Bebo*, 799 F.3d at 775 n.3 (same).

Last, in *Shinseki*, the plaintiffs brought a class action against the Department of Veterans Affairs ("VA"), arguing that "the VA's handing of mental health care and service-related disability claims deprives [the plaintiffs] of property in violation of the Due Process Clause of the Constitution and violates the VA's statutory duty to provide timely medical care and disability benefits."  678 F.3d at 1017.  The Ninth Circuit addressed whether "the

---

[12]     *Compare* 8 U.S.C. § 1160(e)(3)(B) ("Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.") *with* 15 U.S.C. § 45(c) ("If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper.").

- 20 -

Veterans' Judicial Review Act ['VJRA'] . . . deprives us of jurisdiction over these claims."

*Id.* at 1019.  The court explained:

> [T]he VJRA supplies two independent means by which we are disqualified from hearing veterans' suits concerning their benefits.  First, Congress has expressly disqualified us from hearing cases related to VA benefits in [38 U.S.C.] § 511(a) . . . and second, Congress has conferred exclusive jurisdiction over such claims to the Veterans Court and the Federal Circuit.

*Id.* at 1022-23.  With this backdrop in mind, the court concluded the district court lacked jurisdiction over the plaintiffs' first two claims, which related to mental health care (*id.* at 1026-28) and disability benefit claims (*id.* at 1028-32).  However, with respect to the plaintiffs' final claim—a constitutional challenge to the procedures employed by VA regional offices—the court concluded it fell outside the VJRA's jurisdiction-stripping provision because (1) as a textual matter, section 511(a) only precludes judicial review of "'decisions' affecting the provision of benefits to any individual claimants," yet the plaintiffs "do[] not challenge decisions at all.  A consideration of the constitutionality of the procedures in place, which frame the system by which a veteran presents his claims to the VA, is different than a consideration of the decisions that emanate through the course of the presentation of those claims"; and (2) "the VJRA does not provide a mechanism by which the organizational plaintiffs here might challenge the absence of system-wide procedures, which they contend are necessary to afford due process. . . .  Because [the plaintiffs] would be unable to assert [their] claim in the review scheme established by the VJRA, that scheme does not operate to divest us of jurisdiction."  *Id.* at 1033-35 (internal citation omitted).

*Shinseki* is distinguishable for many of the same reasons as *McNary*.  It addressed whether an affirmative jurisdiction-stripping statute should, as a textual matter, be construed to encompass a particular type of claim and emphasized that an adverse ruling would effectively preclude the plaintiffs from ever raising their claim.  Here, the question is whether the FTC Act evinces an implied intent to preclude district court jurisdiction and an adverse ruling wouldn't preclude Axon from raising its claims—it has already done so in the pending administrative proceeding and can renew them, if necessary, when seeking

- 21 -

1  review in an appellate court.

2          2.    Wholly Collateral

3          The next consideration is whether the claim is "wholly collateral" to the statute's

4  review provisions.  Unfortunately, "the reference point for determining whether a claim is

5  'wholly collateral' is not free from ambiguity."  *Bennett*, 844 F.3d at 186.  "Neither *Elgin*

6  nor *Free Enterprise Fund* clearly defines the meaning of 'wholly collateral.'"  *Bebo*, 799

7  F.3d at 773.

8          Since *Elgin*, courts seeking to assess whether a claim is "wholly collateral" have

9  taken two approaches.  *Bebo,* 799 F.3d at 773-74.  First, some courts have looked to "the

10  relationship between the merits of the constitutional claim and the factual allegations

11  against the plaintiff."  *Id.* at 773.  These courts have taken their cue from *Free Enterprise*

12  *Fund*, which concluded that the accounting firm's claims were "wholly collateral" because

13  they were unrelated to "any . . . orders or rules from which review might be sought."  561

14  U.S. at 489-491.  As a result, these courts have concluded that a claim is wholly collateral

15  if the basis for the claim would exist regardless of the merits decision of the agency.  *Hill*

16  *v. SEC*, 114 F. Supp. 3d 1297, 1309 (N.D. Ga. 2015) ("What occurs at the administrative

17  proceeding and the SEC's conduct there is irrelevant to this proceeding which seeks to

18  invalidate the entire statutory scheme."); *Duka v. SEC*, 103 F. Supp. 3d 382, 391 (S.D.N.Y.

19  2015) ("Similarly, [plaintiff] contends that her Administrative Proceeding may not

20  constitutionally take place, and she does not attack any order that may be issued in her

21  administrative proceeding relating to the outcome of the SEC action.") (internal quotations

22  omitted); *Gupta v. SEC*, 796 F. Supp. 2d 503, 513 (S.D.N.Y. 2011) ("These

23  allegations . . . would state a claim even if Gupta were entirely guilty of the charges made

24  against him in the OIP.").  Notably, these courts have either been directly overruled or had

25  their holdings called into serious doubt.  *Hill*, 825 F.3d at 1252; *Tilton*, 824 F.3d at 291.

26          Second, other courts have looked to *Elgin* when evaluating the meaning of "wholly

27  collateral."  *Bebo*, 799 F.3d at 774.  These courts seize on *Elgin*'s conclusion that the claims

28  in that case were not wholly collateral because they were "the vehicle by which [plaintiffs]

- 22 -

**ER 26**

1    seek to reverse the removal decision, to return to federal employment, and to receive

2    compensation."  567 U.S. at 22.  The Courts of Appeals that have chosen between these

3    two approaches have unanimously favored the second approach.  *Bennett*, 844 F.3d at 187

4    ("However, we think the second reading is more faithful to the more recent Supreme Court

5    precedent . . . ."); *Tilton*, 824 F.3d at 288 ("The appellants' Appointments Clause claim

6    arose directly from that enforcement action and serves as an affirmative defense within the

7    proceeding."); *Jarkesy*, 803 F.3d at 23 ("Here, [plaintiff's] constitutional and APA claims

8    do not arise 'outside' the SEC administrative enforcement scheme—they arise from actions

9    the Commission took in the course of that scheme.  And they are the 'vehicle by which'

10   Jarkesy seeks to prevail in his administrative proceeding.") (quoting *Elgin*, 567 U.S. at 22).

11         These approaches can be viewed as two sides of the same inquiry.  *Free Enterprise*

12   *Fund*'s "wholly collateral" finding turned on the fact that the accounting firm's claims were

13   "collateral to any . . . orders or rules from which review might be sought."  561 U.S. at 490.

14   In other words, the fact the accounting firm was seeking to challenge agency action beyond

15   the scope of what was reviewable under the statutory scheme is what rendered its claims

16   collateral.  *Id.*  *Elgin* focused on whether the claims at issue were "the vehicle by which

17   [plaintiffs] seek to reverse" adverse action.  567 U.S. at 22.  That is, both cases looked to

18   whether there was a way for the plaintiff to challenge the agency conduct at issue.  No such

19   vehicle existed in *Free Enterprise Fund*—the claims which the accounting firm sought to

20   bring had no path to judicial review.  In contrast, the *Elgin* plaintiffs did have a path to

21   judicial review and they could have raised their constitutional claims in the course of that

22   path.

23         The best way to harmonize *Free Enterprise Fund* and *Elgin* is to conclude that the

24   "wholly collateral" consideration turns on whether a vehicle exists (or could exist) for the

25   plaintiff ultimately to receive judicial review of its constitutional claim.  If no vehicle

26   exists, the claim is "wholly collateral" to the review scheme, and this consideration would

27   weigh in favor of a district court exercising jurisdiction.  This does "reduce[] the factor's

28   independent significance," but it is "more faithful to the more recent Supreme Court

1    precedent" and harmonizes seemingly discordant case law.  *Bennett*, 844 F.3d at 187.  *See*

2    *also Tilton*, 824 F.3d at 288; *Jarkesy*, 803 F.3d at 27 ("[T]he possibility that [an agency]

3    order in [plaintiff's] favor might moot some or all of his challenges does not make those

4    challenges 'collateral' and thus appropriate for review outside the administrative

5    scheme. . . .  [T]hat possibility [is] a *feature* . . . not a bug.")  (quotation omitted).

6         Given this backdrop, there is no merit to Axon's argument that its constitutional

7    claims are "wholly collateral" to the issues to be adjudicated during the administrative

8    proceeding because its "claims (just like those in *Free Enterprise Fund*) go to the agency's

9    constitutional authority" and "do not 'arise[] out of' an enforcement proceeding."  (Doc.

10   21 at 9-10.)  Because Axon can assert (and already has asserted) its constitutional claims

11   during the administrative proceeding, and because Axon retains the ability to seek further

12   review of those claims in a federal appellate court, those claims are not "wholly collateral"

13   to the FTC Act's review provisions.  This logic also disposes of Axon's contention, raised

14   during oral argument, that its constitutional challenge to the clearance process is "wholly

15   collateral" because the clearance process isn't even enshrined in the FTC Act—Axon's

16   ability to raise this challenge as part of the enforcement proceeding shows it isn't "wholly

17   collateral" under *Elgin*.

18        Finally, one additional clarification is necessary with respect to the concept of

19   "wholly collateral" claims.  Axon's briefing can be interpreted as suggesting its claims are

20   wholly collateral because they are constitutional in nature.  (Doc. 21 at 8-9.)  But in *Elgin*,

21   the Supreme Court expressly rejected "a jurisdictional rule based on the nature of an

22   employee's constitutional claim."  567 U.S. at 15.  Creating such a rule would "deprive the

23   aggrieved employee, the [agency], and the district court of clear guidance about the proper

24   forum for the employee's claims at the outset of the case" because the line between

25   constitutional challenges to statutes and other types of constitutional challenges was "hazy

26   at best."  *Id.*  Likewise, *Elgin* rejected a rule that would have reserved "facial constitutional

27   challenges to statutes" for district courts.  *Id.*  At bottom, "exclusivity does not turn on the

28   constitutional nature of" a claim.  *Id.*  *Thunder Basin* reached a similar conclusion, holding

- 24 -

1   that because a due process challenge "can be meaningfully addressed in the Court of
2   Appeals," the mere fact the plaintiff had asserted a constitutional challenge was insufficient
3   to establish district court jurisdiction.  510 U.S. at 215.

4       *Thunder Basin* and *Elgin*, in short, foreclose the possibility that the Court has
5   jurisdiction over Axon's due process and equal protection claims simply because they are
6   constitutional in nature—*Thunder Basin* precluded jurisdiction over a due process claim,
7   510 U.S. at 215, and *Elgin* precluded jurisdiction over an equal protection claim, 567 U.S.
8   at 7, 16.  *See also Bebo*, 799 F.3d at 768 (district court lacked jurisdiction even though
9   plaintiff sought to challenge a statute as "facially unconstitutional under the Fifth
10  Amendment because it provides the SEC 'unguided' authority to choose which respondents
11  will and which will not receive the procedural protections of a federal district court, in
12  violation of equal protection and due process guarantees").

13      The potential wrinkle is that Axon is also asserting an Article II claim, which was
14  not raised in *Thunder Basin* or *Elgin* but was the claim at issue in *Free Enterprise Fund*.
15  Despite that wrinkle, the logic of *Elgin* extends to preclude jurisdiction over that claim
16  here.  *Elgin* was concerned with a lack of clarity when it came to deciding whether
17  jurisdiction was precluded and rejected "hazy" line drawing.  567 U.S. at 15.  For example:

18      [P]etitioners contend that facial and as-applied constitutional challenges to
19      statutes may be brought in district court, while other constitutional challenges
        must be heard by the [agency].  But, as we explain below, that line is hazy at
20      best and incoherent at worst.  The dissent's approach fares no better.  The
        dissent carves out for district court adjudication only facial constitutional
21      challenges to statutes, but we have previously stated that "the distinction
22      between facial and as-applied challenges is not so well defined that it has
        some automatic effect or that it must always control the pleadings and
23      disposition in every case involving a constitutional challenge.

24  *Id.* (citation omitted).  Axon's Article II claim, at bottom, attacks the for-cause removal
25  protection for FTC commissioners (15 U.S.C. § 41) and ALJs (5 U.S.C. § 7521).  (Doc. 15
26  at 12-14.)  In other words, Axon brings a facial constitutional challenge to a statute.  *Elgin*
27  makes clear that the facial nature of the claim is not, alone, enough to establish district
28  court jurisdiction.  The weight of authority from outside the Ninth Circuit supports this

- 25 -

1    conclusion.  *Hill*, 825 F.3d at 1246 ("Whether an injury has constitutional dimensions is

2    not the linchpin in determining its capacity for meaningful judicial review."); *Jarkesy*, 803

3    F.3d at 403 ("In any case, assuming *arguendo* that Jarkesy put forth a non-delegation

4    doctrine challenge, he is wrong to assign it talismanic significance.  He seems to assume

5    that whenever a respondent in an administrative proceeding attacks a statute on its face, a

6    district court has jurisdiction to hear the challenge, whereas the agency does not.  That is

7    mistaken.").

8                              3.    Agency Expertise

9         "The final consideration within the *Thunder Basin* framework" is whether Axon's

10   claims "fall[] outside the [FTC's] expertise."  *Tilton*, 824 F.3d at 289.  *See also Elgin*, 567

11   U.S. at 22.  This factor looks to "whether agency expertise could be brought to bear on the

12   questions presented."  *Hill*, 825 F.3d at 1251 (internal quotation marks and alterations

13   omitted).  Like the other considerations, this consideration requires a full understanding of

14   the *Thunder Basin* trilogy.

15        *Free Enterprise Fund* concluded that agency expertise played no role because the

16   accounting firm's constitutional claims were not "fact-bound inquiries" and its statutory

17   claims did "not require 'technical considerations of [agency] policy."  561 U.S. at 419

18   (citing *Johnson v. Robison*, 415 U.S. 361, 373 (1974)).  In contrast, *Elgin* rejected the

19   argument that the plaintiffs' constitutional arguments were outside the statutory scope of

20   review because that argument "overlook[ed] the many threshold questions that may

21   accompany a constitutional claim and to which the [agency] can apply its expertise."  567

22   U.S. at 22.  Resolution of substantive arguments that did fall under the agency's expertise

23   in favor of a plaintiff could "avoid the need to reach his constitutional claims."  *Id.*  In other

24   words, the ability to "fully dispose of the case" before reaching the constitutional claims

25   was an example of an agency's expertise being brought to bear.  *Id.*

26        Again, *Free Enterprise Fund* and *Elgin* can be difficult to harmonize.  The Courts

27   of Appeals that have recognized this tension have generally opted to apply *Elgin*'s

28   approach to the agency expertise consideration.  *Bennett*, 844 F.3d at 187-88; *Hill*, 825

- 26 -

1    F.3d at 1250-51; *Tilton*, 824 F.3d at 289-290; *Jarkesy*, 803 F.3d at 28-29; *Bebo*, 799 F.3d

2    at 772-73.  Those courts reasoned that *Elgin* was the latest and more comprehensive

3    assessment of the agency expertise factor, so its interpretation controlled.  In following

4    *Elgin*, those courts concluded that "[agency] expertise can otherwise be brought to bear"

5    and that the plaintiffs' claims, including structural Article II claims, were subject to the

6    statutory review scheme.

7        That said, *Free Enterprise Fund* and *Elgin* must be read as complementary, and thus

8    the question isn't which standard controls, but where Axon's claims fall in the spectrum

9    they create.  The apparent conflict arises because *Elgin*, although its rule is clear, was not

10   dealing with the sort of structural challenge that was raised in *Free Enterprise Fund*.  If

11   *Elgin*'s rule were applied as some courts have described it, agency expertise could be

12   brought to bear in any case, which is an outcome that would conflict with *Free Enterprise*

13   *Fund* and *Thunder Basin*.  On the other hand, carving out a "*Free Enterprise Fund*

14   exception" based on the content of a specific claim would run counter to *Elgin*'s reasoning,

15   which is the Supreme Court's most recent formulation of the agency expertise

16   consideration.

17       The key to harmonizing *Free Enterprise Fund* and *Elgin* is that the agency expertise

18   analysis in *Free Enterprise Fund* was driven by the fact that, for the accounting firm to

19   obtain judicial review through the statutory scheme, it would have had to force the issue

20   by willfully and intentionally violating a rule and then raising the only defense possible—

21   that the agency was unconstitutional.  Only then would the accounting firm's claims be

22   before the SEC and subject to judicial review.  561 U.S. at 491.  In contrast, in *Elgin*, the

23   agency had several avenues through which it could obviate the need to reach a

24   constitutional question.  567 U.S. at 22.

25       The same is true here.  Axon maintains it has done nothing wrong.  The FTC, in

26   applying its own expertise, may agree.  Thus, as in *Elgin*, there may be no need for a federal

27   appellate court to reach Axon's constitutional claims.  Were Axon forced to forego any

28   defense other than its constitutional claims, then, and only then, would Axon be in the same

- 27 -

**ER 31**

1    position as the plaintiff in *Free Enterprise Fund*.  Here, though, Axon has substantive

2    defenses that may obviate the need to reach the constitutional question.  It has not willfully

3    broken a rule in order to vindicate its constitutional claims, nor does it need to do so.  Thus,

4    matters remain that would benefit from the FTC's expertise.

5          Axon argues the FTC cannot bring its expertise to bear because there is no way

6    Axon can win—the FTC is so hopelessly biased that any litigant is doomed to lose.  (Doc.

7    21 at 10.)  Yet even if the FTC incorrectly rules against Axon during the administrative

8    proceeding, "there are precious few cases involving interpretation of statutes authorizing

9    agency action in which [a court's] review is not aided by the agency's statutory

10   construction." *Mitchell v. Christopher*, 996 F.3d 375, 379 (D.C. Cir. 1993).  Additionally,

11   the FTC's alleged win rate is something of a red herring—nothing in the *Thunder Basin*

12   trilogy suggests that a court conducting a jurisdictional-preclusion analysis must begin by

13   gathering statistics concerning the particular agency's "win rate" and then use those

14   statistics as a metric for evaluating whether the review being provided is truly meaningful.[13]

15          …

16          …

17          …

18          …

19          …

20          …

21          …

22          …

─────────────────

23   [13]     In addition to lacking any support in the case law, this approach would also raise

24   practical problems.  For example, although Axon asserts that the FTC has a 100% win rate,
     some law review articles suggest that "FTC opinions that were appealed by losing

25   respondents were reversed 20 percent of the time compared to a 5-percent reversal rate for
     such opinions appealed from district courts [in cases brought by the DOJ's Antitrust

26   Division]."  Terry Calvani & Angela M. Diveley, *The FTC at 100: A Modest Proposal for
     Change*, 21 GEO. MASON L. REV. 1169, 1181 (2014).  During oral argument, Axon argued

27   this law review article is misleading because "it includes cases that go all the way back to
     1976" and there haven't been any appellate reversals of the FTC in recent years.  It is

28   unclear how courts would go about choosing which temporal cutoffs to employ if "win
     rate" statistics were truly part of the analysis.

- 28 -

**ER 32**

1   Accordingly, **IT IS ORDERED** that:

2   (1)   Axon's complaint (Doc. 1) is **dismissed without prejudice** due to a lack of

3   subject matter jurisdiction.

4   (2)   Axon's motion for preliminary injunction (Doc. 15) is **denied as moot**.

5   (3)   The Clerk of the Court shall enter judgment accordingly and terminate this

6   action.

7   Dated this 8th day of April, 2020.

Dominic W. Lanza
United States District Judge

- 29 -

**ER 33**

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **Axon Enterprise Incorporated,** | ) | |
| | ) | No.   **CV-20-014-PHX-DWL** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | April 1, 2020 |
| **Federal Trade Commission,** | ) | 10:06 a.m. |
| **et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC ORAL ARGUMENT**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

Case: 20-15668, 05/01/2020, ID: 11678625, DktEntry: 14, Page 37 of 164
Case 2:20-cv-00014-DWL    Document 44    Filed 04/06/20    Page 2 of 59

2

1

2                          **A P P E A R A N C E S**

3

    For the Plaintiff:
4        Axon Enterprises Incorporated
         By:  **Pamela Beth Petersen**, Esq.
5        17800 North 85th Street
         Scottsdale, Arizona 85255
6
    Telephonically for the Plaintiff:
7        Orrick Herrington & Sutcliffe
         By:  **Antony P. Kim**, Esq.
8             **Garret Garretson Rasmussen**, Esq.
              **Jonathan Adler Direnfeld**, Esq.
9        1152 15th Street NW
         Washington, DC 20005
10
         Orrick Herrington & Sutcliffe
11       By:  **Thomas King-Sun Fu**, Esq.
         777 South Figueroa Street, Suite 3200
12       Los Angeles, California 90017

13   Telephonically for the Defendants:
         U.S. Department of Justice Civil Division
14       By:  **Bradley Thomas Craigmyle**, Esq.
              **Rebecca Marie Cutri-Kohart**, Esq.
15       1100 L. Street NW, Room 11216
         Washington, DC 20005
16
    Telephonically for the New Civil Liberties Alliance:
17       New Civil Liberties Alliance
         By:  **Aditya Dynar**, Esq.
18       1225 19th Street, Suite 450
         Washington, DC 20036
19

20

21

22

23

24

25

**CV-20-014-PHX-DWL – April 1, 2020**

1          (Proceedings begin at 10:06 a.m.)

2          THE CLERK:  Civil case 20-014, Axon Enterprises

3   Incorporated versus the Federal Trade Commission.

4          Time set for telephonic motion hearing.

5          Counsel, please announce your presence for the record.    10:06:40

6          MS. PETERSEN:  Pam Petersen, Your Honor, on behalf of

7   Axon.

8          THE COURT:  Good morning.

9          All right.  Is counsel from the FTC on the line?

10         MR. CRAIGMYLE:  Sorry, I forgot to take myself off    10:06:56

11   mute.

12         This is Bradley Craigmyle for the defendant.  I have

13   with me Rebecca Cutri-Kohart.

14         THE COURT:  All right.  Good morning.

15         All right.  So we are here --    10:07:09

16         And who -- any other counsel on the line?

17         MR. RASMUSSEN:  Yes, other counsel from Orrick on

18   behalf of the plaintiff, Your Honor, Garret Rasmussen.

19         And my colleagues will introduce themselves right now.

20         MR. KIM:  Antony Kim on behalf of Axon.    10:07:32

21         MR. DIRENFELD:  Jonathan Direnfeld on behalf of Axon.

22         MR. FU:  And Thomas Fu on behalf of Axon.

23         THE COURT:  All right.  Mr. Dynar, are you on the

24   phone as well?

25         MR. DYNAR:  Yes, Your Honor, I'm here.  Although I do    10:07:52

Case 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 39 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 4 of 59

4

**CV-20-014-PHX-DWL – April 1, 2020**

1    not wish to speak on behalf of the Amicus.

2            THE COURT:  Okay.  Thank you.

3            And it's my understanding we also have some members of

4    the public and press on the line as well.  So we're happy to

5    let you participate.                                    10:08:07

6            This is sort of uncharted territory in Federal

7    District Court allowing the public to listen in in real time on

8    district court hearings.  But we're going through unusual

9    circumstances, and so I'm very happy that the very important

10   need to have public access to courtroom proceedings was    10:08:23

11   vindicated here and that you're all able to participate.

12           The reason we're here this morning, this case, as was

13   set out in the tentative, was filed earlier this year.  Axon,

14   the plaintiff, has filed a motion seeking a preliminary

15   injunction.  But as part of the briefing process on the motion  10:08:40

16   for preliminary injunction, issues have been raised concerning

17   the Court's subject matter jurisdiction to hear this case.

18   And, in fact, the FTC's briefing largely focused on the

19   jurisdictional issue.

20           On March 10th I issued a tentative order limited to    10:08:59

21   the issue of subject matter jurisdiction.  So everybody has now

22   had ample chance to review that.  The hearing today will be

23   limited to that.

24           And subsequent to that the New Civil Liberties

25   Alliance filed a motion to participate as amici, which I    10:09:17

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 40 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 5 of 59

5

**CV-20-014-PHX-DWL – April 1, 2020**

1    granted.  And I've reviewed their brief as well.

2           So because Axon is the movant, and also because

3    they're the ones who have invoked the Court's jurisdiction, and

4    that's what the issues here are -- today are largely focusing

5    on, I'll let Miss Petersen go first.                                    10:09:37

6           MS. PETERSEN:  Thank you, Your Honor.  Good morning.

7           THE COURT:  And if you could, be even more careful to

8    speak into the microphone, because we have so many telephonic

9    folks participating today.

10          MS. PETERSEN:  I'd like to thank the Court for this       10:09:55

11   oral argument opportunity, and for issuing the tentative ruling

12   sufficiently in advance to really allow a focused presentation

13   on constitutional issues that the Court has acknowledged are

14   substantial and topical.

15          With all due respect, the Court should reconsider its     10:10:09

16   tentative ruling for three primary reasons:

17          First, the Court failed to perform a claim-by-claim

18   *Thunder Basin* analysis which compels the finding of

19   jurisdiction over Axon's constitutional claims, and the

20   severance and dismissal of Axon's Count III merits-based claim.  10:10:27

21          Second, the tentative ruling fails to analyze the

22   substance of Axon's constitutional claims against the issues to

23   be decided on the antitrust merits in the administrative case.

24          The substance of the constitutional claims, if they

25   are inextricably intertwined with the merits, as in              10:10:48

1    *Thunder Basin* and in *Elgin*, there is no district court

2    jurisdiction.  But whereas here, the substance is divorced from

3    the merits and any agency statute, and goes instead to the

4    constitutionality of the presiding officer, or to an agency's

5    general practice or process, district courts in those                    10:11:09

6    circumstances are not stripped of federal question jurisdiction

7    to decide those claims and, in fact, have a duty to do so.

8            Constitutional substance versus individual merits is

9    the way to harmonize the trilogy.

10           And third, the tentative ruling takes the meaningful       10:11:26

11   out of the meaningful review standard, and adopts, contrary to

12   *Free Enterprise*, a possibility of any eventual review test for

13   all constitutional claims, and collapses the wholly collateral

14   and the agency expertise prongs into that same eventual review

15   determination.                                                            10:11:48

16           And as clearly established by the Amicus brief

17   examples in *LabMD* and *Lucia*, eventual review is not the same as

18   meaningful review.

19           And if the tentative ruling sticks, Axon will suffer

20   the same extended, outrageously expensive, multiple round fate    10:12:05

21   against the added backdrop that it can't win in the FTC's

22   inherently biased institutional process.  It's an exercise in

23   futility that forces settlement and prevents these weighty

24   constitutional issues from ever reaching an Article III court

25   at the end of the day.                                                    10:12:29

UNITED STATES DISTRICT COURT

**ER 39**

1    So I think the Ninth Circuit's decision en banc in the

2    *Veterans for Common Sense* case illustrates that in assessing

3    jurisdiction, the Court should examine each claim individually

4    to determine whether the merits are -- whether the claim is

5    entangled so much with the merits or with the statute that is                    10:12:48

6    committed to the agency's determination, or whether instead it

7    rises out of an extra statutory practice or a general practice

8    or procedure unrelated to the individual merits.

9    And so if it's the former, that can be dismissed and

10   severed.  But if it's the latter, the Court should accept               10:13:10

11   jurisdiction.  It's not an all or nothing proposition here.

12   So I'd really like to walk the Court through the three

13   claims of Axon's Complaint, and apply that analysis as I see it

14   to the individual claims.

15   And I'd like to start with our article -- or with our            10:13:26

16   claim III, and just take that off the table from the very

17   beginning, because I think it has caused some confusion and

18   intermixing of inappropriate considerations in terms of the

19   constitutional arguments.

20   So when you apply that substance-based analysis, Axon            10:13:40

21   agrees that the Count III antitrust merits claim should be

22   severed and dismissed.  When we filed this case, there was no

23   administrative proceeding, and so we brought a declaratory

24   judgment claim for a decision on the lawfulness of the

25   acquisition.  And we did that for two primary reasons.              10:14:03

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 43 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 8 of 59

8

**CV-20-014-PHX-DWL – April 1, 2020**

1    One is to avoid any indication that we were trying to

2  delay or avoid the merits, which we certainly were not.

3    And second, to give the FTC the option to try the

4  merits in an Article III court.

5    Now the FTC subsequently decided not to do that.  It          10:14:21

6  filed its own parallel merits based proceeding in the

7  administrative case, which, of course, is what it always does

8  so that it has really that home court advantage.  But we agree

9  that that action divested this Court of jurisdiction over the

10  Count III merits based claim, but only that claim.                   10:14:40

11    And as Your Honor may recall, that as part of the

12  preliminary injunction briefing, we did not rely on Count III

13  as a basis for relief on preliminary injunction.

14    So then if we turn to the two constitutional based

15  claims and look at those independently, I want to start with     10:14:58

16  Count I, which is the clearance process equal protection claim.

17    And the question here is not whether the FTC Act

18  creates an exclusive review scheme for some types of claims.

19  It obviously does.  The question is whether Axon's clearance

20  based claim is one of those.  And it's not.                            10:15:21

21    Fundamentally, Axon's Count I equal protection claim

22  is not based on the antitrust merits, and it exists separate

23  and apart from whatever may happen in the administrative

24  proceedings relating to the merits.  It's about, instead, an

25  uncodified black-box clearance process by which the FTC and the  10:15:38

1   DOJ decide which agency will investigate and prosecute

2   antitrust claims in the first instance, a decision which falls

3   entirely outside of the FTC Act.

4       THE COURT:  I mean, the -- *Elgin* had a similar claim.

5   *Elgin*, the claim was that the actual Selective Service Act

6   violated equal protection because only males had to register

7   and not females.  And so that is also an issue that doesn't

8   really go to the heart of the MSPB's expertise, it was a

9   constitutional claim.

10      And so I'm struggling to figure out how your argument

11  is reconcilable with *Elgin*.

12      MS. PETERSEN:  Yes.  So *Elgin* covered -- it dealt

13  with, under a statutory scheme, a covered employee that was

14  challenging a covered employment action, his termination,

15  right, and was seeking reinstatement relief that was authorized

16  by that statute.

17      And so the merits of the constitutional claim in terms

18  of the sex discrimination case turned on the agency's

19  interpretation of its own statute.  And it really wasn't an

20  outcome determinative thing, depending on how that claim was

21  resolved, he could be reinstated or not reinstated.

22      And so this is what I'm talking about where you have

23  the substance of the constitutional claim when it is

24  intertwined with the merits, or it has to do with the statute,

25  the agency is -- has -- usually interprets and has

10:15:58

10:16:16

10:16:30

10:16:48

10:17:02

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 16 Page: 45 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 10 of 59

10

**CV-20-014-PHX-DWL – April 1, 2020**

1    determinative rights relating to its own statute.  Then there's

2    this intertwined piece that means that there is no district

3    court jurisdiction as an original matter, and that should be

4    decided by the agency.

5          But here you have a situation where this clearance          10:17:25

6    process isn't part of the FTC Act at all.  It's wholly outside

7    of the Act.  And so I don't think you can argue that it's

8    fairly discernible that the FTC -- from the FTC Act, that

9    Congress intended to strip district court jurisdiction over

10   those challenges.  Indeed, it's undisputed that the FTC/DOJ     10:17:44

11   clearance process is not part of any statute, any regulation,

12   or any rule.  And so Congress never considered, let alone

13   addressed such an extra-statutory nonpublic process, it is

14   simply made up between these two agencies with concurrent

15   enforcement jurisdiction.                                        10:18:08

16         And I think when you then turn to the actual text of

17   the statute, which obviously under the analysis we also need to

18   do, the proper place to start really is with *Free Enterprise*.

19   Because as the FTC concedes, it is the SEC review scheme that

20   is the most analogous to the FTC review scheme.  And you've got  10:18:27

21   courts, including, as you've noted in the tentative ruling,

22   that have said that those two statutes are nearly identical or

23   materially indistinguishable.

24         So what the Supreme Court said in *Free Enterprise*

25   relating to that is really very much on point here.  And there   10:18:44

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 46 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 11 of 59

11

1    the Supreme Court rejected the same argument that the

2    Commission is making here, that Section 45 provides an

3    exclusive route to review.

4          The Supreme Court in *Free Enterprise* said, no, when

5    you look at Section 78y, it does not provide an exclusive route  10:19:02

6    to review.  And in analyzing the specific text, the Supreme

7    Court found that not only did that statute not expressly strip

8    the district court of jurisdiction, it didn't do so implicitly

9    either.  And that I think is really a very critical point.

10          So there are other statutes, like 1331, that clearly  10:19:20

11    vest this Court with jurisdiction to hear certain types of

12    claims, and specifically constitutional types of claims, and --

13    where a statute doesn't either expressly or implicitly imply

14    jurisdiction.  And so the Supreme Court, talking about a

15    statute that is the counterpart to the FTC's here, said that it  10:19:39

16    didn't.

17          And then also in that case the court said that -- and

18    emphasized that Section 78y only provided judicial review of

19    Commission action, and not every board action was encapsulated

20    or was going to be encapsulated in a final Commission order or  10:20:00

21    rule.

22          And the same is really true here.  Under Section 45, a

23    party cannot appeal every FTC order.  The FTC Act has exclusive

24    review provisions for some types of claims, but on its face

25    it's limited to cease and desist orders issued by the  10:20:19

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 47 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 12 of 59

12

1    Commission.

2          So it doesn't apply to clearance decisions made by

3    staff before the Commission ever votes out a complaint or

4    appoints an ALJ.  There is no Commission action in the

5    clearance process.                                              10:20:34

6          Nor will this secret pre-suit clearance decision ever

7    see the light of day in any final cease and desist order.  So

8    not only is there not --

9          THE COURT:  Well, I think that's a point I want to

10   focus on.  Because you have raised this argument in the FTC    10:20:50

11   proceeding; correct?  One of the arguments you've made in the

12   pending parallel proceeding is a challenge to the clearance

13   process and how this whole thing is illegitimate.  And if -- I

14   know you think that that's unlikely to prevail, but if you were

15   to prevail, then the whole thing would go away.  And           10:21:08

16   alternatively, if you weren't to prevail, that would be an

17   issue that would be preserved as part of the administrative

18   adjudication that you could then raise in the Ninth Circuit or

19   whatever circuit it is you go to.

20         Is that not correct?                                     10:21:20

21         MS. PETERSEN:  I don't think so, Your Honor.  And a

22   couple reasons why.

23         So first, I do think it's important to clarify that

24   Axon does not concede, as the Court said in the tentative

25   ruling at 16, that it will have every opportunity to raise the 10:21:30

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 48 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 13 of 59

13

1    constitutional challenges in the admin case and any appeal that

2    might follow.  The fact that Axon has been forced to raise its

3    constitutional challenges as affirmative defenses in the

4    administrative case so as not to waive them if this Court does

5    not accept jurisdiction, is not an admission that they can or          10:21:50

6    will be decided in that forum in -- or in a way that's

7    meaningful at the end of the day.

8          THE COURT:  And so on that point, it's just -- I

9    understand the argument, but I, of course, need to follow

10   Supreme Court precedent as best as I can try to understand what      10:22:09

11   the court was saying in its previous cases.

12         And when you read *Thunder Basin*, when you read *Elgin*,

13   there's all sorts of language on how the litigants in those

14   cases also said that, hey, the idea that we can actually

15   litigate these claims at the administrative forum isn't a            10:22:24

16   realistic outcome, because in one case there's evidence that

17   the agency has historically refused to even consider these

18   things.  In any event, agencies don't have the same sort of

19   fact finding abilities and things like that.

20         And the Supreme Court has repeatedly said, it doesn't          10:22:41

21   matter, because when you finally go up to the court of appeals,

22   those Article III judges up there are fully able to evaluate

23   constitutional claims.  If they feel like they need a better

24   evidentiary record, they have all sorts of tools to try to get

25   that evidentiary record.                                             10:22:58

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 4, Page 49 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 14 of 59

14

1      So, again, the arguments you're making here, I

2  understand them, but it seems like they are arguments that the

3  Supreme Court has already considered and rejected in other

4  contexts.

5      MS. PETERSEN:  So I think, again, it has to go back to  10:23:08

6  this analysis that really distinguishes between the substantive

7  merits of the constitutional claim versus the individual merits

8  or what's going to actually be decided in the administrative

9  proceeding.  And both *Elgin* and *Thunder Basin* had situations

10  where it involved the agency statue that it typically was  10:23:24

11  charged with interpreting or constructing, and it was

12  intertwined with the merits in the outcome of those cases.

13  Whereas in *Free Enterprise* and here, it was not.

14      And so I think you have to look at the Constitutional

15  claim, and where it is wholly outside of the statute, and  10:23:42

16  divorced from the merits, there's no sense to have to have this

17  go through the administrative process first.

18      THE COURT:  Let's go through *Elgin* again.  Because,

19  you know, there the underlying statutory scheme has to deal

20  with terminating federal employees or imposing adverse actions  10:24:00

21  on federal employees.  And the defense in that case says, hey,

22  this whole scheme is unconstitutional.  You're not allowed to

23  discipline me for this particular type of violation in the

24  first place because the equal protection clause precludes it.

25      I'm just struggling to see why that is different from  10:24:17

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-5, Page 50 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 15 of 59

15

1   what you're saying here, which is that, even if the FTC has

2   some sort of regulatory authority, the way they're divvying up

3   these cases violates equal protection, so this very proceeding

4   violates my equal protection rights.

5          It just seems to me that -- I know you've made some                    10:24:34

6   arguments on why they're different, but I'm not seeing why

7   they're materially that different.

8          MS. PETERSEN:  So in *Elgin*, at the heart of the case

9   was the interpretation of the statute.  And that was going to

10  make a determination, depending on how that turned out, as to              10:24:48

11  whether or not under the agency statute you could terminate the

12  employee or whether you needed to reinstate them.  So it was

13  combined with each other.

14         So in that circumstance the court held it wasn't

15  wholly collateral and there was some agency expertise that                 10:25:04

16  could be brought to bear with that, because it is in the

17  business of usually interpreting these statutes.

18         And, of course, in *Elgin* you really had a really

19  different purpose of that statute, dealing with all federal

20  employees.  And, of course, concerns about most termination               10:25:20

21  actions can arise constitutional -- various constitutional

22  issues of discrimination in those kinds of things.

23         So there's a concern, obviously, about having them

24  funneled into an agency proceeding for a whole lots of people

25  that work for the Federal Government to be able to provide some           10:25:38

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 51 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 16 of 59

16

1   consistency and whatnot.

2         And those same types of considerations don't apply

3   here.  I mean, unlike the whole federal employees across the

4   country, the FTC has a relatively small number of antitrust

5   merger cases that it considers.  And once these constitutional          10:25:58

6   issues are finally decided, if anybody can survive the process

7   and get to an Article III court at the end of the day, they

8   will be decided for all purposes basically.

9         And I think here it's important to acknowledge, and

10  the Court certainly may not be aware of this development, but          10:26:15

11  the FTC, or at least its complaint counsel staff, have admitted

12  in the administrative case that the clearance process is

13  completely irrelevant to anything in that proceeding.  It's

14  irrelevant to the complaint.  It's irrelevant to the relief

15  requested by the complaint.  And they say irrelevant to Axon's          10:26:37

16  defenses.

17        And so we have -- in that case they have refused

18  across the board discovery.  They have refused to produce any

19  document or any witness relating to the clearance process that

20  would allow Axon to create the factual record to support its          10:26:57

21  constitutional claims.

22        And I'd really like permission to file with the Court

23  complaint counsel's objections that they served on us on March

24  12th of 2020.

25        THE COURT:  That's fine.  You can file that.  And I          10:27:13

Case: 20-15602, 05/01/2020, ID: 11678625, DktEntry: 4-2, Page 52 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 17 of 59

17

**CV-20-014-PHX-DWL – April 1, 2020**

1    think that that's something that I could take judicial notice

2    of.

3          And so I accept what you're saying right here.  But

4    again, didn't that same dynamic occur in *Thunder Basin* and

5    *Elgin,* where the arguments were, hey, these agencies                10:27:25

6    categorically refuse to listen to these constitutional

7    arguments during the administrative proceeding, and the Supreme

8    Court said, still, because the court of appeals can review it,

9    notwithstanding their blind eye toward the claim during

10   administrative proceeding, that's enough to show that           10:27:42

11   meaningful review still exists.

12          MS. PETERSEN:  Well, I think that, again, in those

13   cases the focus was on the intermixing of the constitutional

14   argument.  Because I think the Court's tentative ruling really

15   would, I think, expand certainly what the law that's out there      10:28:00

16   in terms of basically saying that any constitutional claim has

17   to first go through this process, because there's always going

18   to be some type eventual review of something at the end of the

19   day.

20          And I think that that's wholly inconsistent with the        10:28:13

21   ruling in *Free Enterprise*, where the court there found

22   unanimously that there was jurisdiction.  On the jurisdictional

23   point, the court was unanimous.  And so they found that there

24   was district court jurisdiction, that they had jurisdiction to

25   resolve those constitutional claims, which were wholly            10:28:30

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 53 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 18 of 59

18

1   collateral from, and that were constitutional claims that the

2   agencies not only didn't have any expertise about, but they

3   didn't even really have any competence to decide those

4   constitutional claims.

5           And so that's the situation here where you have                    10:28:45

6   something that's wholly divorced from the FTC Act.  And where

7   you have -- again, you have the FTC saying already to us, this

8   is irrelevant, we're not going to give you any discovery.  And,

9   in fact, they've already cited this Court's tentative ruling

10  against us, saying that discovery's not necessary because the    10:29:04

11  appellate court can take judicial notice of relevant facts and

12  direct any discovery that it deems necessary.

13          But that position really is nonsensical, because there

14  are no public facts to take judicial notice of about the secret

15  clearance process.                                                          10:29:24

16          And their outright refusal to give us any discovery

17  ensures that at best there can be a remand and a redo of the

18  whole thing once we get to the court of appeals.  And it's just

19  simply not meaningful review to require a process where we have

20  to -- in this court we could get discovery and it could be       10:29:40

21  fully vetted under Federal Rules of Evidence and Civil

22  Procedure that don't apply in -- the equal protection claim,

23  right, don't apply in the administrative process.  And we

24  wouldn't have these issues where we're going to be absolutely

25  stymied at every step.                                                      10:29:58

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 11, Page 54 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 19 of 59

19

**CV-20-014-PHX-DWL – April 1, 2020**

1       I mean, it really is an admission that it's wholly

2  collateral.  It's an admission that we're not going to decide

3  this, this is not going to be something we're going to deal

4  with in the administrative process.

5       So you've got the FTC taking the position here on the

6  one hand that the administrative process is the exclusive path

7  to resolution of our equal protection claim, and at the same

8  time blocking our ability to meaningfully pursue that claim in

9  the administrative case.  And it simply can't have it both

10  ways.

11       I think that not only in *Free Enterprise* -- and the

12  Amicus brief talks in some detail about the Supreme Court's

13  decision in *McNary* and the Ninth Circuit's en banc decision in

14  Veterans for Common Cause (sic), which I do really think should

15  inform the Court's decision here.

16       And in those cases, both found jurisdiction over

17  constitutional agency challenges that were extra-statutory and

18  not entangled with the individual merits, despite seemingly

19  comprehensive review schemes.  And both of those really focus

20  in on what we are arguing here.  And that is that, where you

21  have a broad pattern or practice kind of a challenge, like they

22  had in *McNary*, or you have an allegation -- a due process

23  allegation in Veterans For Common Cause that goes to the

24  absence of system-wide procedures that were necessary to ensure

25  veterans rights or the proper processing of their claims.

10:30:11

10:30:28

10:30:45

10:31:04

10:31:24

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-4, Page 55 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 20 of 59

20

1      So neither one of them dealt with individual amnesty

2  claim or dealt with an individual claim relating to veterans'

3  benefits.  But looked at instead, where you have constitutional

4  challenges to these overriding processes that are not part of

5  the statute, that then there is jurisdiction as to those        10:31:44

6  claims.

7      And so I would -- I think that the same thing is true

8  here of the FTC/DOJ clearance process, which is entirely absent

9  from the FTC Act, and relates to a process that applies to all

10  merger parties, including Axon, where now we have a facial      10:32:01

11  constitutional challenge to the wholesale lack of procedures

12  necessary to ensure equal protection of rights of similarly

13  situated companies.

14      So I really do think it falls directly into the

15  *Free Enterprise* and *McNary* and the *Veterans for Common Sense*   10:32:15

16  cases.  And I do want --

17      THE COURT:  Let me just ask one question.  I know that

18  this -- we're limited to subject matter jurisdiction today, and

19  this maybe strays a little bit into the merits, which I'm not

20  trying to address today.  But on your challenge to the          10:32:29

21  clearance process, how is that an equal protection claim versus

22  a due process claim?

23      MS. PETERSEN:  Well, we alleged both.  But in terms of

24  equal protection --

25      THE COURT:  What is the class, in other words, that is      10:32:45

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 11, Page 56 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 21 of 59

21

1    being -- how is the government improperly treating certain

2    classes through the clearance decision?  It seems to me that

3    your argument is really, this is a randomizer.  You take -- one

4    day one person will be treated one way, the next day that exact

5    same person will be treated differently.  That sounds like a          10:33:04

6    due process argument to me rather than an argument that based

7    on a particular party or entity's characteristics they're

8    treated unfairly because of who they are.

9         MS. PETERSEN:  Yeah.  Well, the Count I of our

10   Complaint alleges both due process and equal protection.              10:33:18

11        But in terms of the clearance process and what the

12   result is of that, that decision decides a party's fate from

13   there on out, as to whether or not they're going to land in the

14   FTC bucket, which always goes administratively, or whether

15   they're going to land in the DOJ bucket, which has to bring          10:33:39

16   their case in district court with totally different rules and

17   procedures and standards of review once you get to the court of

18   appeals.

19        And so that is treating similarly situated merger

20   companies completely different based on that flip of a coin.         10:33:52

21   Based on, if you lose and you go to the FTC bucket, you're

22   going to lose.  If you win and you go in the DOJ bucket and end

23   up in district court, you at least have a fighting chance in a

24   neutral Article III court.

25        And so it really sets up everything that comes                   10:34:06

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-2, Page 57 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 22 of 59

22

**CV-20-014-PHX-DWL – April 1, 2020**

1   thereafter.

2          And that became really very apparent to us in December

3   of last year when the FTC told us, A, they were going to file

4   an administrative complaint, and B, they made this outrageous

5   blank check demand and said, basically the only way that you          10:34:24

6   can stop us from filing this complaint is if you not only

7   divest Vievu and all of the assets you acquired from that

8   company, which we fully agreed to do up front, you also have to

9   give them your -- the keys to the kingdom.  You have to license

10  your own software, you have to license your own hardware to be          10:34:47

11  used against you with this new -- with this new competitor.

12  And that was a Fifth Amendment taking we believe that

13  absolutely crossed the line.

14          But it's only when you have an administrative agency

15  that is so emboldened and knows it can't lose in its own          10:35:02

16  administrative court that it can overreach in that way and make

17  those types of demands.  And that's the problem.  There is no

18  accountability there.

19          And so before the administrative case was ever filed,

20  we clearly had standing.  Nobody's ever challenged we had          10:35:20

21  standing to file this suit here.  That then, you know, became

22  fully developed, and I think it indicates certainly that it's

23  not inextricably intertwined with the merits.  And like

24  *Free Enterprise,* which dealt with an investigation that had not

25  yet come to fruition and the court found jurisdiction and dealt          10:35:42

UNITED STATES DISTRICT COURT

**ER 55**

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 16, Page 58 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 23 of 59

23

**CV-20-014-PHX-DWL – April 1, 2020**

 1   with those constitutional claims there, we think the same

 2   result should happen here.

 3          THE COURT:  Is it -- is it your position that all of

 4   the courts of appeals that have decided these SEC cases since

 5   trilogy was decided, they all got it wrong?                    10:35:58

 6          MS. PETERSEN:  Yeah, let me switch to then the

 7   second -- the second count, which is the Article II removal

 8   claim.

 9          And, yes, the Commission relies on a handful, right,

10   of the SEC ALJ cases.  And several points I'd like to make     10:36:11

11   about those.

12          One certainly is, at the outset that, if those cases

13   apply at all, they only apply to our Count II removal claim,

14   not to the equal protection clearance process claim.  And so

15   that's another reason why those claims really need to be       10:36:27

16   independently and separately analyzed.

17          But as Chief Roberts said in the *McBride* decision,

18   constitutional questions aren't resolved by a show of hands.

19   And those cases are not controlling on this Court.  They're all

20   outside of the Ninth Circuit, which has yet to rule on this    10:36:45

21   issue.  So this Court really has an opportunity to write on a

22   clean slate there, and we encourage you to do so.

23          But the binding Supreme Court -- binding Supreme Court

24   precedent, and that's *Free Enterprise*, that is controlling.

25   And far from a wrinkle, I mean, it really is the controlling   10:37:01

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 59 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 24 of 59

24

**CV-20-014-PHX-DWL – April 1, 2020**

1    case, we believe, in this matter.

2            And so --

3            THE COURT:  So all of those courts just misunderstood

4    *Free Enterprise* when --

5            MS. PETERSEN:  I think the other courts conflated the          10:37:14

6    meaningful review standard and collapsed, as frankly this

7    Court's tentative ruling does as well, all three of those

8    factors into, is there eventual review?  And that's not what

9    the Supreme Court said.  And the Supreme Court has never

10   collapsed those factors into one.  And it's discussed them on          10:37:31

11   numerous occasions in different cases.  It's only some other

12   circuits that have said, oh, well, the meaningful one is really

13   the most important one.  The Supreme Court hasn't said that.

14   And the analysis --

15           THE COURT:  Well, I mean, just, *Thunder Basin* --           10:37:44

16   because I've read it 10,000 times over the last two months, as

17   I'm sure you have.  The way they frame the issue is they -- on

18   page 207 they lay out three issues.  One, the language

19   structure and purpose; two, the legislative history; and three,

20   whether the claims can be afforded meaningful review.  And then          10:38:05

21   later in the -- under the heading of meaningful review, that's

22   when they talk about wholly collateral.

23           And so, again, for all the reasons -- I've tried to be

24   very transparent in my analysis in the tentative, and

25   everybody's pointed out, the cases can be hard to reconcile.  I          10:38:22

UNITED STATES DISTRICT COURT

**ER 57**

1  nevertheless don't think it's just made up out of whole cloth,

2  that there's reasons to interpret these things as saying,

3  really, this third factor, availability of ultimate meaningful

4  review in a federal court really is a key part of this

5  analysis.                                                        10:38:38

6        MS. PETERSEN:  Well, I think it is a key part of the

7  analysis.  But we also don't believe that eventual review is

8  the same thing as meaningful review.

9        And just like in the *Lucia* case, where you have the

10 situation where you go through the administrative process, you   10:38:50

11 appeal to the SEC, here the FTC, as a first line appeal.  You

12 go up to the court of appeals.  There's an en banc proceeding

13 after that.  You finally get to the Supreme Court.  And once

14 you get to the Supreme Court, *Lucia* won on that Article II

15 appointments clause issue.  And what was the remedy there?  It   10:39:11

16 was to send him back to do a complete do over back in the

17 administrative proceeding again.

18        Well, that after-the-fact remand doesn't at all

19 vindicate the constitutional harm that has already occurred.

20        THE COURT:  Let me -- the question I have for that, I     10:39:28

21 find the emphasis on *Lucia* ultimately not that persuasive,

22 because I understand 100 percent from Mr. *Lucia*'s perspective

23 and his counsel's perspective in this case, that this is

24 something of a Pyrrhic victory at the end of the day, because

25 he didn't really -- you know, all these harms have still        10:39:49

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 61 of 164
Case 2:20-cv-00014-DWL  Document 44  Filed 04/06/20  Page 26 of 59

26

1   occurred.

2         But I'm trying to figure out what the Supreme Court --

3   the Ninth Circuit hasn't ruled on this, so I'm trying to

4   harmonize Supreme Court precedent looking to these out of

5   circuit cases as helpful but not binding authorities.          10:39:58

6         So *Lucia* comes off the trilogy.  If -- when I read

7   *Lucia*, I do not find much suggestion from the decision that the

8   Supreme Court also thought that it was outrageous that this

9   person had to go through and exhaust their claims through the

10  administrative process.  To the contrary, when you read the     10:40:21

11  portion where they talk about it, they sort of say, really good

12  job, Mr. Lucia, you followed the rules that everybody's

13  supposed to follow.  You exhausted these claims through the

14  administrative process, and that's why we are going to give you

15  remedial relief, even if a different litigant who hadn't done   10:40:37

16  it that way might not have gotten the remedy you're seeking

17  here.

18        So I want to be clear, I totally understand why from

19  your perspective and his perspective that's not ultimately a

20  very helpful outcome, but it's hard to read *Lucia* and somehow 10:40:48

21  take from the embers of that decision implicit rejection of

22  what happened in *Elgin* and what happened in *Thunder Basin*.

23        MS. PETERSEN:  Well, I do think that the fact of *Lucia*

24  and it being decided in 2018 is another way to distinguish some

25  of those other SEC cases which all came before that.            10:41:09

1    And I think that post *Lucia* you have the Fifth Circuit

2    who currently has under advisement the *Cochran versus SEC*

3    decision.  And that case was something that very much mirrors

4    our Article II removal claim here.  And the district court said

5    it didn't have jurisdiction, it goes up to the Fifth Circuit,          10:41:29

6    and they said, well, now wait a minute, and they issued a stay,

7    basically preliminary injunction, that the proceedings should

8    not go forward, we're going to take up this issue.

9    And so it decided, at least under the current

10   landscape, that there are substantial questions on the merits         10:41:41

11   and serious legal questions and those types of things.

12   And as this Court notes in its tentative ruling, the

13   Supreme Court now has under advisement the *Seila Law* case, with

14   also a similar Article II removal challenge.

15   And so Axon has presented here a colorable                            10:42:01

16   constitutional claim that is far from settled.  So I don't

17   think those SEC cases carry the day here.

18   THE COURT:  To me the *Seila Law* case, they're

19   just -- obviously they're talking in a broad brush way about

20   similar issues.  But they're very different.  I mean, *Seila Law*      10:42:22

21   is the merits of the Article II claim.  And all of the SEC

22   cases and all of the three trilogy cases are the very different

23   question of who gets to decide those constitutional claims.

24   So who gets to decide to me is very different from

25   merits.  And I'm trying to be very careful that just because I        10:42:39

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 63 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 28 of 59

28

CV-20-014-PHX-DWL – April 1, 2020

1    think the merits are very compelling issues and interesting

2    issues, that shouldn't somehow affect how I address this

3    totally different question of who decides these issues.

4         MS. PETERSEN:  But here when you look at the Count II

5    claim, who gets to decide these issues is the very ALJ that we         10:42:58

6    are contending does not have constitutional authority to hear

7    these claims in the first place.  It's not challenging any

8    individual rule or order of his, it's challenging his ability

9    to sit at all over the case.

10        And you have a constitutional claim there that, you         10:43:16

11   know, based on *Lucia,* and certainly calling out in the dissent

12   the specific that this is going to apply to the removal as

13   well, I mean, it really has teed up that this is a serious

14   issue that's got to be decided here on the merits.

15        And the FTC has no expertise or competence to do that.         10:43:36

16   And the ALJ shouldn't be deciding his own constitutional

17   authority as to whether or not he should sit on the case.

18        And so where you have an unconstitutional officer

19   presiding, whose every action is going to be ultra vires, and

20   that cannot be remedied after the fact on appeal.  The         10:43:58

21   appellate court can only vacate and remand.  So we're going to

22   have this whole do over, multiple round type of situation.  And

23   that doesn't erase the constitutional harm that's already

24   occurred.

25        The constitutional violation is the harm, and the         10:44:13

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 64 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 29 of 59

29

1   process is the penalty.  And that's the problem.  And the

2   Ninth Circuit has clearly said, quoting, *Elrod*, as we've listed

3   both of those cases in our reply, it's well established that

4   the deprivation of constitutional rights unquestionably

5   constitutes irreparable injury.                          10:44:32

6         THE COURT:  How is that consistent with *Lucia*?  I

7   mean, the similar issues there, and they said the remedy was to

8   redo it now that the -- they fixed the problem with how the ALJ

9   has been appointed.

10        I mean, all these arguments are common sense things   10:44:48

11  you're raising that I understand.  But that's not what the

12  Supreme Court did in *Lucia* in terms of a remedy.

13        MS. PETERSEN:  Well, I'm not sure that the remand is

14  really a remedy.  It was an acknowledgement that the --

15        THE COURT:  I mean, I'm just -- the text of *Lucia*, the  10:45:02

16  only issue left is remedial.  And then they go in and they say

17  why -- he is entitled to this remedy because he exhausted the

18  claim.

19        So they called it remedial.  I'm not sure how I can

20  say that this wasn't a remedy.                           10:45:17

21        MS. PETERSEN:  Well, I think you can say that it's not

22  a remedy, because as I just stated, you know, where you already

23  have the deprivation of your constitutional rights by being put

24  through the process to begin with, that can just never be

25  corrected.  Which is why preliminary injunctions and district  10:45:31

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 21, Page 65 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 30 of 59

30

 1   court jurisdictions are important to be able to deal with these

 2   issues up front.  There's no mechanism in the FTC proceeding

 3   for any kind of an interlocutory appeal.  Parties should not be

 4   put through the time and the expense and the reputational

 5   damage with publically-traded companies, like Axon.  I mean,                10:45:47

 6   there's all kinds of considerations relating to your

 7   shareholders.

 8        And what happens in these cases is that there's such

 9   this intense pressure to settle.  And then, of course, once you

10   settle, under the FTC's rules you're silenced, you can no                   10:45:58

11   longer -- you have to waive all of your appellate rights.  And

12   these things evade review all of the time.

13        And so it takes -- last year -- well, not last year.

14   I wanted to point out in something particular to Your Honor's

15   decision where you cite the George Mason Law Review article, on             10:46:19

16   page 25, the Calvani article about the FTC's reversal rate on

17   appeal.  And I really want to point out to the Court that that

18   is an outdated reference, because it includes cases that go all

19   the way back to 1976.  And far from a 20-percent reversal rate,

20   in the past 25 years only two merger cases from Article III                 10:46:42

21   proceedings have even ever been appealed, which is telling in

22   and of itself.  People can't survive this process and go on

23   into the appellate arena.

24        And both of those cases were affirmed under the highly

25   deferential standard of review that applies to these                        10:47:01

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 66 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 31 of 59

31

1    administrative proceedings.

2            So even on appeal the FTC's win rate is 100 percent.

3            And so that 100 percent win rate, it's really not a

4    red herring, respectfully.  It's a statistic and a coercive

5    fact that compels companies to settle because there isn't any          10:47:21

6    hope.  And it makes these important constitutional issues evade

7    review.

8            So we've been kicking around it, it's like the

9    inscription in Dante's Inferno above the gate to hell, you

10   know, right, that says, "Abandon all hope, ye who enter here."         10:47:40

11   Because that's really what it's like.  If you have that coin

12   toss and you lose and you're now the reality is in the FTC's

13   administrative proceedings, there isn't an opportunity for

14   meaningful review.  And very few companies ever survive that

15   process to get to an Article III court at the end of the day.          10:48:00

16           So I think we have to really factor in these real

17   world -- this reality about how this really works in the real

18   world in deciding about whether or not there's actual

19   meaningful review of something.

20           But, again, going back to the count -- the Count II           10:48:14

21   removal claim, our challenge is to the ALJ's general authority

22   to hear the case at all, right, not any specific order or

23   ruling.  So it, like the clearance decision, is not intertwined

24   with the merits or any agency statute.  And, in fact, the ALJ

25   removal provisions are not contained in Article 15 at all,             10:48:36

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 67 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 32 of 59

32

**CV-20-014-PHX-DWL – April 1, 2020**

1    they're in Article 5.  And they're also undisputed.  I mean,

2    nobody disputes that those provisions do not allow for at will

3    removal by the precedent.  So there's nothing to be interpreted

4    there, right.

5         And so this is a claim that really is wholly                    10:48:51

6    collateral to the administrative process, and not subject to

7    meaningful review, as we see it, and certainly as any party

8    that finds itself in the FTC proceedings see it.

9         So the merging parties here are destined at best for a          10:49:15

10   complete do over years later and millions of dollars later.

11   And that just can't be remedied.  And it's not just -- I'm not

12   just saying the expense and the time and whatever, because I

13   recognize that, like under *Standard Oil*, at least in the

14   context of irreparable harm analysis, which I think is really

15   different from meaningful review, but it's more than that,         10:49:35

16   right, it's the reputational harm.  But at bottom it's the

17   constitutional violation of having -- being submitted to an

18   unconstitutional process with an unconstitutional presiding

19   officer, and not -- and that's harm that just simply can't be

20   remedied.                                                           10:49:55

21        So I would submit, Your Honor, that, again, we would

22   request that you reconsider based on these different factors.

23        And there's only one other -- well, two other points

24   I'd like to make.

25        One is that the Court, in a long footnote at the end           10:50:09

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 68 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 33 of 59

33

1   of your decision, talks about the Ninth Circuit's decision in

2   *Ukiah*.  But with respect, I think that the *Veterans for Common*

3   *Sense* case is really the more applicable Ninth Circuit

4   authority here, not *Ukiah*.

5          And in that case, the parties challenged the issuance      10:50:25

6   of an FTC administrative complaint.  It had filed a motion to

7   dismiss with the ALJ in the administrative proceedings and lost

8   there, and then went to district court to try to get a

9   preliminary injunction.  And the injunction was denied, where

10  the court found that the issuance of administrative complaint   10:50:45

11  is not a final agency action.  And that was the teaching of

12  *Standard Oil*.  And the Ninth Circuit affirmed that.

13         But critically, *Ukiah* did not raise any constitutional

14  claim at all, or any other extra-statutory process like Axon

15  raises here.  And Axon is not contesting the FTC's jurisdiction  10:51:05

16  to issue an administrative complaint.  So it really is, I

17  believe, on a different footing.

18         And the last thing I'd like to address is the comment

19  in the Court's tentative ruling about sort of the why wait 18

20  months to bring your claim.  And there really was no            10:51:22

21  unreasonable delay here.  Axon filed within two weeks of the

22  FTC's blank check ultimatum that was made.

23         And had Axon attempted to file back in mid 2018 when

24  the administrative investigation started, the FTC would have

25  been arguing lack of standing, no final agency action,          10:51:47

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 69 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 34 of 59

34

 1    ripeness, all of those kinds of things.

 2           And I think, of course, the Court wants to encourage

 3    parties to cooperate in a federal investigation and not simply

 4    run to court and try to stop it from happening.  And so that's

 5    what we did.                                                    10:52:05

 6           And in order for us to have teed this up earlier, we

 7    would have had to basically refuse to comply with a federal

 8    subpoena and risk contempt or other very serious sanctions in

 9    order to finally get an appealable order that somebody could

10    review.  And *Free Enterprise* holds that a party doesn't have to 10:52:25

11    take that risk, and you don't have to bet the farm.  And in our

12    business that's absolutely what it would have been.

13           From our perspective -- I mean, how does a company

14    whose customers are law enforcement agencies, right, refuse to

15    cooperate with a federal investigation?  I mean, it's not       10:52:42

16    possible.

17           So we determined, of course, that it was in the best

18    interests of our shareholders to cooperate.  You obviously hope

19    for a different result than what happened here.  But the timing

20    of the filing of the Complaint really doesn't affect the        10:52:57

21    jurisdiction analysis.  I mean, we've never taken the position

22    that because we were first to file, that is dispositive in the

23    case.  We specifically say that we don't take that position.

24    You have to look again at the substantive merits of the claim.

25           And so if -- but if the Court had jurisdiction back in    10:53:16

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 79 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 35 of 59

35

1   May of 2018, it has it now.  It's not a use it or lose it

2   proposition.  And so that I think is a red herring.

3          And we did everything that we could do to cooperate.

4   But then when it became clear in December that they were going

5   to file an administrative action and they made this incredible       10:53:35

6   demand relating to our own IP, that we had to make a stand.

7   And it was clear we were never going to get fair treatment in

8   the administrative proceedings on that issue.

9          And we really urge this Court to, therefore, accept

10  jurisdiction so that we can get a full neutral airing of these       10:53:54

11  issues.

12         THE COURT:  I understand all those reasons why you

13  chose to file suit when you did.  But as I understand -- as I

14  understand the -- your position, based on the substantive

15  arguments you're making in the Complaint in the preliminary          10:54:07

16  injunction, that entire 18-month process was unconstitutional

17  because you were being regulated by an unconstitutional agency

18  who went through an unconstitutional process to be decided the

19  one to regulate you in the first place.  Is that correct?

20         MS. PETERSEN:  Well, we're not claiming that the mere         10:54:25

21  fact of regulation is an injuring fact.  I mean, that isn't

22  what we said.  But the clearance process, which puts us in the

23  FTC's bucket for everything that comes after, and then,

24  therefore, ensures the unequal treatment of us from other

25  similarly situated companies in the DOJ's realm in Federal           10:54:44

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 11, Page 71 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 36 of 59

36

1    District Court, that is unconstitutional.

2         THE COURT:  I guess maybe I didn't ask the question

3    very well.

4         The clearance process happened at the very outset of

5    this, if I'm understanding it correctly, before May 2018 when      10:54:59

6    the FTC opened their investigation into you and started making

7    these investigative demands, because that's how they decided

8    between them and the DOJ who was going to handle it.  So

9    everything that happened from May 2018 onward in your view was

10   unconstitutional because the FTC is an unconstitutional agency,    10:55:18

11   and the antecedent process that lead the FTC rather than the

12   DOJ to be the one to be issuing the investigative demands, all

13   of that was unconstitutional as well.

14        MS. PETERSEN:  Yeah.  And we don't -- of course we

15   don't know anything about that actual process because it's not    10:55:33

16   public.  But we believe it to be an irrational one without

17   substantial basis.

18        And whether or not -- certainly at the time that the

19   FTC in December said this is the way this is going to go, we

20   had standing, and those violation -- or that disequal treatment   10:55:52

21   became very real.  And the filing, of course, of the

22   administrative action as well cinches that all up.

23        But it initiates, it all originates with that

24   clearance based decision which, again, isn't Commission action,

25   it's done by their staff, and so it doesn't apply to the          10:56:16

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 73 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 37 of 59

37

1    statute at all.

2         But the timing of any decision that brings to fruition

3    the disproportionate rights between the parties in those two

4    proceedings, whether it's during the investigation alone or

5    whether it's after the proceeding is filed, is the same.          10:56:36

6         THE COURT:  So could you have filed suit in June 2018,

7    one month after the investigation began, and asked me to issue

8    a injunction to halt the FTC from continuing to issue

9    investigative demands because the agency's unconstitutional and

10   the process that led them to regulate you is unconstitutional?    10:56:55

11        MS. PETERSEN:  Right.  And I think that's what I was

12   saying, is that at that point in time the FTC would be taking

13   the position that there's no final agency action, it's not

14   ripe, you don't have standing, we haven't concluded our

15   investigation, whatever it was.  But in December               10:57:08

16   pre-enforcement when they made this blank check demand, that

17   only an agency that's unaccountable and knows it can't lose

18   would make, everything -- clearly the jurisdiction and the harm

19   kicks in then.  And it kicks in unrelated to the administrative

20   process.                                                        10:57:36

21        THE COURT:  So just to go back to my question.  I'm

22   not talking about right when they issued the demand, I'm

23   talking about the 18 or so months that preceded it.  Could you

24   have filed a lawsuit at that point and sought an injunction?

25        MS. PETERSEN:  We could have.                             10:57:50

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 11 Page 73 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 38 of 59

38

CV-20-014-PHX-DWL – April 1, 2020

1      THE COURT:  Would I have had jurisdiction to entertain

2  that lawsuit?

3      MS. PETERSEN:  I think you would have.

4      But because, again, it's the clearance decision that

5  starts this whole process, and that in the FTC way of doing          10:58:01

6  things ensures that you're going to go the administrative

7  route.  And that really is what differentiates similarly

8  situated companies between the two processes.

9      THE COURT:  And I'm not faulting you, I'm just trying

10  to understand the facts and the parties' positions.  And so in      10:58:18

11  your view you were aware of the constitutional injury, and at

12  least in a lot of respects for 18 months, but chose to go

13  through the process in the hope that you would persuade the FTC

14  to stop its opposition of the acquisition because you thought

15  it could be fair during the investigation, and it's only at the    10:58:39

16  end of the process when they made their ultimatum you realized

17  that it was unfair?

18      MS. PETERSEN:  Well, no, Your Honor.  I think -- I

19  mean, from a realistic perspective, when we -- we've never been

20  involved in anything like this before.  We didn't know how this    10:58:52

21  process worked at the beginning.  We didn't know how the

22  clearance process worked or didn't work, and the results of

23  that.  You know, which all sort of came to light as the

24  investigation continued.

25      And as I said, I think we want to have companies            10:59:06

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 74 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 39 of 59

39

```
 1    cooperate with federal investigations.  And in our business

 2    there's no way we could have defied that to tee up some type of

 3    a contempt order in order to challenge that.

 4         And so when it became very clear in December when they

 5    made this blank check ultimatum what our fate was going to be       10:59:24

 6    here, that's really where things coalesced.  But I don't think

 7    that means that there wouldn't have been jurisdiction

 8    necessarily previous to that, but there certainly was at that

 9    point in time.  And that's when we two weeks later filed this

10    case.                                                               10:59:43

11         THE COURT:  All right.  The reason I'm asking that

12    question, it's something that I think is a tricky issue in this

13    case, and I'll be interested in hearing the FTC's perspective

14    on it when it's their turn.

15         But when I think about the three factors that are set         10:59:53

16    out in the trilogy, one of them at least touches upon the

17    availability of meaningful review.  On the one hand, if your

18    injury was solely being subjected to an investigation, where

19    the investigation might not even lead to administrative

20    proceeding, I could see why at that point, that was sort of        11:00:08

21    similar to Free Enterprise Fund.  There there isn't an

22    availability for meaningful review because this might never

23    even get into the administrative forum and, therefore, we don't

24    have any way to vindicate and ultimately raise our

25    constitutional claims in a federal court.                          11:00:24
```

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 11, Page 75 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 40 of 59

40

1     But here where you only filed the lawsuit right when

2   the administrative proceeding was starting, a race to the

3   courthouse on which one would come first, I'm struggling to

4   figure out the legal significance, if any, of that timing for

5   purposes of my jurisdictional analysis.  Because I don't know          11:00:40

6   if it should matter, but the fact is, by the time you filed

7   this lawsuit, it was a foregone conclusion that there was going

8   to be an administrative proceeding where you could raise all

9   these things, and even if you weren't going to win initially,

10  you'd have the right to raise them in a circuit court at the          11:00:57

11  end of it.

12     MS. PETERSEN:  Well, I agree it was a foregone

13  conclusion that they were going to file the enforcement action.

14  I don't agree that it's a foregone conclusion that we were

15  going to be able to raise these claims in a meaningful way in          11:01:08

16  the FTC and get meaningful review to them at the end of the

17  day.  That I really do take issue with, Your Honor.

18     THE COURT:  Okay.

19     MS. PETERSEN:  And I do think in *Free Enterprise* it's

20  important to note that it wasn't just about the board's                11:01:23

21  issuance of this sort of critical report about the firm.

22  Thereafter, it instituted a formal investigation proceeding.

23  And that proceeding was ongoing at the time the Complaint was

24  filed -- that the case was filed.  And the Supreme Court, like

25  I said before, unanimously found jurisdiction in that                  11:01:47

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 44 Page: 76 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 41 of 59

41

1   pre-enforcement setting relating to the situation arising out

2   of the investigation, and did not require that the party see

3   that through fruition to see whether or not they actually

4   brought any claims against them or not, or filed for any

5   enforcement action.  And I think that that's very telling,          11:02:10

6   Your Honor.

7           THE COURT:  All right.  Thank you.

8           All right.  Mr. Craigmyle.

9           MR. CRAIGMYLE:  Thank you, Your Honor.

10          And may it please the Court, Bradley Craigmyle for the      11:02:26

11  FTC and its commissioners.

12          The tentative ruling correctly decided that Congress

13  intended to channel plaintiff's claims through the exclusive

14  review scheme that's set out in the FTC Act.  That review

15  scheme gives courts of appeal exclusive jurisdiction at the end    11:02:40

16  of the administrative proceeding, after a final and adverse

17  cease and desist order.

18          The Supreme Court in *Thunder Basin* and *Elgin* explained

19  that Congress can divest district courts of jurisdiction by

20  channeling claims through an exclusive review scheme that          11:02:54

21  bypasses district court review and allows for direct review in

22  the courts of appeals.

23          The tentative ruling correctly explained that the

24  FTC Act shares all the same hallmarks as the Mine Act, which

25  was an issue in *Thunder Basin*.  So it's fairly discernable that  11:03:08

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 11, Page 77 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 42 of 59

42

1    Congress intended to preclude district court jurisdiction.

2              And I'll hit just a few high points from the FTC Act.

3              It sets out a comprehensive process to adjudicate

4    claims before the agency.  Respondents can put on evidence

5    before a hearing with an ALJ.  They can appeal the ALJ's                11:03:25

6    decision to the Commission.  And ultimately they can appeal

7    from any final and adverse cease and desist order to the courts

8    of appeals.

9              And nowhere in that exclusive review scheme is there a

10   carve out for constitutional claims.  But there is limited            11:03:40

11   jurisdiction in the district courts in situations that do not

12   apply here.

13             In the Amicus brief and opposing counsel in her

14   presentation mentioned that the FTC Act is like the Exchange

15   Act, and they used that as a bridge to *Free Enterprise*, which        11:03:58

16   they claim held that Section 78y is not exclusive.  That

17   argument overreads *Free Enterprise,* which held that 78y did not

18   preclude jurisdiction over a challenge to the Public Company

19   Accounting Oversight Board.  And the tentative correctly

20   pointed out, that holding turned on a mismatch between the             11:04:17

21   claims at issue there and the review scheme.

22             And plus, jurisdiction is claim specific.  As the --

23   as all five courts of appeals that the SEC and ALJ cases have

24   held, 78y is exclusive when there's no mismatch between the

25   claims and the review scheme.                                          11:04:35

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-5, Page 78 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 43 of 59

43

1    So that takes us to the second part of the analysis,

2  whether Congress meant to challenge the types of claims that

3  plaintiff raises here.  And to answer that question the Court

4  looks to three factors.

5    The first is whether the plaintiff can get meaningful          11:04:49

6  judicial review.  The tentative ruling correctly concluded that

7  plaintiff can get meaningful judicial review if necessary at

8  the end of the administrative proceeding.  Plaintiff can raise

9  its constitutional claims before the agency and, in fact, has.

10  And if necessary, it can renew those claims before the courts     11:05:05

11  of appeals.

12    THE COURT:  Let me just jump in -- let me jump in on

13  that point.

14    Miss Petersen stated that, in fact, they have tried to

15  raise the clearance process constitutional claim during the      11:05:17

16  administrative process and the agency has turned around by

17  thumbing their nose at it, refusing to allow evidence

18  concerning it, and basically ignoring it and not allowing it to

19  be addressed on the merits.

20    Do you agree with that characterization?  And if so,          11:05:34

21  how can you harmonize that with the notion that they are

22  currently receiving meaningful review through the

23  administrative process?

24    MR. CRAIGMYLE:  So I'll take those in reverse order,

25  Your Honor.                                                      11:05:50

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 79 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 44 of 59

44

1    The meaningful review goes to meaningful judicial

2    review.  And so opposing counsel mentioned that she would not

3    be able to raise the clearance claim before the court of

4    appeals after a final and adverse cease and desist order.  And

5    I just don't think that's right.                                    11:06:04

6        As Your Honor pointed out, it's preserved before the

7    agency.  The ALJ will ultimately pass on it, and if it's

8    appealed to the Commission, the Commission will pass on it.

9    And if there's a final and adverse cease and desist order,

10   plaintiff is free to renew that claim before the court of       11:06:20

11   appeals that will ultimately decide it.

12       And just to go back to the discovery, I'm not exactly

13   sure the details of all of the discovery in the administrative

14   proceedings, but if the parties do come to an impasse, I

15   believe plaintiff will have the ability to raise those impasses  11:06:36

16   with the ALJ who will decide the discovery disputes.  And

17   ultimately, if plaintiff chooses to appeal the ALJ's decision

18   to the Commission, it can again raise those claims and say the

19   ALJ got these discovery issues wrong, and the Commission will

20   have a chance to pass on those.                                   11:06:58

21       And then ultimately, as the tentative ruling pointed

22   out, if this claim makes it to the court of appeals after the

23   end of the agency procedures, and the court of appeals doesn't

24   think it has the necessary record, even after taking into

25   account judicially noticeable facts, what *Elgin* made clear and   11:07:15

1    what Section 45(c) makes clear, that the court of appeals has

2    every authority to send it back to the agency and say, here's

3    what we need in terms of a factual record, please make that

4    factual record.

5        So I don't think the clearance claim changes the                    11:07:32

6    meaningful judicial review analysis at all.

7        Moving to the second factor --

8        THE COURT:  Let me -- sorry, let me go back to the

9    meaningful review.

10       There's also some discussion in the tentative, and         11:07:47

11   then Miss Petersen's argument here today, about the realities

12   of litigating before the FTC.  They've stated that the FTC has

13   a 100 percent win rate in recent years during the

14   administrative process.  The tentative cites this law review

15   article that says that, well, at least sometimes the FTC       11:08:07

16   ultimately loses on appeal.  And then she argued today that

17   that's true but misleading, because all of the recent cases

18   continue to have a 100 percent win rate for the FTC even on

19   appeal.

20       And so how, if at all, should those considerations         11:08:23

21   factor into my analysis on whether the availability of review

22   here is, in fact, meaningful?

23       MR. CRAIGMYLE:  I don't think those statistics are

24   relevant.  The fact remains that under 45(c) after any final

25   and adverse cease and desist order plaintiff is free to raise  11:08:42

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 81 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 46 of 59

46

**CV-20-014-PHX-DWL – April 1, 2020**

1  these claims before the court of appeals.  And if it tees up,

2  to your questions of law, the court of appeals will be

3  reviewing those claims de novo, it won't be a deferential

4  review as it would be with factual determinations.

5       So I think that there's every chance for meaningful      11:08:59

6  judicial review in the court of appeals.

7       THE COURT:  Okay.

8       MR. CRAIGMYLE:  And moving to the wholly collateral

9  factor, the tentative correctly explained, plaintiffs claim

10 they're not wholly collateral because a vehicle exists for it    11:09:14

11 to ultimately get judicial review.  In other words, it's

12 already in the pipeline for judicial review.

13      And the Article II claims are no different, because at

14 bottom those are a facial constitutional challenge to a

15 statute.  And *Elgin* makes clear that that alone is not enough   11:09:29

16 to establish district court jurisdiction.

17      In the Amicus brief and opposing counsel mentioned the

18 Ninth Circuit's decision in a case called *Shinseki*, so I'll

19 just briefly make a few comments about that.

20      So there an organization challenged the procedures         11:09:47

21 that the VA uses when adjudicating claims for medical benefits.

22 And the Ninth Circuit held that the exclusive review scheme,

23 which funneled the claims through the veterans court and

24 ultimately in the federal circuit, did not preclude

25 jurisdiction because it did not, quote, provide a mechanism by    11:10:04

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 4-6 Page: 82 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 47 of 59

47

```
 1    which the organizational plaintiffs here might challenge the

 2    actions of system-wide procedures.

 3            So, again, what was driving the Court's analysis there

 4    was the inability to raise those claims on appeal.  And it

 5    didn't have anything to do with the substance of the                11:10:20

 6    constitutional claims.

 7            And here plaintiffs claim they're not wholly

 8    collateral because it, quote, filed this suit to vindicate its

 9    Vievu acquisition.  And that's from the Complaint at paragraph

10    11.  That's the very same thing that it's trying to do before      11:10:33

11    the agency.

12            And I'll just make --

13            THE COURT:  Let me just ask, if one thinks about the

14    wholly collateral factor in that way, how is it any different

15    from the factor about ultimate availability of judicial review    11:10:48

16    in the court of appeals?  I mean, if one thinks about wholly

17    collateral as, as long as you're allowed to raise it at some

18    point in the agency proceeding and you can renew it, it's

19    therefore not wholly collateral.  That doesn't seem to be any

20    different from how we're talking about ultimate availability of   11:11:05

21    review.

22            MR. CRAIGMYLE:  Well, I think some of the courts of

23    appeals in the FTC/ALJ cases mention that it's possible that

24    that analysis might dilute its factors significance a little

25    bit.  But I think they rightfully concluded that this line of     11:11:21
```

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-4, Page 83 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 48 of 59

48

CV-20-014-PHX-DWL – April 1, 2020

1   reasoning, this line -- this way of looking at the wholly

2   collateral factor is most consistent with *Elgin*.

3            And the tentative ruling pointed out that there were

4   sort of two ways of looking at the wholly collateral factor.

5   And one was whether the constitutional claims were entangled       11:11:39

6   with the substance of the -- with the substantive claims before

7   the agency, which is what opposing counsel argued should be the

8   proper way to analyze these claims.

9            But all of the courts of appeals who consider those

10  two schools of thought have held that really this boils down to    11:11:58

11  whether the constitutional claims arise out of the enforcement

12  proceedings, and whether there's a vehicle to ultimately raise

13  these in the court of appeals.

14           THE COURT:  So using that here, some of the

15  constitutional claims definitely arise out of the enforcement      11:12:16

16  proceeding.  But just to play devil's advocate, does the claim

17  that the very act of giving out the investigation to the FTC

18  rather than the DOJ, and then the FTC ensuing -- pursuing an

19  18-month period of nonenforcement investigation that may have

20  never culminated in an administrative proceeding, yet              11:12:40

21  nevertheless required Axon to pay $1.6 million in discovery

22  costs, couldn't that be considered wholly collateral?

23           MR. CRAIGMYLE:  I don't think so, Your Honor.  I think

24  at bottom that's a challenge to agency action.  And even if

25  plaintiff had filed suit before the -- months before perhaps      11:13:03

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 84 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 49 of 59

49

CV-20-014-PHX-DWL – April 1, 2020

1    the FTC was going to file its complaint before the

2    administrative body, I think *Thunder Basin* makes clear, that

3    would be a pre-enforcement challenge, and the exclusive review

4    scheme does not carve out pre-enforcement challenges.

5           At bottom, it's really a challenge to agency action          11:13:25

6    that's going to culminate in an order.  And if that order is an

7    adverse cease and desist order, it's welcome to raise those

8    claims again before the courts of appeals.

9           And moving briefly to the agency expertise factor, the

10   tentative ruling correctly concluded that the FTC can acquire      11:13:45

11   its expertise by deciding substantive antitrust issues, and in

12   doing so it might resolve those issues in plaintiff's favor and

13   move into constitutional claims.

14          The Amicus brief claims this possibility shows that

15   plaintiff will not get meaningful judicial review after the       11:13:59

16   administrative proceedings.  But *Elgin* explained that if an

17   agency can apply its expertise by resolving an issue in the

18   plaintiff's favor, and in turn mooting the constitutional

19   issues, that fact suggests that Congress meant to channel the

20   plaintiff's claims through the exclusive review scheme.           11:14:16

21          And I'll briefly respond to plaintiff's primary

22   argument that this case is on all fours with *Free Enterprise*.

23   It's not.  Plaintiff doesn't have to drum up an artificial

24   challenge to raise its constitutional claims.  And it doesn't

25   have to take an additional risk by inviting additional            11:14:33

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 44 Page 85 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 50 of 59

50

CV-20-014-PHX-DWL – April 1, 2020

1   punishment.  Plaintiff is a respondent in an ongoing

2   enforcement proceeding.  All it has to do is raise its claims

3   in that proceeding, and if at the end of the proceeding

4   plaintiff is harmed by a final order, it can appeal to the

5   court of appeals.                                              11:14:48

6           And I'll follow up on just a few more points.

7           THE COURT:  On that point, just, let's do the

8   hypothetical.  Let's say that at the -- if the investigation

9   had not culminated in an enforcement proceeding, how could Axon

10  have ever had any mechanism for getting an Article III judge to  11:15:07

11  weigh in on its claim that the FTC is an unconstitutional

12  agency that is nevertheless burdening it with all of these

13  discovery demands that are expensive, and it shouldn't have to

14  risk being held in contempt in order to raise that

15  constitutional challenge.                                      11:15:27

16          What I'm struggling with is, this case ultimately did

17  lead to administrative proceeding, and now Axon is raising all

18  its constitutional challenges.  But there was a scenario where

19  it didn't play out that way, and I'm just trying to figure out

20  whether the specific facts of this case actually matter for    11:15:43

21  purposes of the implicit preclusion analysis.

22          MR. CRAIGMYLE:  I mean, that would, of course, be a

23  different case had the FTC closed out its investigation and

24  sort of decided nothing to see here.  I'm not sure what -- at

25  that point I'm not sure what remedy Axon will be asking for.    11:16:06

1    So it wouldn't be asking to halt proceedings, because there

2    would be no proceedings.  And I suppose it could point to all

3    of the costs that it incurred in responding to the

4    investigation.  I think there's probably a --

5            THE COURT:  So the hypothetical would be, let's say          11:16:26

6    two months into the investigation, when it was still unclear

7    how the investigation was going to play out, Axon filed a

8    lawsuit with me asking for a preliminary injunction to stop the

9    FTC from peppering it with these subpoenas and investigative

10   demands because what the FTC is doing is unconstitutional for          11:16:47

11   various reasons.

12           Would I have jurisdiction in that scenario under the

13   *Free Enterprise* and *Elgin* and *Thunder Basin*?

14           MR. CRAIGMYLE:  No, I don't think so.  And again,

15   Your Honor, I point you back to *Thunder Basin,* which was a          11:17:06

16   pre-enforcement challenge, and the court said, we can still

17   discern from the statutory review scheme that these sorts of

18   claims are meant to be channeled through the review scheme

19   which allows for review when everything is all said and done.

20           And the Eleventh Circuit in *Hill* also rejected that          11:17:21

21   sort of timing pre-enforcement challenge and said that at

22   bottom this is a challenge to a forthcoming order.

23           So, no, I don't think the Court would have had

24   jurisdiction in that case -- in that hypothetical, rather.

25           THE COURT:  All right.  And I interrupted you, so you          11:17:40

Case: 20-15662  05/01/2020  ID: 11678625  DktEntry: 4  Page: 87 of 164
Case 2:20-cv-00014-DWL  Document 44  Filed 04/06/20  Page 52 of 59

52

1   can continue with the other point you were making.

2           MR. CRAIGMYLE:  Just to follow up, I guess, on the

3   hypothetical.  I don't think that *Standard Oil* would allow you

4   to have jurisdiction under final agency action, and even

5   assuming the costs that might flow from the investigation.  So          11:17:59

6   I think there would be some jurisdictional problems under

7   *Standard Oil* as well.

8           So just to close the loop on a few points in response

9   to opposing counsel's presentation.  She mentioned the Supreme

10  Court's decision in *McNary*.  And there the Supreme Court          11:18:17

11  permitted undocumented aliens to challenge an agency procedure

12  without first going through the procedure.  But it did so

13  because requiring the alien to go through the procedures would

14  require them to voluntarily surrender themselves for

15  deportation, which the court said was, quote, tantamount to a          11:18:33

16  complete denial of judicial review for most undocumented

17  aliens.

18          So *McNary* doesn't change the analysis here.  Plaintiff

19  can get meaningful review.

20          And I guess just to briefly follow up on the          11:18:46

21  discussion about *Lucia*, I think Your Honor is exactly right

22  that *Lucia* made clear that the remedy -- even assuming

23  plaintiff is right on the merits of the claims, the remedy is

24  to send it back to the agency and say, do it again before a

25  properly serving ALJ.  And that supports the *Thunder Basin* and          11:19:07

Case: 20-15662 05/01/2020 ID: 11678625 DktEntry: 11 Page: 88 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 53 of 59

53

1    *Elgin* analysis which says that an Article III court can provide

2    meaningful judicial review and full post-deprivation relief.

3           And there was a little discussion about the *Seila*

4    case.  And again, I think Your Honor has it exactly right.

5    That case deals with who gets to decide, and that's a different          11:19:29

6    question -- excuse me, that question deals -- that case deals

7    with the merits.  What we're talking about here is who gets to

8    decide.  So the jurisdictional question is totally separate

9    from the merits.

10          And unless Your Honor has other questions, we're happy        11:19:47

11   to rest on our briefs and the tentative ruling.

12          THE COURT:  All right.  Thank you.

13          All right.  Miss Petersen.

14          MS. PETERSEN:  Just a couple of quick points here,

15   Your Honor.                                                            11:20:04

16          Counsel argued that the statute didn't have an express

17   carve out for constitutional claims.  And while that's true,

18   that's not the standard.  There is a presumption of district

19   court jurisdiction if there's no discernible intent from

20   Congress to actually strip that jurisdiction.                          11:20:27

21          And so that's really a different -- the different

22   dynamic here.  And there is no discernible intent for a

23   clearance act procedure that's not part of the Act.

24          And so Congress never considered that, as I mentioned

25   before, never addressed it.  And so there is no discernible            11:20:43

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 12, Page 89 of 164
Case 2:20-cv-00014-DWL   Document 44   Filed 04/06/20   Page 54 of 59

54

1    intent.

2          He made a point about, on appeal, the Article III

3    court way at the end of the process reviews decisions of law

4    de novo.  The problem with that is that all of the legal

5    determinations are informed by the facts, which the statute          11:21:05

6    says shall be conclusive.  Is there any evidence to support

7    them?

8          So there is this highly deferential standard of review

9    that applies to all of the facts, that then informs the

10   decisions on the law.  And so that fact in and of itself          11:21:21

11   doesn't make the process meaningful.

12          THE COURT:  Just -- the problem is just, you know, if

13   you were bringing this case in 2011, after *Free Enterprise Fund*

14   and before *Elgin*, I think that argument would have more force,

15   but -- and I'm quoting from *Elgin*, quote, the MSPB has          11:21:40

16   repeatedly refused to pass upon the constitutionality of

17   legislation, unquote.  But nevertheless, the Supreme Court held

18   that meaningful review was available because, quote, an

19   Article III court is fully competent to adjudicate

20   constitutional claims.  And even without fact-finding          11:21:59

21   capabilities, the federal circuit may take judicial notice of

22   facts relevant to the constitutional question.  We see nothing

23   extraordinary in a statutory scheme that vests reviewable

24   fact-finding authority in a non-Article III entity that has

25   jurisdiction over an action but cannot fully decide the legal          11:22:17

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-1, Page 90 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 55 of 59

55

1    question to which the facts pertain.

2         MS. PETERSEN:  Well, if it's reviewable and if it's

3    meaningful reviewable, which is the argument here, is that it's

4    just simply not.

5         *Free Enterprise* was a pre-enforcement challenge, and                    11:22:29

6    there was jurisdiction.  And there wasn't a distinction between

7    constitutional claims.

8         *Elgin*, the parties there asked for sort of an

9    exception, right, for facial constitutional challenges, that in

10   *Elgin* they determined the particular constitutional challenge            11:22:48

11   made in that case was intertwined with the whole termination

12   decision.  Because it went to the merits, it was not excluded.

13        But I don't think you can read *Elgin* to say there's

14   never going to be district court jurisdiction of any facial

15   constitutional challenge.  I mean, it didn't hold that.  That              11:23:04

16   would have overruled *Free Enterprise,* which clearly didn't

17   happen.

18        And then going to Your Honor's hypothetical, which I

19   think really is an important one, and it's one that is really

20   laid out very nicely in the New Civil Liberties Alliance brief.           11:23:18

21   And that is, when you have an agency that's engaging in an

22   unconstitutional process, it's almost worse if they don't

23   decide at the end of the day to file the enforcement action,

24   because now you've put a party through this process, and there

25   is no opportunity for review.  There is no way to remedy at all           11:23:41

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4-5, Page 91 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 56 of 59

56

 1    the constitutional harm, the $1.6 million, as you've noted, in

 2    terms of fees just during the investigation.

 3           And so the FTC acts unconstitutionally and gets away

 4    with it.

 5           THE COURT:  What's your response then --                    11:23:58

 6    Mr. Craigmyle's argument was -- and I know it's a little bit

 7    apples and oranges.  But the general rule in agency law is, the

 8    mere fact of an entity or party having to incur costs as part

 9    of an agency's oversight of it isn't the type of harm that

10    triggers an immediate need -- right to judicial review.          11:24:19

11           MS. PETERSEN:  Well, I think that those cases

12    basically are talking about irreparable injury in a preliminary

13    injunction type of situation.  And I think that, again, is a

14    different kind of a standard than meaningful review.  I don't

15    think that they just meld kind of one into the other.            11:24:35

16           And so whether or not there's irreparable harm is one

17    thing.  Whether there's constitutional harm because your rights

18    have been violated is something else.  And that's what we

19    believe has been established here and why Your Honor should

20    reconsider the ruling.                                           11:24:50

21           THE COURT:  Okay.

22           MS. PETERSEN:  Just one closing thought.

23           I think that if the Court's tentative ruling stands,

24    and you issue it, we believe that it unnecessarily insulates

25    the conduct of administrative agencies from meaningful           11:25:05

Case: 20-15663, 05/01/2020, ID: 11678625, DktEntry: 16, Page 92 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 57 of 59

57

 1  constitutional oversight, and invites continued administrative

 2  overreaching, like we've seen with the FTC here.

 3        And so we'd urge you to reconsider and to accept

 4  jurisdiction of the constitutional claims that we've made.

 5        THE COURT:  Okay.                                    11:25:22

 6        MS. PETERSEN:  Thank you, Your Honor.

 7        THE COURT:  Thank you.

 8        All right.  Well, this was a very helpful argument.  I

 9  thank both counsel for being so well prepared.  It's given me a

10  lot to think about.                                        11:25:30

11        I'll be taking this under advisement.

12        Hope to issue something soon, which is a purposefully

13  ambiguous term.  I'll do it as soon as possible, but you really

14  have given me a lot to think about today.

15        MS. PETERSEN:  Judge, in that respect, I would just    11:25:42

16  note that as part of the tentative ruling you mentioned the

17  May 19th hearing date, which just to update the Court, has been

18  continued to June 23rd by the Commission, and then thereafter

19  stayed for an additional 30 days.

20        So while we certainly do encourage the Court to rule    11:25:58

21  promptly, the urgency in terms of the -- because the

22  proceedings are now stayed for at least the next 30 days, it's

23  more importantly obviously from our perspective that the Court

24  get it right than you rush.

25        THE COURT:  Okay.  Thank you.                          11:26:14

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 4, Page 93 of 164

```
1          MS. PETERSEN:  So thank you.

2          THE COURT:  All right.  Thank you very much.

3          This hearing is adjourned.

4     (Proceedings concluded at 11:26 a.m.)

5

6                              -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:15-cr-05663-05/01/2020 ID: 11678625 DktEntry: 21 Page 94 of 164
Case 2:20-cv-00014-DWL Document 44 Filed 04/06/20 Page 59 of 59

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 6th day of April,

15   2020.

16

17

18
                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

# Exhibit A



# Federal Trade Commission

**Section 5 Revisited:  Time for the FTC to Define the
Scope of Its Unfair Methods of Competition Authority**

**Remarks of Joshua D. Wright**[*]
**Commissioner, Federal Trade Commission**

**at the**

**Symposium on Section 5 of the Federal Trade Commission Act**

**The Willard InterContinental
Washington, D.C.**

**February 26, 2015**

Good afternoon.  Thank you for the kind introduction and warm welcome.  I am

delighted to be here today.  I would like to thank Baker Hostetler, and especially Carl

Hittinger, for organizing this terrific symposium and for the generous invitation to

share my views with you this afternoon.  Events such as this one are no small task to

organize and they serve an incredibly important role in the development of antitrust

and consumer protection law because they offer a vital platform for the honest

exchange of ideas among practitioners, consumer advocates, agency officials, members

---

[*] The views stated here are my own and do not necessarily reflect the views of the Commission or any other Commissioner.  I am grateful to my attorney advisor, Jan M. Rybnicek, for his invaluable assistance in preparing this speech.

of the judiciary, and Congress.  Given the caliber of the panelists at today's event, I have no doubt that we will all walk away having learned something new about Section 5.

I have made no secret of the fact that I believe there is no more important challenge facing the Commission today than finally articulating the appropriate scope and role of the agency's "unfair methods of competition" authority under Section 5. The historical record reveals a remarkable and unfortunate gap between the theoretical promise of Section 5 as articulated by Congress over a century ago and its application in practice by the Commission.  Congress intended Section 5 to play a key role in the Commission's competition mission by allowing the agency to leverage its institutional advantages to develop evidenced-based competition policy.  However, the record suggests that the Commission's use of Section 5 has done very little to influence antitrust doctrine or to inform judicial thinking since the agency's inception.  In order to fulfill Section 5's promise, and finally provide meaning and purpose to the agency's signature competition statute, it is clear that the Commission must first provide a framework for how it intends to use its "unfair methods of competition" authority.

That is why, soon after joining the Commission, I publicly distributed a proposed policy statement outlining my views as to how the Commission should use its Section 5 authority.  My hope was that doing so would start—or at least restart—a conversation on the topic and help the Commission identify areas of consensus upon which we as an agency could build.  I view the release of my proposed policy statement as an

2

**ER 95**

unequivocal success in this regard. In the two years since issuing my policy statement, I have been pleased by the many thoughtful contributions to the marketplace of ideas discussing the scope and role of Section 5. Academics and practitioners have responded to the Section 5 debate with dozens of articles and hundreds of pages of analysis. Current and former Commissioners also have shared their views. Conferences have been held, replies have been written, criticisms leveled, blogs posted, and speeches made—there was even a Section 5 hashtag on Twitter for a few days. The point is, a substantial record has been compiled. These contributions have helped bring several key policy questions into focus and, in my view, positioned the agency to undertake the long overdue task of issuing a policy statement that both strengthens the Commission's ability to target anticompetitive conduct and provides meaningful guidance to the business community about the contours of Section 5.

I would like begin today by briefly taking stock of the Section 5 debate. I would like to summarize the case for formal agency guidance defining the boundaries of Section 5 and dispel a couple of myths about the disadvantages to drawing some meaningful parameters around the Commission's "unfair methods of competition" authority. Beyond taking stock of the current debate, I also would like to share with you what I think is the next logical step in rehabilitating Section 5 and making it a productive member of the competition community as the Commission embarks upon its second century of protecting competition and consumers. Lastly, I would like to

3

**ER 96**

discuss some of my concerns about what is likely to happen to the FTC's Section 5 authority if the Commission fails to provide guidance. I intend to leave time for questions at the end of my remarks, so please do not be shy when that time comes.

Before I get too far along in my comments, however, I am obligated to provide a short disclaimer familiar to most of you, and that is that the views I express today are my own and not necessarily those of the Commission or any of the other Commissioners. With that bit of business out of the way, let's jump right in.

## I. THE CASE FOR FORMAL GUIDANCE DEFINING THE SCOPE OF THE FTC'S "UNFAIR METHODS OF COMPETITION" AUTHORITY

I have shared my views on why the Commission should issue formal guidance defining the parameters of the agency's "unfair methods of competition" authority in countless forums since coming to the Commission.[1] Rather than using my time today to restate each of those arguments in detail again, I would like to quickly touch upon what I view as the most salient points before moving on to what I propose the agency should do as a first step to rehabilitating Section 5 so that it can contribute effectively to the Commission's competition mission as Congress intended.

---

[1] *See, e.g.*, Joshua D. Wright, *Recalibrating Section 5: A Response to the CPI Symposium*, 11 CPI ANTITRUST CHRON., Nov. 2013, *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/recalibrating-section-5-response-cpi-symposium/1311section5.pdf; Joshua D. Wright, Comm'r, Fed. Trade Comm'n, Section 5 Recast: Defining the Federal Trade Commission's Unfair Methods of Competition Authority, Remarks at the Executive Committee of the New York State Bar Association's Antitrust Section (June 19, 2013), http://www.ftc.gov/sites/default/files/documents/public_statements/section-5-recast-defining-federal-trade-commissions-unfair-methods-competition-authority/130619section5recast.pdf.

There are at least two principal reasons the Commission's "unfair methods of competition" authority has not lived up to its Congressional promise, both of which would be solved by formal guidance explaining how the agency intends to implement Section 5 as part of its competition mission. The first reason arises from a combination of (1) the agency's administrative process advantages and (2) the vague and ambiguous nature of the agency's "unfair methods of competition" authority. Together these two characteristics pose a unique barrier to the application of Section 5 in a manner that consistently benefits rather than harms consumers.

The vague and ambiguous nature of Section 5 is well known. Proposed definitions for what constitutes an "unfair method of competition" have varied substantially over time and belief that the modern FTC has now somehow moved beyond this inherent product of its institutional design are no more than wishful thinking. Indeed, for at least the past twenty years, commissioners from both parties have acknowledged that a principled standard for the application of Section 5 would be a welcome improvement. The lack of institutional commitment to a stable definition of what constitutes an "unfair method of competition" leads to two sources of problematic variation in the agency's interpretation of Section 5. One is that the agency's interpretation of the statute in different cases need not be consistent even when the individual Commissioners remain constant. Another is that as the members of the Commission change over time, so does the agency's Section 5 enforcement policy,

leading to wide variations in how the Commission prosecutes "unfair methods of competition" over time.  In short, the scope of the Commission's Section 5 authority today is as broad or as narrow as a majority of commissioners believes it is.

This uncertainty surrounding the scope of Section 5 is exacerbated by the administrative procedures available to the Commission.  Consider the following empirical observation.  The FTC has voted out a number of complaints in administrative adjudication that have been tried by administrative law judges in the past nearly twenty years.  In each of those cases, after the administrative decision is appealed to the Commission, the Commission has ruled in favor of FTC staff and found liability.  In other words, in 100 percent of cases where the administrative law judge ruled in favor of the FTC staff, the Commission affirmed liability; and in 100 percent of the cases in which the administrative law judge ruled found no liability, the Commission reversed.[2]  This is a strong sign of an unhealthy and biased institutional process.  By way of contrast, when the antitrust decisions of federal district court judges are appealed to the federal courts of appeal, plaintiffs do not come anywhere close to a 100 percent success rate—indeed, the win rate is much closer to 50 percent.  Even bank robbery prosecutions have less predictable outcomes than administrative adjudication at the FTC.  One interpretation of these historical data is that the process at the FTC

---

[2] *See, e.g.*, David Balto, *Can the FTC be a Fair Umpire?*, THE HILL (Aug. 14, 2013), http://thehill.com/blogs/congress-blog/economy-a-budget/316889-can-the-ftc-be-a-fair-umpire; Doug Melamed, Comments to Fed. Trade Comm'n Workshop Concerning Section 5 of the FTC Act (Oct. 14, 2008), *available at* http://ftc.gov/os/comments/section5workshop/537633-00004.pdf

stacks the deck against the parties.  Another is that the FTC has an uncanny knack for picking cases; a knack unseen heretofore within any legal institution.  I will allow discerning readers to choose the most likely of these interpretations—but suffice it to say the "case selection" theory requires one to also grapple with the fact that Commission decisions, when appealed, are reversed at a rate four times greater than antitrust opinions by generalist federal judges.[3]

Significantly, the combination of institutional and procedural advantages with the vague nature of the Commission's Section 5 authority gives the agency the ability, in some cases, to elicit a settlement even though the conduct in question very likely may not be anticompetitive. This is because firms typically will prefer to settle a Section 5 claim rather than to go through lengthy and costly litigation in which they are both shooting at a moving target and have the chips stacked against them.  Such settlements also perpetuate the uncertainty that exists as a result of the ambiguity associated with the agency's "unfair methods of competition" authority by encouraging a process by which the contours of Section 5 are drawn through settlements without any meaningful adversarial proceeding or substantive analysis of the Commission's authority.

The second principal reason Section 5 has failed to contribute effectively to the Commission's competition mission is because of the absence of even a minimal level of certainty for businesses.  A stable definition of what constitutes an "unfair method of

---

[3] *See* Joshua D. Wright & Angela M. Diveley, *Do Expert Agencies Outperform Generalist Judges? Some Preliminary Evidence from the Federal Trade Commission*, J. ANTITRUST ENFORCEMENT 1, 16 (2012).

competition" would provide businesses with important guidance about what conduct is lawful and what conduct is unlawful under Section 5. The benefit of added business certainty is less important than ensuring Section 5 enforcement actions—including consents—actually reach and deter anticompetitive conduct rather than chill procompetitive conduct. However, guidance to the business community surely is important. Indeed, the FTC has issued nearly 50 sets of guidelines on a variety of topics, many of them much less important than Section 5, to help businesses understand how the Commission applies the law and to allow practitioners to better advise their clients on how to comply with their legal obligations. Without a stable definition of what constitutes an "unfair method of competition," businesses must make difficult decisions about whether the conduct they wish to engage in will trigger an investigation or worse. Such uncertainty inevitably results in the chilling of some legitimate business conduct that would otherwise have enhanced consumer welfare but for the firm's fear that the Commission might intervene and the attendant consequences of that intervention. Those fears would be of little consequence if the agency's authority was defined and businesses could plan their affairs to steer clear of its boundaries.

Some commentators have asserted that formal agency guidance would too severely restrict the Commission's enforcement mission.[4] They warn that defining the

---

[4] *See, e.g.*, Sharis A. Pozen & Anne K. Six, *Section 5 Guidelines: Fixing a Problem that Doesn't Exist?*, 9 CPI ANTITRUST CHRON., Sept. 2013, *available at* https://www.competitionpolicyinternational.com/section-5-guidelines-fixing-a-problem-that-doesn-t-exist/; Edith Ramirez, Chairwoman, Fed. Trade Comm'n, Unfair Methods and the Competitive Process: Enforcement Principles for the Federal Trade Commission's Next

8

**ER 101**

boundaries of the Commission's "unfair methods of competition" authority would achieve stability and clarity only at the expense of creating an enforcement regime that fails to adequately protection competition.  These commentators instead urge reliance upon the same case-by-case approach that has garnered success in the context of the traditional antitrust law.  Under this view, the scope of the Commission's authority to prosecute unfair methods of competition is best determined by reading the leading cases to identify which enforcement principles the Commission applies when determining whether to prosecute a particular business practice under Section 5.

Although the desire to strike the correct balance between flexibility and certainty is well intended, the so-called common law approach to defining Section 5 is a recipe for unprincipled and inconsistent enforcement and an invitation for an outside institution—the courts or Congress in particular—to define Section 5 for the FTC.  The approach of reading a stack of Section 5 consents elicited from parties bargaining in the shadow of the administrative process advantages for the FTC just discussed to decipher its meaning ultimately offers no certainty and results in a boundless standard under which the Commission may prosecute any conduct as an unfair method of competition.

As I have recently written, this is because reliance upon the common law method for developing "unfair methods of competition" law mistakenly assumes that the

---

Century, Keynote Address at the George Mason Law Review and Law & Economics Center Antitrust Symposium: The FTC: 100 Years of Antitrust and Competition Policy (Feb 13, 2014), *available at* http://www.ftc.gov/system/files/documents/public_statements/314631/140213section5.pdf.

common law virtues that have proved beneficial to the development of the traditional antitrust laws apply equally in the context of Section 5.[5]  They do not.  Fundamental differences between the inputs and outputs of traditional litigation and the inputs and outputs of Section 5 enforcement prevent the common law process from generating meaningful guidance for what constitutes an "unfair method of competition."  But you do not have to take my word for it.  Indeed, the Commission has employed the so-called case-by-case approach for a century and, to date, Section 5 has not meaningfully contributed to competition policy.  In addition to failing to produce any direct and positive influence on antitrust law during that time period, Section 5 cannot point to a single standalone "unfair methods of competition" victory affirmed by a federal appeals court in the modern antitrust era.  One hundred years is ample time for a robust natural experiment to evaluate the virtues of the Commissions' case-by-case approach to Section 5.  The results are in.  The common law method has proven incapable of generating meaningful guidance as to what constitutes an "unfair method of competition."  To expect better results from the same approach is unwise.

Moreover, as I have already mentioned, the Commission has provided guidance in a number of areas of competition and consumer protection law—many of them far less important than the scope of Section 5—without compromising its enforcement agenda.  Consider an obvious example in the arena of competition law, the Horizontal

---

[5]  *See generally* Jan M. Rybnicek & Joshua D. Wright, *Defining Section 5 of the FTC Act: The Failure of the Common Law Method and the Case for Formal Agency Guidelines*, 21 GEO. MASON L. REV. 1287 (2014).

Merger Guidelines, which explain how the antitrust agencies analyze the likely competitive effects of a merger. Those guidelines have proven to be one of the most significant contributions to antitrust law and policy and have greatly benefited the antitrust agencies, the federal courts, and the business community.

Similarly, in response to Congressional criticism about how the FTC was implementing its consumer protection authority under Section 5, and amidst serious threats of shut down the agency, the Commission issued policy statements explaining how it analyzes whether conduct was unfair or deceptive.[6] Today the Commission's deception and unfairness policy statements are widely regarded as a major success *and* serve as a key basis for the Commission to more confidently litigate disputes when its authority is challenged. The FTC should be proud of the fact that it has not reflexively refused to place limits on its own discretion when appropriate. Historically, even if at times under some pressure from Congress, the FTC has embraced limits on discretion both in the name of sound policy and to strengthen the foundation of questionable legal authority. Guidance regarding what precisely constitutes an "unfair method of competition" under Section 5 would similarly improve significantly the FTC's competition mission and shore up an obvious weakness in its authority.

---

[6] *See* FTC Policy Statement on Unfairness (1980), appended to Final Order, Int'l Harvester Co., 104 F.T.C. 949, 1070 (1984), *available at* http://ftc.gov/bcp/policystmt/ad-unfair.htm; FTC Policy Statement on Deception (1983), appended to Final Order, Cliffdale Assocs., Inc. 103 F.T.C. 110, 174 (1984), *available at* http://www.ftc.gov/bcp/policystmt/ad-decept.htm.

11

## II.    THE TIME IS RIPE FOR THE FTC TO VOTE ON THE SCOPE OF THE AGENCY'S "UNFAIR METHODS OF COMPETITION" AUTHORITY

Having summarized the case for formal "unfair methods of competition" guidance, let me turn now turn to the current state of play and what I believe the Commission should do next.  The last two years have witnessed what amounts to a healthy and fruitful public comment period on the appropriate scope and role of the Commission's "unfair methods of competition" authority.  During that time, members of the antitrust bar, academics, consumer advocates, and business stakeholders have together participated in dozens of panel discussions on Section 5 and penned countless articles debating various proposals.  Members of Congress, too, have sent letters to the Commission urging us to act and have even raised the scope of Section 5 as an issue during Congressional hearings.[7]  Commentators have had no shortage of opportunities to weigh in with their views on what the Commission should do with respect to Section 5, as well as to consider and respond to the views offered by others.  And this of course only represents the most recent round of commentary, which necessarily builds on decades of scholarship and debate—much of it offered by experts at today's symposium—as well as a formal workshop on the scope of Section 5 organized by Chairman Leibowitz in 2008.  I do not know of any topic in competition policy that has

---

[7]  *See* Letter from Members of the House and Senate Judiciary Comms. to FTC Chairwoman Edith Ramirez (Oct. 23, 2013), *available at*
http://judiciary.house.gov/_files/news/2013/Signed%20Letter%20to%20FTC.pdf; *Hearing on "The FTC at 100: Where Do We Go From Here?", Before the Subcomm. on Commerce, Manufacturing, and Trade of the H. Comm. on Energy and Commerce*, 113th Cong. 1 (Dec. 3, 2013).

**ER 105**

been deliberated more thoroughly before a policy decision has been made than the scope and role of the Commission's "unfair methods of competition" authority.

Significantly, each of my colleagues at the Commission has also voiced, to varying extents, her opinion about the appropriate scope and role of Section 5.[8] This is a welcome addition to the conversation and one that I do not believe any previous Commission has enjoyed. Importantly, the gap between each Commissioners' views, and indeed the views of an overwhelming majority of commentators generally, appears to be relatively narrow and essentially limited only to the question of how efficiencies should be treated when deciding whether to pursue an enforcement action under Section 5. This is an important milestone and one that I think this Commission should seize upon. I am optimistic that this Commission can finally do what other Commissions have been unable to do: issue agency guidance defining what constitutes an "unfair method of competition" under Section 5. Indeed, as I will elaborate upon in a moment, I believe any of the three primary definitions of an "unfair method of competition" that have been articulated by myself or my colleagues is better than the status quo. As such, if there is consensus within the Commission on any of these three alternative definitions, the Commission ought to vote to adopt that definition for what

---

[8] Interview with Commissioner Terrell McSweeny, MONOPOLY MATTERS (ABA Section of Antitrust Law, Unilateral Conduct Comm.), Fall 2014, at 3, 4; Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, Section 5: Principles of Navigation, Remarks before the U.S. Chamber of Commerce (July 25, 2013), *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/section-5-principles-navigation/130725section5speech.pdf; Ramirez, *supra* note 4; Julie Brill, Comm'r, Fed. Trade Comm'n, Remarks at the Technology Policy Institute Aspen Forum (Aug. 20, 2013), *available at* http://youtu.be/9V_YEu1FIAE.

constitutes an "unfair methods of competition."   And, after 100 years without any meaningful guidance on Section 5 and with Congress watching, it ought to do so now.

With this in mind, next week I intend to put each of the three principal definitions for how to define an "unfair method of competition" up for a vote by the Commission.  The precise language of the three proposed definitions are attached as an appendix to this speech, which will be available on the Commission's website later today.  The three proposed definitions reflect the three definitions of an "unfair method of competition" contemplated by current Commissioners, including myself.   Each proposal includes at its core the element that an "unfair method of competition" under Section 5 requires evidence that the conduct in question "harms or is likely to harm competition significantly" as that term is understood under the traditional federal antitrust laws.  Harm to competition is a concept that is readily understandable and that has been deeply embedded into antitrust jurisprudence since the early part of the last century.  Each of my colleagues has acknowledged that Section 5 should only be used to prosecute conduct that actually is anticompetitive.  This is a significant and welcome area of consensus in light of past commissioners' efforts to use Section 5 to remedy a variety of social and environmental ills unrelated to competition.[9]   This element

---

[9]  *See* Michael Pertschuk, Chairman, Fed. Trade Comm'n, Remarks before the Annual Meeting of the Section of Antitrust and Economic Regulation, Association of American Law Schools (Dec. 27, 1977) (asserting that Section 5 can be used to remedy "social and environmental harms" such as "resource depletion, energy waste, environmental contamination, worker alienation, [and] the psychological and social consequences of producer-stimulated demands").

14

**ER 107**

prevents the Commission from reverting to considering non-economic factors, such as whether the practice harms small business or whether it violates public morals, when deciding whether to prosecute conduct as an "unfair method of competition." Significantly, however, this element also allows the Commission to challenge conduct that, for one reason or another, might not fit within established Sherman Act or Clayton Act precedent, and thus might find resistance initially in the federal courts. In doing so, it allows the Commission to leverage its institutional advantages to develop evidenced-based competition policy that can then shape antitrust doctrine in the federal courts.

The second element of each definition that I will offer for a vote is that Section 5 cannot be used to challenge conduct where there is well-forged case law under the traditional federal antitrust laws. The federal judiciary has provided little lasting guidance on the appropriate scope of Section 5. But, as one court has explained, and many current and former commissioners have acknowledged, this requirement ensures that the Commission will not use Section 5 to shop for favorable law to attack conduct governed by the more rigorous requirements of Section 2 of the Sherman Act.[10] Prosecuting the same or similar conduct under disparate standards blurs the lines between lawful and unlawful commercial behavior and invites the Commission to evade advances in antitrust law designed to protect consumers from false positives and

---

[10] *Boise Cascade Corp. v. FTC*, 637 F.2d 573, 582 (9th Cir. 1980) (stating that where there is "well forged" case law governing the challenged conduct, the Commission cannot prosecute the conduct under Section 5 because doing so might "blur the distinction between guilty and innocent commercial behavior").

**ER 108**

false negatives. Whether well-forged case law exists in any particular case will of course remain within the Commission's discretion, but the requirement nevertheless adds an important measure of stability regarding the agency's "unfair methods of competition" authority.

The area in which each of the three proposed definitions differs is in how efficiencies are treated under Section 5. This is the area in which my colleagues have expressed slightly different preferences. My preferred approach is that Section 5 only be used where there are no cognizable efficiencies present. In my view, where the parties can show cognizable efficiencies the agency is better off challenging the conduct under the traditional antitrust rules that are better designed for balancing. I do not believe the Commission's track record in administrative adjudication—in terms of both substance and process—justifies the view that it has a comparative advantage in cases requiring balancing. I will give my colleagues an opportunity to vote on this proposal, but I will not be surprised if a majority of them view this approach as too restrictive.

The second option incorporates into the definition of "unfair methods of competition" a test my colleague Commissioner Ohlhausen has thoughtfully advocated for as an element of her own policy statement, which requires that any antitrust harm be disproportionate to any cognizable efficiencies.[11]

---

[11] *See* Ohlhausen, *supra* note 8, at 10.

16

The third option requires the Commission to show that the harms are not outweighed by the cognizable efficiencies before bringing an "unfair methods of competition" claim under Section 5. This approach has been pointed to by Chairwoman Ramirez as the appropriate framework to apply for "unfair methods of competition" cases and essentially employs the modern day "rule of reason" when deciding whether conduct violates Section 5.[12] The basic view underlying this definition of an unfair method of competition is that the institutional differences between administrative adjudication and federal court do not require any adjustment to the rule of reason framework. While I do not believe a rule of reason approach is the best available choice, in my view, any of the three potential options I have discussed would be superior to the status quo. Each would create a stable definition for what constitutes and unfair method of competition and tether that definition to modern economics. Accordingly, to be clear, I intend to vote in support of each of these proposals in hopes that one gains the support of a majority of the Commission.

While I am truly hopeful at least one definition of "unfair methods of competition" attracts three votes, I am also acutely aware that optimism in light of a record of a century without guidelines is indulged at my own risk. So what happens next? There are a few possibilities. One possibility is that the Commission defines an

---

[12] *See* Ramirez, *supra* note 4, at 8 ("Our most recent Section 5 cases show that the Commission will condemn conduct only where, as with invitations to collude, the likely competitive harm outweighs the cognizable efficiencies.").

**ER 110**

"unfair method of competition" next week.  Indeed, my hope is that my colleagues will recognize the important consensus that exists on the scope and role of Section 5 and take a modest step in articulating the agency's enforcement policy with respect to Section 5 by adopting one of these three proposed definitions.

A second possibility is that a majority of my colleagues choose to vote "no" on each of these proposals.  That possibility does not require much in the way of additional explanation.  While a "no" vote by the full Commission would be non-public, close observers of the agency will surely take note of the lack of any press release or announcement that the agency at long last has produced Section 5 guidelines.

A third possibility, worse still in my view, is that a majority of Commissioners simply may choose not to vote at all.  Under Commission rules, the full Commission need not vote unless and until a majority has formed.  Thus, it is possible that my motion finds itself languishing in agency procedural purgatory, because Commissioners are not required to vote.  I believe either of these last two possibilities would be a lost opportunity for the FTC and would send the wrong message about the Commission's desire for Section 5 to live up to its Congressional promise.

### III. IF THE COMMISSION FAILS TO ARTICULATE THE SCOPE OF SECTION 5, CONGRESS MAY DEFINE IT FOR THE AGENCY

Not only is the question of what constitutes an "unfair method of competition" particularly ripe for agency action in light of the considerable thought that has been devoted to the issue in recent years, but I also believe that there exists a significant

18

**ER 111**

risk—maybe now more so than at anytime in FTC history—that if the Commission fails to take action to define the scope of the Section 5 soon, Congress may choose to define the statute for the Commission. Indeed, in recent years numerous members of Congress have grown interested in the scope of the Commission "unfair methods of competition" authority and have voiced concerns regarding the absence of any clear standard to which the business community can turn in order to better understand the agency's enforcement policy. Members of both the Senate and House Judiciary Committees have sent Chairwoman Ramirez a letter urging the Commission to finally provide guidance that would make Section 5 enforcement transparent, fair, predictable, and reasonably stable over time. Other members of Congress have raised questions about the vague and ambiguous nature of Section 5 during recent Congressional hearings. I do not believe this interest should be taken lightly, and continued resistance on the part of the Commission to define the parameters of Section 5 could spur legislative action.

If Congress were to define Section 5, it without question would result in a more restrictive definition of what constitutes an "unfair method of competition" than anything the Commission would implement. Indeed, the simplest and most obvious solution Congress might adopt, and one that would have the added benefit for many of harmonizing the powers of the FTC and the Department of Justice's Antitrust Division, would be to define an "unfair method of competition" under Section 5 as a violation of the Sherman Act or Clayton Act. A slightly broader, and just as simple solution for

19

**ER 112**

Congress would be to define an unfair method as either a violation of the Sherman Act or Clayton Act or an invitation to collude. A third possibility, and one that attacks the Section 5 problem not from a standpoint of substance but rather of procedure, would be for Congress to remove the Commission's administrative advantages altogether and allow the federal courts to supervise the Commission's use of Section 5 and define the boundaries of what constitutes an "unfair method of competition" when necessary. Although at one point this might have seemed like an unlikely option, recent legislative proposals stripping the agency of its administrative powers in the context of merger challenges in order to align the preliminary injunction standards between the FTC and the Department of Justice suggest that this might not be so farfetched of a possibility.[13]

In short, if the FTC continues to refuse to define what constitutes an "unfair method of competition," it should not be surprised when and if Congress becomes intensely interested in introducing legislation to finally solve a problem created more than a century ago. A solution to the Section 5 problem is inevitable. It is my sincere hope that this Commission seizes the opportunity it has before it now to solve the Section 5 problem on its own terms rather than leaving the solution to Congress.

Thank you for your time. I am happy to take any questions.

---

[13] *See* Brent Kendall, *A Challenge to the FTC Methods*, WALL STREET JOURNAL (Nov. 15, 2014), http://www.wsj.com/articles/a-challenge-to-ftc-methods-1416184116; *Hearing on the SMARTER Act of 2014 Before the Subcomm. on Regulatory Reform, Commercial and Antitrust Law of the H. Comm. on the Judiciary*, 113th Cong. 2 (Apr. 3, 2014); Joshua D. Wright, Comm'r, Fed. Trade Comm'n, Judging Antitrust, Remarks at the Global Antitrust Institute Invitational Moot Court Competition (Feb. 21, 2015), *available at* http://www.ftc.gov/system/files/documents/public_statements/626231/150221judgingantitrust-1.pdf (expressing support for the passage of the SMARTER Act).

# APPENDIX

<u>Option 1 – Efficiencies Screen</u>
An "unfair method of competition" is an act or practice (1) that harms or is likely to harm competition significantly, (2) that lacks cognizable efficiencies, and (3) for which there is not well-forged case law under the traditional antitrust laws that might cause the distinction between lawful and unlawful commercial behavior to become blurred.

<u>Option 2 – Disproportionality Test</u>
An "unfair method of competition" is an act or practice (1) that harms or is likely to harm competition significantly, (2) where the harms are disproportionate to the cognizable efficiencies, and (3) for which there is not well-forged case law under the traditional antitrust laws that might cause the distinction between lawful and unlawful commercial behavior to become blurred.

<u>Option 3 – Rule of Reason</u>
An "unfair method of competition" is an act or practice (1) that harms or is likely to harm competition significantly, (2) where the harms are not outweighed by the cognizable efficiencies, and (3) for which there is not well-forged case law under the traditional antitrust laws that might cause the distinction between lawful and unlawful commercial behavior to become blurred.

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Axon Enterprise, Inc.,

          Plaintiff,

v.

Federal Trade Commission, et al,

          Defendants.

No. 2:20-cv-00014-PHX-DWL

**DECLARATION OF ANTONY P. KIM**

I, Antony P. Kim, declare as follows:

1.      I am a competent adult and have personal knowledge of the following facts.

2.      I am a partner at the law firm of Orrick, Herrington & Sutcliffe LLP, and am resident in the firm's Washington D.C. office.  I represent Axon as outside counsel in connection with *Axon Enterprise, Inc. v. Federal Trade Commission, et al.*, Case No. 2:20-cv-00014-PHX-DWL, which filed in the U.S. District Court for the District of Arizona on January 3, 2020.

3.      I have represented clients and practiced before the U.S. Federal Trade Commission in connection with various competition and consumer protection matters for over 16 years.

4.      Attached hereto as Ex. A is a chart that I prepared based on information from the U.S. Federal Trade Commission's web-page that lists the agency's internal adjudicative "Part 3 Proceedings," *available at* https://www.ftc.gov/enforcement/cases-

proceedings/adjudicative-proceedings, as of January 9, 2020 at 12:00 pm Eastern. As set forth in that chart, the information in Columns A-D was copied directly from the aforementioned web-page and relates to internal administrative, adjudicative proceedings that were updated at the Federal Trade Commission between January 1, 2015 through the present. Based on my review of the dockets in connection with each such proceeding, I added the information in Columns E, F and G in the chart, indicating, respectively, (a) whether the administrative law judge (ALJ) made a finding of liability against respondent(s), (b) whether the Commission (in response to an appeal from the ALJ's Initial Decision, or in response to a motion for summary disposition made by the parties) made a finding of liability against respondent(s), and (c) whether the proceeding therefore resulted in a "win" (i.e., a finding of liability) or "loss" (i.e., no finding of liability) for the Commission.

5.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 9th day of January, 2020 at Washington D.C.

_____
Antony P. Kim

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 120 of 164

# Exhibit A

# EXHIBIT A

**Federal Trade Commission Adjudicative Proceedings Updated as of January 1, 2015**

Source: FTC Website, at https://www.ftc.gov/enforcement/cases-proceedings/adjudicative-proceedings

Includes proceedings in which Part 3 Complaint was filed; *excludes* cases filed exclusively in Federal Court

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | **TITLE** [1] | **DOCKET NUMBER** | **STATUS** | **UPDATED** | **ALJ Liability Decision** | **Commission Liability Decision** | **Commission WIN or LOSS** |
| 1. | Axon/VieVu, In the Matter of (Administrative) | 9389 | Pending | January 8, 2020 | Case Pending | Case Pending | N/A |
| 2. | Post Holdings, Inc.; In the Matter of (Administrative) | D-9388 | Pending | January 6, 2020 | Case Pending | Case Pending | N/A |
| 3. | Illumina Inc./Pacific Biosciences of California, Inc., In the Matter of (Administrative) | D-9387 | Pending | January 6, 2020 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 4. | RagingWire Data Centers, Inc., In the Matter of (Administrative) | 9386 | | January 6, 2020 | Case Pending | Case Pending | N/A |
| 5. | Evonik/PeroxyChem, In the Matter of (Administrative) | 9384 | | January 2, 2020 | Case Pending | Case Pending | N/A |
| 6. | Cambridge Analytica, LLC, In the Matter of (Administrative) | 9383 | | December 18, 2019 | Case Settled | Case Settled | N/A |

---

[1]  Columns A-D were copied directly from the FTC Website, at: https://www.ftc.gov/enforcement/cases-proceedings/adjudicative-proceedings  (as of January 9, 2020 at 12:00 pm Eastern)

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 121 of 164

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | TITLE [1] | DOCKET NUMBER | STATUS | UPDATED | ALJ Liability Decision | Commission Liability Decision | Commission WIN or LOSS |
| 7. | Benco/Schein/Patterson, In the Matter of (Administrative) | 9379 | Pending | November 8, 2019 | Liability (2 out of 3 defendants) | No Appeal | WIN |
| 8. | Otto Bock HealthCare North America, Inc., In the Matter of (Administrative) | 9378 | Pending | November 6, 2019 | Liability | Liability (Upheld ALJ) | WIN |
| 9. | 1-800 Contacts, Inc, In the Matter of (Administrative) | 9372 | | October 8, 2019 | Liability | Liability (Upheld ALJ) | WIN |
| 10. | Fidelity National Financial/Stewart Information Services, In the Matter of (Administrative) | 9385 | Closed | September 25, 2019 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 11. | Louisiana Real Estate Appraisers Board, In the Matter of (Administrative) | 9374 | Pending | August 15, 2019 | Case Pending | Case Pending | N/A |
| 12. | Impax Laboratories, Inc., In the Matter of (Administrative) | 9373 | Pending | August 2, 2019 | No Liability | Liability (Reversed ALJ) | WIN |
| 13. | Sanford Health/Sanford Bismarck/Mid Dakota Clinic, In the Matter of (Administrative) | 9376 | Closed | July 9, 2019 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 14. | Tronox/Cristal USA, In the Matter of (Administrative) | 9377 | Pending | May 29, 2019 | Liability | Case Settled (Divestiture Ordered) | N/A |
| 15. | Chicago Bridge & Iron Company N.V., ...In the Matter of | 9300 | | May 11, 2019 | Liability | Case Settled (Divestiture Ordered) | N/A |
| 16. | Monier Lifetile LLC, Boral Ltd., and Lafarge S.A, In the Matter of | 9290 | | February 5, 2019 | Case Settled (Divestiture Ordered) | Case Settled (Divestiture Ordered) | N/A |

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 122 of 164

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | TITLE [1] | DOCKET NUMBER | STATUS | UPDATED | ALJ Liability Decision | Commission Liability Decision | Commission WIN or LOSS |
| 17. | Wilhelm Wilhelmsen/Drew Marine, In the Matter of (Administrative) | 9380 | | August 1, 2018 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 18. | CDK Global and Auto/Mate, In the Matter of (Administrative) | 9382 | | March 26, 2018 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 19. | J.M. Smucker/Conagra, In the Matter of (Administrative) | 9381 | | March 8, 2018 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 20. | Jerk, LLC, d/b/a Jerk.com, In the Matter of (Administrative) | 9361 | | January 8, 2018 | N/A | Liability (Summary Decision) | WIN |
| 21. | ProMedica Health System, Inc., a corporation, In the Matter of (Administrative) | 9346 | | October 16, 2017 | Liability | Liability (Upheld ALJ) | WIN |
| 22. | DraftKings, Inc. / FanDuel Limited, In the Matter of (Administrative) | 9375 | | July 14, 2017 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 23. | Advocate Health Care Network, NorthShore University HealthSystem, In the Matter of (Administrative) | 9369 | | March 20, 2017 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 24. | ECM BioFilms, Inc., also d/b/a Enviroplastics International, In the Matter of (Administrative) | 9358 | | March 16, 2017 | Liability | Liability (Upheld ALJ) | WIN |
| 25. | California Naturel, In the Matter of (Administrative) | 9370 | | December 12, 2016 | N/A | Liability (Summary Decision) | WIN |
| 26. | The Penn State Hershey Medical Center/PinnacleHealth System, In the Matter of (Administrative) | 9368 | | October 23, 2016 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 27. | LabMD, Inc., In the Matter of (Administrative) | 9357 | | September 29, 2016 | No Liability | Liability (Reversed ALJ) | WIN |

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 123 of 164

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | **TITLE** [1] | DOCKET NUMBER | STATUS | UPDATED | ALJ Liability Decision | Commission Liability Decision | Commission WIN or LOSS |
| 28. | Superior/Canexus, In the Matter of (Administrative) | 9371 | | August 3, 2016 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 29. | Cabell Huntington Hospital/St. Mary's Medical Center, In the Matter of (Administrative) | 9366 | | July 6, 2016 | N/A | N/A (Case dismissed due to new state law in West Virginia on "cooperative agreements") | N/A |
| 30. | Staples/Office Depot, In the Matter of (Administrative) | 9367 | | May 19, 2016 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 31. | Steris/Synergy Health, In the Matter of (Administrative) | 9365 | | October 7, 2015 | N/A | N/A (Case dismissed after losing PI Motion in federal court) | N/A |
| 32. | Sysco/USF Holding/US Foods, In the Matter of (Administrative) | 9364 | | June 29, 2015 | Party Abandoned Merger | Party Abandoned Merger | N/A |
| 33. | McWane, Inc., and Star Pipe Products, Ltd., In the Matter of (Administrative) | 9351 | | April 17, 2015 | **Liability** In ALJ's Initial Decision on May 9, 2013, held that evidence did not support complaint counsel's charges that McWane illegally conspired with Sigma and Star to raise and stabilize fittings prices. Based on these findings, he dismissed the first three counts in the seven-count FTC complaint. But ALJ ruled that the evidence did support other four counts in the administrative complaint, and his Initial Decision would have required McWane to stop engaging in the conduct outlined in those counts. | **Liability (Upheld and Reversed ALJ, in part)** Commission affirmed, in part, a May 2013 Initial Decision by the ALJ, finding McWane unlawfully maintained a monopoly in the domestic "fittings" product market. The Commission dismissed the remaining counts. Dismissed Counts 1 and 2 in the public interest, because no majority position was reached (Ramirez/Brill were deadlocked with Ohlhausen/Wright). Count 3, which the ALJ dismissed, was not appealed by complaint counsel. Commission reversed ALJ's finding of liability on Count 4; and dismissed Counts 5 and 7 after determining it was not necessary to address merits, based on other findings. | **WIN** |
| 34. | Phoebe Putney Health System, Inc., ....In the Matter of (Administrative) | 9348 | | March 31, 2015 | Case Settled | Case Settled | N/A |

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 124 of 164

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | TITLE [1] | DOCKET NUMBER | STATUS | UPDATED | ALJ Liability Decision | Commission Liability Decision | Commission WIN or LOSS |
| 35. | Graco Inc., Illinois Tool Works Inc., and ITW Finishing LLC, In the Matter of (Administrative) | 9350 | | March 25, 2015 | Case Settled | Case Settled | N/A |
| 36. | AmeriGas and Blue Rhino, In the Matter of (Administrative) | 9360 | | January 9, 2015 | Case Settled | Case Settled | N/A |

Case: 20-15662, 05/01/2020, ID: 11678625, DktEntry: 14, Page 125 of 164

Pamela B. Petersen
Arizona Bar No. 011512
**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
Secondary: legal@axon.com

Garret G. Rasmussen
Antony P. Kim
Jonathan A. Direnfeld
Thomas Fu
**Orrick, Herrington & Sutcliffe LLP**
1152 Fifteenth Street N.W.
Washington D.C. 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
grasmussen@orrick.com
akim@orrick.com
jdirenfeld@orrick.com
tfu@orrick.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| AXON ENTERPRISE, INC., a Delaware Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION, a federal administrative agency,<br><br>and<br><br>JOSEPH SIMONS, NOAH PHILLIPS, ROHIT CHOPRA, REBECCA SLAUGHTER, and CHRISTINE WILSON, in their official capacity as Commissioners of the Federal Trade Commission,<br><br>    Defendants. | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Jury Trial Demanded) |

**ER 124**

**INTRODUCTION**

1.      Plaintiff Axon Enterprise, Inc. ("Axon") brings this case to challenge the unconstitutional structure and processes employed by Defendant, the Federal Trade Commission ("FTC" or "Commission"), to prohibit lawful mergers and extract unwarranted settlements. The FTC exists as a Constitutional anomaly. In one hand, it wields a mighty sword—the power to not only prosecute cases, but to judge them too; in the other, a massive shield—near-total protection from political accountability, with the Commissioners who direct its actions subject to neither democratic election nor at-will removal by the President. For decades, the agency has leveraged that power against American companies indiscriminately—including, most recently, Axon. No longer.

2.      Axon brings this case to take a stand for public safety and for technical innovation and advancement—hallmarks of the company since its founding.  For over 18 months, Axon has cooperated in an investigation by the FTC into its acquisition of Vievu LLC ("Vievu"), a lawful transaction under the antitrust laws that has had no anti-competitive effect.  Axon is eager to prove its case in any federal court in this country. But Axon cannot—and will not—accept the FTC's attempts to extort an irrational "settlement" through a biased adjudicative process that vests the Commission with the powers of prosecutor, judge, and jury in violation of the Due Process and Equal Protection guarantees of the U.S. Constitution. Instead, Axon seeks to demonstrate in a neutral forum that the FTC's accusations are baseless; that Axon's acquisition of Vievu, a significantly distressed company, benefited customers and prevented massive public safety program disruptions; and that its law enforcement partners have more choices today than ever before.

3.      On December 23, 2019, two days before Christmas, the FTC unequivocally told Axon, a manufacturer of non-lethal policing equipment such as body-worn cameras ("BWCs")

and digital evidence management systems ("DEMS"), that it must completely unwind its May 2018 acquisition of a small, struggling company named Vievu. Axon, which acquired Vievu to assume a multi-year contract with the New York City Police Department ("NYPD") that Vievu could not fulfill, offered to divest all assets it acquired from Vievu, all Axon improvements to Vievu's products, and even provide the buyer with $5 million in working capital. But the FTC insisted on more: Axon must not only divest all acquired assets plus improvements, but also agree to grant whomever buys those assets a license to all of Axon's BWC and DEMS intellectual property and technology—technology Axon has invested 10 years and over $200 million in building from the ground up. Indeed, the FTC itself described its demand as a "blank check" to take Axon's independently created intellectual property and customers. The FTC's demand would not return the parties to the positions they held before the acquisition, when Vievu (equipped with its *own* intellectual property) was not a viable going concern or competitive constraint; to the contrary, it would stand up a new company (equipped with *Axon's* intellectual property) far stronger than Vievu ever was or could have become. In other words, the FTC is seeking to deprive Axon of its intellectual property without Due Process, an unprecedented ultimatum that sends a chilling message to the nation's technology-based industries.

4.     The FTC's aggressive demands are not supported by the evidence. At the time of acquisition, Vievu was effectively insolvent and had failed to invest in R&D for the fast-approaching, next generation of products being developed by a host of new competitors. And, Vievu's most technologically-advanced product, the LE5 BWC, suffered from multiple defects that created information security and officer safety risks. Vievu's products remain viable today only because Axon invested in numerous modifications at considerable expense.

5.      Axon's acquisition of Vievu has had no material effect on the competitive landscape. Indeed, in the year and a half post-acquisition, competition has only increased. Customers continue to be able to choose from any of a field of well-funded competitors, including Motorola/WatchGuard,[1] Panasonic, Coban, Mobile Vision, and BodyWorn by Utility; and because of low barriers to entry, several more competitors such as Getac, Intrensic/GoPro and Visual Labs have launched BWCs in recent years.  All of this competition has benefited customers. The FTC's insistence that Axon surrender a "blank check" for settlement is therefore without merit.

6.      Instead, the FTC's demand rests on a more fundamental calculation. The Commission is confident it can strong-arm Axon into settling because, unlike the Department of Justice ("DOJ"), which must pursue its merger challenges in federal court, the FTC has the option of initiating proceedings within the agency itself. What is more, the question whether a given merger will be reviewed by the DOJ or the FTC is arbitrary, and secretly negotiated between the agencies themselves. Indeed, the FTC has told Axon that if Axon does not unconditionally surrender within a matter of days, it will initiate exactly that type of proceeding in January 2020.

7.      The import of that threat is clear: in an administrative proceeding, the FTC will not only charge and prosecute the case, but also appoint the Administrative Law Judge ("ALJ") that presides over it. And if the FTC disagrees with the ALJ's ultimate decision on either the facts or

---

[1] At the time of the Vievu acquisition, Watchguard was Axon's biggest competitor. In July 2019, Motorola purchased Watchguard for $271 million with the FTC's blessing, despite the fact Motorola was already a formidable competitor in the BWC and DEMS space with large city references and whose market capitalization of $27.6 billion dwarfs Axon's at $4.3 billion. The Motorola/Watchguard combination now has 8 Major City Chief Association ("MCC") agencies, including Houston with more than 5,100 sworn officers, and at least 70 agencies with 100+ officers.

the law, the same Commissioners who voted to file the enforcement action against Axon have the

right to review these findings de novo *and change them*. If that procedure sounds unfair, that's

because it is. Indeed, a former FTC Commissioner himself described it as an "unhealthy and biased

institutional process" that virtually guarantees an agency win. *See* Joshua D. Wright, Section 5

Revisited: Time for the FTC to Define the Scope of Its Unfair Methods of Competition Authority

at 6 (2015).[2] As observed by Wright:

> The FTC has voted out a number of complaints in administrative adjudication that
> have been tried by administrative law judges *in the past nearly twenty years*. In
> each of those cases, after the administrative decision is appealed to the
> Commission, the Commission has ruled in favor of FTC staff and found liability.
> In other words, **in 100 percent of cases where the administrative law judge ruled
> in favor of the FTC staff, the Commission affirmed liability; and in 100 percent
> of the cases in which the administrative law judge [ ] found no liability, the
> Commission reversed. This is a strong sign of an unhealthy and biased
> institutional process.** By way of contrast, when the antitrust decisions of federal
> district court judges are appealed to the federal courts of appeal, plaintiffs do not
> come anywhere close to a 100 percent success rate—indeed, the win rate is much
> closer to 50 percent.

*Id*. (emphasis added, footnote omitted).

    8.    The FTC's Commissioners are largely unaccountable. They are not only unelected

by the People, but also shielded from removal by the President. And so, if they set their sights on

an unwarranted and coercive merger remedy, there is nothing to stop them.

    9.    Policing and public safety are, for obvious reasons, issues of significant societal

importance. And at a time when deep divisions exist between law enforcement agencies and the

communities they serve, Axon's mission to "Protect Life – Protect Truth" has helped bridge gaps

---

[2] Available at
https://www.ftc.gov/system/files/documents/public_statements/626811/150226bh_section_5_symposium.pdf

and unify communities using innovative technology. The technologies Axon develops (including

body cameras and less-lethal weapons) help to protect both the police officers who use them and

the citizens who interact with them, and these technologies command broad public support. *See,*

*e.g.,* Cato Institute, Americans Overwhelmingly Support Equipping Police with Body Cameras

(reporting that 89% of Americans support requiring police to wear body cameras).[3] But an FTC

action against Axon could have significant consequences for both the company and public safety

by diverting finite resources necessary for continued innovation and competitiveness.[4]

10.     The Constitution was designed to prevent exactly the kind of unfair, unaccountable,

and unchecked governmental action being exercised against Axon. The "essential constitutional

promise" of Due Process is the right to a "fair opportunity to rebut the Government's factual

assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004). The

FTC would deny Axon that right, by serving as prosecutor, judge, and jury in its own

administrative process. Further, the promise of Equal Protection restricts the Government from

arbitrarily treating one person different from another. Yet the FTC would deny Axon that right by

subjecting it to a biased administrative proceeding with a preordained result—while other

---

[3] Available at https://www.cato.org/policing-in-america/chapter-4/police-body-cameras#_ftnref66

[4] In addition to ongoing investments to further innovate its BWC and DEMS products, solutions that scale the best and are the simplest to use, Axon is heavily investing in Records Management, Computer Aided Dispatch, and Artificial Intelligence product lines that will continue to make policing safer, more efficient, and more accountable. Axon is making these investments with an industry-leading focus on ethical and responsible innovation through its AI and Policing Technology Ethics Board. *See* https://www.axon.com/axon-ai-and-policing-technology-ethics. This includes development of automated license plate recognition ("ALPR") software to stay competitive with Motorola/Watchguard, which recently acquired similar technology via a $445 million acquisition of Vigilant Solutions.

6

**ER 129**

companies, whose merger reviews are assigned to the DOJ, retain the right to litigate the merits of mergers before a neutral arbiter in federal court. Finally, Article II's Vesting Clause mandates that the federal law-enforcement power of the United States be ultimately controlled solely by the President, the People's only nationwide elected representative, and not unelected bureaucrats. But the FTC would deny Axon that protection as well, subjecting it to an unfair prosecution run entirely by Commissioners accountable to neither the People nor the President.

11.     Axon has filed this suit to vindicate its Vievu acquisition and its Constitutional rights to Due Process and Equal Protection under the law. It seeks to prove, before a neutral arbiter, that its actions were wholly lawful. And it will expose the unfair and unconstitutional procedures and structures employed by the FTC to extract unjustified remedies.

12.     This Court should end the abuses perpetrated by the FTC for far too long. It should declare the FTC's structure and biased procedures unconstitutional. And it should enjoin the FTC from subjecting Axon to its unfair and unconstitutional internal forum, adjudicating the legality of Axon's acquisition in this Article III court instead.

<strong>PARTIES</strong>

13.     Axon is a Delaware corporation with its principal place of business at 17800 N. 85th Street, Scottsdale, Arizona 85255.

14.     The FTC is an independent administrative agency of the United States. Among other things, the FTC is empowered to initiate administrative proceedings pursuant to Section 5(b) of the Federal Trade Commission Act ("Act"), and to seek injunctive relief in federal district court pursuant to Section 13(b) of the Act.

15.     Joseph Simons, Noah Phillips, Rohit Chopra, Rebecca Slaughter, and Christine Wilson (collectively "Commissioners") are Defendants in their official capacity as Commissioners of the FTC.

## JURISDICTION AND VENUE

16.     This action arises under the Constitution and laws of the United States, and this Court has federal question jurisdiction over this action pursuant to Article III of the Constitution and 28 U.S.C. § 1331.

17.     Plaintiff's right to immediate judicial review in this Court with respect to Defendants' alleged conduct is based on the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

18.     Venue is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**A.     Axon's Acquisition of Vievu—A Failing Company.**

19.     In 1993, Rick Smith formed the company that is now Axon to design less-lethal conducted energy weapons for police departments.

20.     Axon unveiled its first BWC, the Axon Pro, in 2008. This camera was head-mounted and uploaded footage for online storage to a cloud-based evidence management software now known as Evidence.com. This innovative product revolutionized digital evidence collection, storage and retrieval and won the 2009 Innovation Top Software Award by the Cygnus Law Enforcement Group presented at the International Association of Chiefs of Police annual conference. Axon's DEMS solution was thus developed, launched and commercially successful

8

**ER 131**

long before its competition, including Vievu, which did not announce its "Veripatrol" cloud-based DEMS offering until February 2015. Prior to 2015, Vievu only offered local, on-premise DEMS.

21. Axon's first contracts for its BWCs and DEMS were with small police departments. Axon received a big boost in 2009, when a police officer involved in a lethal-force incident was exonerated based on footage from an Axon camera. The company received another boost in April 2013, when the Rialto, California Police Department released a study showing an 88% drop in complaints against police officers that coincided with the use of Axon cameras.

22. Vievu was founded in 2007 by a former Axon employee and was acquired by Safariland LLC in 2015. Safariland is a privately-owned reputable provider of safety and survivability products for public safety such as body armor and holsters. But Safariland had no experience in software development and soon determined it was in over its head without the engineering expertise required to support DEMS products and keep pace with competitor advancements. It therefore significantly cut back on research and engineering investments.

23. Although an early leader in BWC sales, by 2016 Vievu was "teetering on irrelevance among major departments," as recognized by a market analyst at the time,[5] having failed to invest in R&D and next generation products to stay competitive. Then in October 2016, Vievu threw a "Hail Mary", offering to supply more than 20,000 BWCs and a DEMS solution on unsustainable terms (at roughly one-third of Axon's bid price). This 5-year contract, terminable at will, proved to be Vievu's downfall.

---

[5] *See* Craig-Hallum Capital Group LLC, Oct. 3, 2016 Institutional Research Note, opining that Vievu's pricing on its NYPD bid was "an attempt to remain relevant" but "likely results in a significantly unprofitable contract for Vievu."

9

24. On May 3, 2018, Axon announced its acquisition of Vievu for approximately $7 million in guaranteed upfront cash and stock—a testament to the company's failing status.[6] By that time, Vievu was essentially insolvent. It won its largest contract, the NYPD, at a price that was driving unsustainable economic loss, and had not won any major contract thereafter because the NYPD body camera rollout was consuming all its resources. Its parent company, Safariland, lacked the resources to support Vievu, which was losing nearly $1 million *per month*. Vievu's trajectory was irreversible. At the time Axon acquired it, Vievu had more than $19 million in debt owed to Safariland entities, another $8 million in off-balance-sheet purchase commitments, and the cash equivalent of less than three days' operating expenses. And despite Safariland's exhaustive attempts to shop Vievu to other potential buyers, there were no takers. Vievu came to Axon as a last resort.

**B. The FTC's Excessive and Unwarranted Settlement Demand.**

25. On or about June 14, 2018, the FTC sent Axon a letter indicating it was investigating the Vievu acquisition. At that point, Axon had not taken any material steps toward transitioning Vievu's customers to Axon, for example, by shifting them from Vievu's products to Axon's product and technology offerings. Instead, Axon was honoring all of Vievu's customer contracts.

26. Axon cooperated in the FTC's investigation. Over the course of more than 18 months, Axon produced more than 262,000 documents, provided reams of data and other

---

[6] Deal terms also included approximately $6 million in additional common stock, contingent upon achieving certain milestones over two years, which have been partially met, and an ancillary minimum holster purchase commitment with Safariland.

information, and produced multiple executives for investigational depositions. At no point did the FTC request (or even suggest) that Axon "hold separate" the Vievu business or assets.  At no point did the FTC request (or even suggest) that Axon avoid transitioning Vievu's customers to Axon's superior products and technology platform.

27.    Rather, after more than 18 months, the FTC threatened to sue Axon in an internal administrative hearing where the outcome is all but guaranteed. The FTC made clear, in at least three face-to-face meetings, that Axon's only hope for avoiding litigation was to surrender a "blank check" divesture. The FTC told Axon it would unilaterally dictate the terms of settlement from a "menu" of all Axon's customers and contracts (not just those won post-acquisition), Axon's intellectual property and technology, Axon employees, and any ancillary services and support functions the FTC deemed necessary. Remarkably, the FTC described its vision of "re-creating" Vievu into a virtual "clone" of Axon armed with Axon's own intellectual property—something that Vievu never was nor could be without impermissible government regulation of, and unwarranted interference in, a highly-competitive marketplace.

28.    The FTC's arbitrary take-it-or-leave-it demand is possible only because this governmental agency lacks any real accountability to the Constitution's requirements of Due Process or Equal Protection, or to the tenets of antitrust merger law.

**C.    The Government Merger Review Process.**

29.    The FTC and the DOJ Antitrust Division have dual jurisdiction for reviewing mergers and acquisitions that may present substantive antitrust concerns. Section 7 of the Clayton Act, codified at 15 U.S.C. § 18, prohibits mergers and acquisitions where the "effect . . . may be substantially to lessen competition" or "tend to create a monopoly." Both the DOJ and FTC have

11

authority to file suit to block a proposed transaction on antitrust grounds. The DOJ's authority to sue is rooted in Section 15 of the Clayton Act, and the FTC's authority is based on Section 13(b) of the FTC Act.

30. Because the DOJ and FTC have dual-jurisdiction to review mergers, the agencies have created a "clearance" process to decide which agency will investigate a merger. Over the years, the agencies have reached a series of informal, non-public understandings as to how they will divvy up merger investigations. Clearance is an opaque, black-box process. The agencies maintain complete control over the structure and implementation of the clearance process and have total discretion to decide which agency will undertake a particular merger investigation. Merging parties have no insight or input into which agency will investigate their merger. Moreover, clearance rules and procedures are not mandated by statute, subject to Congressional scrutiny, or promulgated through notice-and-comment rulemaking.

31. Which agency reviews a consummated transaction is critical. The DOJ's only means of unwinding a consummated merger is to sue in federal court. *See United States v. Parker-Hannifin Corporation,* No. 1:17-cv-01354-UNA (Sept. 26, 2017) (DOJ lawsuit brought to "unwind" transaction "by means of an order requiring defendant . . . to divest" the defendant's assets or the acquired entity's assets). The FTC, on the other hand, has the option to sue in federal

12

**ER 135**

court under Section 13(b) of the Act,[7] or to commence an internal administrative hearing before either a single Commissioner or an ALJ on the FTC's payroll.

32.     The FTC's internal administrative hearing provides none of the substantive or procedural protections enjoyed by litigants in federal district court. These proceedings are, instead, fraught with Due Process and Equal Protection deficiencies.

- Federal district court judges are Article III impartial fact-finders who owe no allegiances to the DOJ. In contrast, any FTC Commissioner (including one who voted to sue the defendant) is permitted to preside over the administrative hearing; and, at best, an ALJ appointed by the FTC and on the FTC's payroll will preside.

- Federal court proceedings are governed by the Federal Rules of Evidence and Federal Rules of Civil Procedure. Neither apply in FTC administrative proceedings.

- The DOJ must satisfy a more rigorous standard of finding that a merger or acquisition "substantially lessens competition," whereas the FTC can satisfy a less onerous "unfair competition" standard in the administrative context.

---

[7] Section 13(b) of the FTC Act provides, in relevant part, that *"[w]henever the Commission has reason to believe that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review . . . would be in the interest of the public*—the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practices. . . and in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b) (emphasis added).

13

- Litigants in federal court can appeal adverse decisions to impartial circuit court judges. Decisions rendered in FTC administrative proceedings must first be appealed to the same FTC Commissioners who voted to sue the defendant at the outset.

- The DOJ cannot change the findings made by the district court when appealing a decision to the circuit court. However, the FTC Commissioners, on appeal, can ignore and completely change the merits decision rendered in the administrative proceedings *before* the defendant appeals to the circuit court.

- Different appellate standards of review also apply depending on where the case originated. The district court's factual findings in a DOJ case are reviewed for "clear error," whereas "[t]he findings of the Commission as to the facts, if supported by evidence, shall be *conclusive*." 15 U.S.C. § 45(c) (emphasis added).

33. Given the inherently biased and unfair nature of administrative hearings at the FTC and the limited review of its factual findings on appeal, it is no surprise that the agency believes itself to be virtually untouchable in its internal arena. Indeed, that belief was on full display when the FTC insisted that Axon not only divest the assets it actually acquired in the Vievu merger, but also provide the FTC with "a blank check" to create a new competitor far stronger than Vievu ever was (or could have been) by forcing Axon to license its own intellectual property developed over 10 years at significant investment expense. The agency will not accept anything less. In a December 2019 face-to-face meeting with Axon's counsel, the FTC specifically threatened to extract its extraordinary relief from Axon one way or another—either voluntarily through settlement, or forcibly through its internal administrative process. Such an aggressive demand reflects a negotiating posture taken only by a party that believes it cannot lose. But because the

14

FTC intends (if no settlement is reached) to litigate, not before a neutral arbiter, but in an administrative proceeding over which it has ultimate control and which has proven futile for defendants, it has no reason to temper its demands.

34.     This kind of sham hearing process is exactly what the Due Process Clause was designed to prevent. As the Supreme Court has emphasized, the irreducible minimum of Due Process is "notice of the factual basis" of the Government's assertions "and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi,* 542 U.S. at 533. Indeed, "[f]or more than a century, the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right … an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Baldwin v. Hale,* 1 Wall. 223, 233 (1864)). And a "meaningful" hearing, for purposes of Due Process, "requires a neutral and detached judge." *Id.* (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 617 (1993)). "These essential constitutional promises may not be eroded." *Id.* And yet that basic protection—provided to everyone from public employees to enemy combatants—is denied to companies caught up in a merger challenge pursued by the FTC.

35.     The fact that only some companies—namely, those that happen to have their mergers investigated by the FTC and not the DOJ—are subject to those unfair procedures only emphasizes their Constitutional infirmity. There is no rational basis for denying companies faced with a merger challenge brought by the FTC of the basic protections they would (and other companies do) enjoy in a merger challenge brought by the DOJ. That is especially so given that the choice of whether a challenge is brought by the DOJ or the FTC is sorted out by the agencies

themselves. The law has long been skeptical of the Government's ability to circumvent legal protections by arranging proceedings so that one entity takes an action that the other cannot. *See Elkins v. United States,* 364 U.S. 206, 224 (1960) (ending the "silver platter doctrine"). If the promise of Equal Protection means anything, it is that the Government cannot arbitrarily choose which persons it deems worthy of more or fewer legal protections.

**D.     The FTC Lacks Any Political Accountability.**

36.     Worse still, the FTC lacks any political check on how it exercises its unfair procedures against the companies that happen to fall within its bailiwick. Although Article II "vested" all "executive Power" in the President, Art. II, § 1, cl. 1, and charged the President alone with "tak[ing] Care that the Laws be faithfully executed," Art. II, § 3, the FTC enforces the antitrust laws outside of Presidential control.

37.     As the Supreme Court has explained, the Framers concentrated Executive power solely in the President to "ensure … accountability" in the Executive Branch. *Printz v. United States,* 521 U.S. 898, 922 (1997). They recognized that the President could not carry out all of his duties alone, and therefore, must be able to delegate some authority and responsibilities to others. *See* Art. II, § 2, cl. 2 (discussing appointments of superior and inferior officers); *Myers v. United States*, 272 U.S. 52, 117 (1926) ("the President alone and unaided could not execute the laws," and thus must "select those who [are] to act for him under his direction in the execution of the laws.").

38.     But the Framers feared the obvious mischief that could be worked by such unelected individuals armed with law-enforcement power. Thus, the Framers struck a balance. On the one hand, they allowed the President to delegate power; on the other, they took care to ensure that the President was always the one with whom "the buck stops." *Free Enterprise Fund v.*

*PCAOB,* 561 U.S. 477, 493 (2010). Accordingly, the Supreme Court has recognized that, "as a general matter," the President must have the "power to remove" principal officers "who assist him in carrying out his duties." *Id*. at 513-14. Indeed, if "any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, *and controlling* those who execute the laws." *Id*. at 492 (quoting 1 Annals of Cong. 463 (1789) (Joseph 8 Gales ed., 1834) (Madison) (emphasis added)).

39.     Just as the President's ability to select administrative officers "is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible." *Myers*, 272 U.S. at 117. That removal power is crucial to the democratic legitimacy of the Executive Branch in two ways: First, it makes inferior officers less likely to deviate from the President's (and hence, the People's) will. An officer who knows that disobedience can (and will) be met with removal is less likely to take an action at odds with the President's agenda. Second, and perhaps more important, the removal power gives the People political recourse if they are displeased with the actions taken by those who enforce federal law. Although the People cannot vote for (or against) an Executive officer directly, they can vote for (or against) the President, who bears ultimate responsibility for federal law enforcement. Those two mechanisms for accountability work together to ensure that the Government officials who carry out the work of the Executive Branch do so in a way that reflects the People's will, and not their own. As Alexander Hamilton wrote: If the Executive power were "subject, in whole or in part, to the control and co-operation of others," it would "deprive" the People of their "greatest securities" for the "faithful exercise of any delegated power"—namely, the "restraints of public opinion." The Federalist No. 70 at 424, 428-29 (Hamilton).

17

40.  FTC Commissioners, however, are shielded from at-will Presidential removal—and hence from the key mechanism of democratic accountability—in violation of Article II. The FTC is headed by five Commissioners, nominated by the President and confirmed by the Senate, each serving a 7-year term. 15 U.S.C. § 41. But once appointed, the Commissioners are not subject to removal by the President absent a finding of "inefficiency, neglect of duty, or malfeasance in office." *Id.*. This means FTC Commissioners are not politically accountable for their actions. So long as the Commissioners stop short of "malfeasance," the President can do nothing but stand by and watch, no matter how much he disagrees with them. Moreover, because the FTC-appointed ALJ can also only be removed for "good cause" in accordance with statutory procedures, 5 U.S.C. § 7521(a), (b)(1), an impermissible "dual-layer of protection" even further restricts Executive control. *See PCAOB*, 561 U.S. at 495 (holding unconstitutional similar multi-layer tenure protection where Board members appointed by SEC could only be removed by those Commissioners, not the President, for cause).

41.  This means that crucial law enforcement actions, sometimes with massive consequences for the American economy (and here, for public safety), are currently taken by individuals not elected by the People, and not controlled by the President. That runs directly contrary to Article II and the democratic principles underlying the Constitution. Indeed, the U.S. Government itself has acknowledged as much. In its recent merits brief filed in the U.S. Supreme Court in *Selia Law LLC v. Consumer Financial Protection Bureau,* No. 19-7 (Dec. 9, 2019),[8] the

---

[8] Available at https://www.scotusblog.com/case-files/cases/seila-law-llc-v-consumer-financial-protection-bureau/

Solicitor General stated that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)—a 1935 case upholding the Constitutionality of the FTC's removal structure—"should be narrowed or overruled," at least in the context of an agency headed by a single director. U.S. Br. 44. Much of the Government's reasoning, however, equally supports overruling *Humphrey's Executor* specific to the FTC's 5-member Commission.

42.    *Humphrey's Executor* was rooted on the mistaken notion that the FTC served quasi-legislative and quasi-judicial functions, rather than Executive law enforcement functions. The Government now concedes that "the reasoning for *Humphrey's Executor* does not withstand careful analysis. Even at the time of the decision, there was little reason to conclude that the FTC exercised anything other than executive authority." U.S. Br. 45. The Government further noted that the Supreme Court's decision in *Humphrey's Executor* "was concededly inconsistent with the exhaustive and careful reasoning of the *Myers* decision," which struck down as unconstitutional a law denying the President unrestricted power to remove first class postmasters, 272 U.S. at 176, and that "legal developments since *Humphrey's Executor* have only clarified that independent agencies exercise executive power—particularly those agencies like the CFPB [and the FTC] that have the authority to bring enforcement actions in federal court seeking civil penalties." U.S. Br. 45. Indeed, according to the Solicitor General:

> The Court's modern decisions, moreover, make crystal clear that agencies engaged in rulemaking and adjudicative functions are wielding executive power in the constitutional sense. Although "[a]gencies make rules * * * and conduct adjudications * * * and have done so since the beginning of the Republic," and "[t]hese activities take 'legislative' and 'judicial' forms," at bottom "they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power' " when performed by the Executive Branch.

19

**ER 142**

*Id*. at 31 (citing *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (emphasis in original)); *see also id*. at 30 ("the exercise of rulemaking and adjudicative functions by such an agency is— and must be—the exercise of *executive* power.") (emphasis in original).

43. The Solicitor General is hardly the only one to recognize the unconstitutionality of the FTC's structure. Indeed, numerous prominent scholars, members of Congress, and even States have filed briefs in the *Selia Law* case criticizing *Humphrey's Executor*. Ilan Wurman of the Sandra Day O'Connor College of Law at Arizona State University, for instance, authored a brief on behalf of several separation of power scholars—including Stanford Law School professor and former Tenth Circuit judge Michael W. McConnell—urging that the Court "should reconsider that precedent altogether." Br. of Separation of Powers Scholars at 23. Similarly, 27 members of the House of Representatives filed an amicus brief calling the basic premise of *Humphrey's Executor*—that the FTC "did not exercise any executive power"—"dubious" and stated that the case might come out "differently today if the same facts arose again." Br. of Twenty-Seven Members of the U.S. House of Representatives at 7, 18. And no fewer than 13 States—Texas, Alabama, Arkansas, Georgia, Indiana, Kansas, Louisiana, Nebraska, Oklahoma, South Carolina, South Dakota, Utah, and West Virginia—attacked *Humphrey's Executor* as "thinly reasoned." Br. of Texas et al. at 12. There is thus a large and growing consensus emerging that the FTC's structure violates the basic tenets of Article II.

**E.    The FTC's Substantive Objections to Axon's Acquisition Are Meritless.**

44. The FTC's unconstitutional structure, as well as its substantive and procedural defects, have been laid bare in case after case. A particularly glaring example involves Axon's small acquisition of Vievu—a transaction intended to bolster technology and innovation in public

20

safety and prevent the imminent disruption of BWC programs in several major law enforcement agencies, including NYPD. In addition to benefiting Vievu's customers, this transaction presented no risk of harm to competition, which is more robust today than ever before.

45. To avoid this fact, the FTC has posited in its discussions with Axon a very narrow relevant market that includes only large metropolitan police departments (essentially the 69 MCC member agencies[9] out of 18,000 law enforcement agencies in the U.S.) requiring both BWCs and cloud-based DEMS (but excluding local on-premise DEMS used by many agencies, including MCC Nashville won by Watchguard in May 2019). The FTC has reverse-engineered an artificially constrained relevant market in order to claim that Vievu had high shares, when in actuality the NYPD alone skewed all of Vievu's numbers and was central to its financial downfall.

46. Moreover, this type of gerrymandering is arbitrary and overly narrow because there is no distinction—and the FTC has not articulated one to date—between BWCs and DEMS offered to large police departments as compared to smaller agencies. Axon and many of its competitors offer the exact same products to both large and small police departments. And while BWCs and DEMS are complementary (police departments need a DEMS to offload and store footage created by BWCs), they are separate and distinct products. BWCs and DEMS perform different functions,

---

[9] *See* https://www.majorcitieschiefs.com/. Association members are metropolitan cities and counties ranging in sworn officer size from 435 (Salt Lake City) to 36,228 (NYPD). Of course, lots of non-MCC member cities and counties are of equal size and significance; for example, VisioLogix won Rochester, NY with 747 officers, but is not within the FTC's definition so is ignored. The FTC's myopic focus also excludes Major County Sheriff Association ("MCSA") members as large as the LA County Sheriff's Department with 9,316 sworn officers—an agency that has not yet chosen a BWC or DEMS supplier (proposals are due January 9, 2020 and there will be no competitor shortage).

as demonstrated by the fact that police departments mix and match BWCs and DEMS and many competitors offer BWCs or DEMS, but not both. There is no void in the very crowded BWC space with more than 20 camera competitors.

47. The FTC is also improperly discounting in-car video solutions commonly packaged today with BWC and DEMS in police department Requests for Proposals ("RFPs"), because Vievu did not have an in-car product and had no such product in development. At least 6 leading BWC/DEMS competitors also offer in-car video solutions (Motorola/Watchguard, Panasonic, Utility, Getac, Coban, and Digital Ally), causing Axon to launch its Fleet in-car offering in 2015 to stay competitive. Vievu's failure to invest in a dashboard camera solution put it at significant competitive disadvantage. But not to worry, the FTC simply excluded in-car video from its market definition to artificially elevate Vievu's relevance.

48. But even with the FTC's cherry-picked MCC definition of the market, at least 7 BWC competitors offer cloud DEMS (Motorola/Watchguard, Panasonic, Getac, Utility, Coban, Visual Labs/Samsung, and Digital Ally), 5 of whom have large MCC reference accounts. Indeed, WatchGuard/Motorola have 8 MCC accounts, Panasonic has 3, and Utility has 2. And competitors Coban and Getac have won large non-member agencies like the California Highway Patrol (7,197 officers) and the Florida Fish & Wildlife Commission (806 officers).

49. These manufacturers not only compete against Axon, they also beat Axon. Indeed, post-acquisition, Axon has lost at least 55 tenders with agencies of 100+ sworn officers to 10 separate companies:

- Watchguard (19 wins) – including MCC Nashville Metro PD, TN (1,398 officers)
- Utility (11 wins) – including St. Louis County PD, MO (880 officers)

22

**ER 145**

- Panasonic (7 wins) – including Connecticut State Police (1,060 officers)
- Getac (5 wins) – including Toledo PD, OH (592 officers)
- Motorola (6 wins)
- L3/Mobile Vision (2 wins)
- Visual Labs (2 wins)
- Coban (1 win) – California Highway Patrol (7,197 officers)
- Safety Vision (1 win)
- Intrinsic/GoPro (1 win)

And even when playing in the FTC's MCC-only sandbox, Axon lost both Nashville and El Paso to Watchguard in 2019.

50.     As these statistics demonstrate, the markets for BWC and DEMS (however those markets are defined) are also characterized by low barriers to entry. Recent entrants, including Getac and Visual Labs, have quickly gained traction. These dynamics are wholly inconsistent with any market power on Axon's part—the company simply cannot exclude other companies from competing, or deter entry by new players, or charge supracompetitive prices. These are not hypothetical arguments, but rather, based on the actual experience of what has come to pass in the more than 18 months since Axon acquired Vievu. Indeed, expansion by incumbent vendors and entry by new players is likely to continue because many police departments, including large metropolitan cities and counties, are open opportunities. At least half of the nation's largest 1,200 police departments and thousands of the 18,000 U.S. law enforcement agencies have yet to adopt BWCs and DEMS.

51.     Moreover, BWC and DEMS trade in bid markets with the price set by individual competitors in response to RFPs. And while Vievu was an early viable competitor, since at least 2015 customers rarely rated Axon and Vievu as each other's next-best competitor. And expert econometric analysis of opportunity data indicates that Vievu did not constrain Axon's pricing.

23

**ER 146**

Axon did not discount more when Vievu was bidding, and Axon did not lose more bids when Vievu was bidding. Customers could and did turn to a number of other companies to buy their BWC and DEMS, including much larger vendors like Motorola and Panasonic. In 2017 alone, Axon faced stiff competition on bids from the likes of Motorola (10), Panasonic (18), and WatchGuard (45), demonstrating that these competitors have been and remain prominent.

52.     Indeed, pre-acquisition (between 2016 and May 2018), 4 competitors won 9 MCC accounts. Vievu, on the other hand, had no major city win after NYPD in 2016. At the time of acquisition, Vievu had no ability to bid on new BWC or DEMS contracts. In fact, new Vievu bids were essentially non-existent in 2017 and pre-acquisition in 2018. Vievu had locked itself into contracts that drove negative cash flow and significant operating losses. The very NYPD contract that led to the public appearance of a healthy business for Vievu had, in actuality, overwhelmed it, causing the firm to cancel nearly all of its research and development activities and to forego the development of cutting-edge features that its customers wanted and competitors offered. And because NYPD consumed all of Vievu's resources that might have otherwise gone to create next-generation products or effectively bid for other customers, Vievu had eliminated itself as a competitive threat.

53.     The low price that Vievu bid for the NYPD deal—roughly one-third of Axon's bid price—reflected the company's gamble that it could regain relevance at the expense of profit. Vievu similarly won a low-price contract with Oakland in September 2016, thus taking on two very large, resource-intensive obligations with very little margin for error. But Vievu could not deliver. In addition to security flaws, Vievu's DEMS was prone to losing or corrupting data and resulted in the Oakland Police Department losing 25% of its stored video footage during a software

24

upgrade—data typically needed to prosecute criminal trials. And what would have been the fatal blow for Vievu came only a few months after Axon's acquisition, when a Vievu LE-5 body camera's lithium battery caught fire and exploded, prompting the NYPD to pull thousands of those cameras off the street. Accordingly, pre-existing design flaws in Vievu's products made Vievu's exit from the market imminent. Instead, Axon was able to step in and invest in improvements to Vievu's products to better serve our country's public safety agencies, at considerable monetary cost to Axon, and ensure their body camera programs did not fail.

54.     Axon's acquisition of Vievu falls squarely within the "failing firm" safe harbor. Vievu was unable to meet its financial obligations in the near term and was effectively insolvent. And there were no viable buyers for Vievu. Safariland made substantial good faith efforts to sell Vievu, but no one was willing to make an offer let alone consummate a deal. Notably, Safariland approached Axon, not the other way around. The sale to Axon was its last and only option.

55.     Still, the FTC caused Axon to spend at least $1.5 million in legal fees (not to mention substantial internal resources and mission distraction) during an 18+ month investigation, before now threatening the company with a forceful unwinding of its Vievu acquisition. Even worse, the FTC insists on creating a new competitor with capabilities well beyond anything Vievu would have developed in the absence of the merger, by cloning Axon's independently-developed intellectual property and handing it to a third party—a strongarm demand wholly unsupported by viable antitrust theories of merger harm. This extreme remedy bears no relation to the Vievu that actually existed in May 2018 or could ever have existed today.

56.     The basic claim underlying all of the FTC's actions against Axon is thus without merit. Accordingly, the FTC seeks to hide behind its own biased procedures instead of meeting

25

Axon's arguments before a neutral arbiter. This Court should prohibit the agency from doing so. If the FTC wishes to challenge and unwind the Vievu consummated merger, it should do so in the same way the DOJ does: on the merits, in the open, in a federal court. Here, Axon will demonstrate that its acquisition of Vievu was lawful and not anti-competitive.

## COUNT I

### (Violation of Axon's Fifth Amendment Rights)

57. Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

58. The imminent administrative proceeding, in which the FTC will act as prosecutor, judge, and jury, violates Axon's Due Process rights, including but not limited to depriving Axon of the ability to make its case before a neutral arbiter.

59. By arbitrarily subjecting Axon to unfair procedures before an administrative body, rather than to a fair trial before a neutral judge appointed in accordance with Article III of the Constitution with the procedural protections of a federal court, the FTC has violated Axon's Equal Protection rights.

60. The Commission's conduct has caused and will continue to cause Axon to suffer immediate and irreparable harm to its Constitutional rights to Due Process and Equal Protection. No money damages can remedy this harm, and Axon has no legal avenue by which to recover any money damages against the Commission. Moreover, the FTC's administrative proceeding is not speculative. It will happen and happen imminently. The FTC has assured Axon of this fact.

**COUNT II**

**(The FTC's Structure Violates Article II)**

61.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

62.     The FTC's actions separately violate Axon's Constitutional rights because the agency's structure, on its face, is unconstitutional under Article II. In particular, Article II requires that Executive officials exercising law-enforcement power be removable at will by the President. Although the FTC clearly exercises law-enforcement power—including but not limited to Axon's case—its Commissioners are shielded from at-will removal. Moreover, ALJs appointed by the FTC, who also can only be removed for cause, create an impermissible dual-layer of insulation. Because the agency's structure violates Article II, any actions taken against Axon under its present structure are invalid.

**COUNT III**

**(Declaratory Judgment that Axon's Acquisition Did Not Violate Antitrust Laws)**

63.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

64.     Axon's acquisition of Vievu did not violate Clayton Act § 7 or any other antitrust law. The acquisition was not likely to substantially lessen competition and in fact has not done so.

65.     At all relevant times, barriers to entry have been low, and the market for BWCs and the separate market for DEMs (however defined) was and remains highly competitive and subject to rapid change. A considerable number of police departments of all sizes have yet to adopt body camera technologies, creating endless opportunity for existing and new entrants.

27

66.     Both before and after Axon's acquisition of Vievu, there were and have been strong competitors and new entrants. These competitors and entrants have enhanced competition in the marketplace.

67.     At no time has Axon engaged in supracompetitive pricing, nor could it.

68.     At the time of the acquisition, Vievu was a failing company.

69.     In sum, for all the foregoing reasons, Axon's acquisition of Vievu was and remains lawful.

## PRAYER FOR RELIEF

WHEREFORE, Axon respectfully requests that this Court enter judgment in its favor and against the FTC as follows:

a.  Declare the FTC's structure unconstitutional;

b.  Declare the FTC's administrative procedures unconstitutional;

c.  Declare that Axon's acquisition of Vievu was lawful;

d.  Enjoin the FTC and its Commissioners from pursuing an administrative enforcement action against Axon.

e.  Award Axon its reasonable costs incurred in bringing this action; and

f.  Award such other and further relief the Court deems just and proper.


Dated: January 3, 2020                          Respectfully Submitted,


                                                _/s/ Pam Petersen_____
                                                Pamela B. Petersen
                                                Arizona Bar No. 011512

28

**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
Secondary: legal@axon.com

Garret G. Rasmussen (*pro hac vice* pending)
Antony P. Kim (*pro hac vice* pending)
Jonathan A. Direnfeld (*pro hac vice* pending)
Thomas Fu (*pro hac vice* pending)
Orrick, Herrington & Sutcliffe LLP
1152 Fifteenth Street N.W.
Washington, D.C. 2005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
grasmussen@orrick.com
akim@orrick.com
jdirenfeld@orrick.com
tfu@orrick.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

29





APPEAL,CLOSED,MIDP,STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00014-DWL

Axon Enterprise Incorporated v. Federal Trade Commission et al
Assigned to: Judge Dominic W Lanza
Case in other court:  Ninth Circuit, 20-15662
Cause: 05:702 Administrative Procedure Act

Date Filed: 01/03/2020
Date Terminated: 04/08/2020
Jury Demand: Plaintiff
Nature of Suit: 410 Other Statutes: Anti-Trust
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Axon Enterprise Incorporated**
*a Delaware Corporation*

represented by **Antony P Kim**
Orrick Herrington & Sutcliffe LLP -
Washington, DC
1152 15th St. NW
Washington, DC 20005
202-339-8493
Fax: 202-339-8500
Email: akim@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garret Garretson Rasmussen**
Orrick Herrington & Sutcliffe LLP -
Washington, DC
1152 15th St. NW
Washington, DC 20005
202-339-8481
Fax: 202-339-8500
Email: grasmussen@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Adler Direnfeld**
Orrick Herrington & Sutcliffe LLP -
Washington, DC
1152 15th St. NW
Washington, DC 20005
202-339-8614
Fax: 202-339-8500
Email: jdirenfeld@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ER 153**

**Pamela Beth Petersen**
Axon Enterprise Incorporated
17800 N 85th St.
Scottsdale, AZ 85255-9603
623-326-6016
Fax: 480-905-2027
Email: ppetersen@axon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas King-Sun Fu**
Orrick Herrington & Sutcliffe LLP - Los
Angeles, CA
777 S Figueroa St., Ste. 3200
Los Angeles, CA 90017
213-612-2458
Fax: 213-612-2499
Email: tfu@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Federal Trade Commission**
*a federal administrative agency*

represented by **Bradley Thomas Craigmyle**
US Dept of Justice Civil Division Federal
Programs Branch
1100 L St. NW, Rm. 11216
Washington, DC 20005
202-616-8101
Email: Bradley.T.Craigmyle@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
US Dept of Justice - Federal Programs Branch
Federal Programs Branch
1100 L St. NW
Washington, DC 20005
202-305-4968
Fax: 202-616-8470
Email: chetan.patil@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
US Dept of Justice - Federal Programs Branch
Federal Programs Branch
1100 L St. NW
Washington, DC 20005
202-514-0265
Email: rebecca.cutri-kohart@usdoj.gov

**ER 154**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Simons**
*in his official capacity as Commissioners of the Federal Trade Commission*

represented by **Bradley Thomas Craigmyle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Noah Phillips**
*in his official capacity as Commissioners of the Federal Trade Commission*

represented by **Bradley Thomas Craigmyle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rohit Chopra**
*in his official capacity as Commissioners of the Federal Trade Commission*

represented by **Bradley Thomas Craigmyle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rebecca Slaughter**

represented by **Bradley Thomas Craigmyle**

**ER 155**

*in her official capacity as Commissioners of the Federal Trade Commission*

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christine Wilson**
*in her official capacity as Commissioners of the Federal Trade Commission*

represented by **Bradley Thomas Craigmyle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chetan Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Marie Cutri-Kohart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**New Civil Liberties Alliance**
*Amicus Curiae New Civil Liberties Alliance*

represented by **Aditya Dynar**
New Civil Liberties Alliance
1225 19th St. NW, Ste. 450
Washington, DC 20036
202-869-5210
Email: adi.dynar@ncla.legal
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/03/2020 | 1 | COMPLAINT. Filing fee received: $400.00, receipt number 0970-17790993 filed by Axon Enterprise Incorporated. (Petersen, Pamela) (Attachments: # 1 Civil Cover Sheet)(BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 2 | *Summons Submitted by Axon Enterprise Incorporated. (Petersen, Pamela) *Modified to correct event type and text on 1/3/2020 (BAC). (Entered: 01/03/2020) |
| 01/03/2020 | 3 | Filing fee paid, receipt number 0970-17790993. This case has been assigned to the Honorable Deborah M Fine. All future pleadings or documents should bear the correct case number: CV-20-00014-PHX-DMF. Magistrate Election form attached.(BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 4 | Summons Issued as to Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, |

**ER 156**

Rebecca Slaughter, Christine Wilson. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(BAC). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/03/2020)

| | | |
|---|---|---|
| 01/03/2020 | 5 | NOTICE TO THE PARTIES - The Court is participating in the Mandatory Initial Discovery Pilot (MIDP) and this case is subject to that pilot. The key features and deadlines are set forth in the attached Notice which includes General Order 17-08. Also attached is a checklist for use by the parties. All parties must respond to the mandatory initial discovery requests set forth in the General Order before initiating any further discovery in this case. Please note: The discovery obligations in the General Order supersede the disclosures required by Rule 26(a)(1). Any party seeking affirmative relief must serve a copy of the attached documents (Notice to Parties, including General Order 17-08 and MIDP Checklist) on each new party when the Complaint, Counterclaim, Crossclaim, or Third-Party Complaint is served. (BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 6 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Axon Enterprise Incorporated. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. ***No further action is required***. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 7 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Axon Enterprise Incorporated. Pursuant to the Electronic Case Filing Administrative Policies and Procedures Manual Section II(B), attorneys are required to submit the automated Civil Cover Sheet when filing a new case. ***FOLLOW-UP ACTION REQUIRED:*** Please refile the Civil Cover Sheet, using the correct format. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 8 | NOTICE TO PARTY OF DEFICIENCY RE: CORPORATE DISCLOSURE STATEMENT: Pursuant to FRCiv 7.1 and LRCiv 7.1.1 the attached Corporate Disclosure Statement form must be filed by all nongovernmental corporate parties with their first appearance. A supplemental statement must be filed upon any change in the information. In addition, if not already filed, the Corporate Disclosure Statement should be filed within 14 days. Corporate Disclosure Statement Deadline set as to Axon Enterprise Incorporated. (BAC) (Entered: 01/03/2020) |
| 01/03/2020 | 9 | Additional Attachments to Main Document re: 1 Complaint *Corrected Civil Cover Sheet* by Plaintiff Axon Enterprise Incorporated. (Petersen, Pamela) (Entered: 01/03/2020) |
| 01/03/2020 | 10 | Corporate Disclosure Statement by Axon Enterprise Incorporated. (Petersen, Pamela) (Entered: 01/03/2020) |
| 01/06/2020 | 12 | Party Elects Assignment of Case to District Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/07/2020) |
| 01/07/2020 | 13 | MINUTE ORDER: Pursuant to Local Rule 3.7(b), a request has been received for a random reassignment of this case to a District Judge. FURTHER ORDERED Case reassigned by random draw to Judge Dominic W Lanza. All further pleadings/papers should now list the following COMPLETE case number: CV-20-0014-PHX-DWL. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/07/2020) |
| 01/07/2020 | 14 | PRELIMINARY ORDER: IT IS THEREFORE ORDERED: 1. That Plaintiff(s) must promptly serve a copy of this Order and its Attachments on Defendant(s) and file notice of service with the Clerk of Court; 2. That, unless the Court orders otherwise, on **April 6, 2020**, the Clerk of Court shall terminate without further notice any Defendant in this action that has not been served pursuant to Rule 4(m) of the Federal Rules of Civil Procedure; 3. That, unless the Court orders otherwise, the parties shall file with the Clerk of Court a notice of service of MIDP Responses, supplemental MIDP Responses, and production of ESI, rather than copies of the actual disclosures |

**ER 157**

| | | |
|---|---|---|
| | | [see attached Order for details]. Signed by Judge Dominic W Lanza on 1/7/20. (Attachments: # 1 Notice - MIDP, # 2 MIDP User Manual)(MAW) (Entered: 01/07/2020) |
| 01/09/2020 | | Remark: Pro hac vice motion(s) granted for Thomas King-Sun Fu on behalf of Plaintiff Axon Enterprise Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/09/2020) |
| 01/09/2020 | 15 | MOTION for Preliminary Injunction *and Supporting Memorandum of Points and Authorities* by Axon Enterprise Incorporated. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Petersen, Pamela) (Entered: 01/09/2020) |
| 01/10/2020 | | Remark: Pro hac vice motion(s) granted for Jonathan Adler Direnfeld on behalf of Plaintiff Axon Enterprise Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/10/2020) |
| 01/10/2020 | | Remark: Pro hac vice motion(s) granted for Garret Garretson Rasmussen on behalf of Plaintiff Axon Enterprise Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/10/2020) |
| 01/10/2020 | 16 | * SERVICE EXECUTED filed by Axon Enterprise Incorporated: Declaration of Service re: Summons; Complaint for Declaratory and Injunctive Relief; Preliminary Order dated January 7, 2020; Notice to Parties-Mandatory Initial Discovery Pilot Project; Mandatory Initial Discovery Users' Manual for the District of Arizona; Civil Cover Sheet; Plaintiff's Corporate Disclosure Statement; and Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Points and Authorities upon Federal Trade Commission; Joseph Simons; Rebecca Slaughter; Christine Wilson; Noah Phillips; Rohit Chopra on 1/9/2020 (summons and complaint) and mailed motion for preliminary injunction and supporting memorandum on 1/10/2020; copies of summons and complaint were mailed by certified mail to Michael Bailey on 1/10/2020 and to William P. Barr on January 9, 2020 and mailed motion for preliminary injunction and supporting memorandum January 10, 2020, Postal Service delivery confirmation or signed PS Form 3811 not provided for Bailey or Barr, per Declaration. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Direnfeld, Jonathan) * Modified to add text; attorney noticed on 1/13/2020 (LAD). (Entered: 01/10/2020) |
| 01/10/2020 | | Remark: Pro hac vice motion(s) granted for Antony P Kim on behalf of Plaintiff Axon Enterprise Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/10/2020) |
| 01/13/2020 | 17 | SERVICE EXECUTED filed by Axon Enterprise Incorporated: Declaration of Service re: Summons; Complaint for Declaratory and Injunctive Relief; Preliminary Order dated January 7, 2020; Notice to Parties-Mandatory Initial Discovery Pilot Project; Mandatory Initial Discovery Users' Manual for the District of Arizona; Civil Cover Sheet; Plaintiff's Corporate Disclosure Statement; and Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Points and Authorities *(Supplemental Declaration of Service to ECF 16)* upon Federal Trade Commission; Joseph Simons; Rebecca Slaughter; Christine Wilson; Noah Phillips; Rohit Chopra; Michael Bailey; William P. Barr on January 13, 2020. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Direnfeld, Jonathan) (Entered: 01/13/2020) |
| 01/23/2020 | 18 | NOTICE OF ATTORNEY APPEARANCE: Bradley Craigmyle appearing for Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson. . (Craigmyle, Bradley) (Entered: 01/23/2020) |
| 01/23/2020 | 19 | RESPONSE to Motion re: 15 MOTION for Preliminary Injunction *and Supporting Memorandum of Points and Authorities* filed by Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson. (Craigmyle, Bradley) (Entered: 01/23/2020) |
| 01/29/2020 | 20 | NOTICE re: Notice of Change of Contact Information by Axon Enterprise Incorporated . (Petersen, Pamela) (Entered: 01/29/2020) |

**ER 158**

| 01/30/2020 | 21 | REPLY to Response to Motion re: 15 MOTION for Preliminary Injunction *and Supporting Memorandum of Points and Authorities* filed by Axon Enterprise Incorporated. (Attachments: # 1 Exhibit 1)(Petersen, Pamela) (Entered: 01/30/2020) |
| --- | --- | --- |
| 01/30/2020 | 22 | MOTION to Expedite Hearing and Consideration of Preliminary Injunction Motion by Axon Enterprise Incorporated. (Attachments: # 1 Text of Proposed Order)(Petersen, Pamela) (Entered: 01/30/2020) |
| 01/31/2020 | 23 | RESPONSE in Opposition re: 22 MOTION to Expedite Hearing and Consideration of Preliminary Injunction Motion filed by Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson. (Craigmyle, Bradley) (Entered: 01/31/2020) |
| 03/04/2020 | 24 | ORDER: IT IS ORDERED that Axon's motion to expedite (Doc. 22 ) is granted. Oral argument is set on **April 1, 2020, at 10:00 a.m.** [see attached Order for details]. Signed by Judge Dominic W Lanza on 3/4/20. (MAW) (Entered: 03/04/2020) |
| 03/06/2020 | 25 | First MOTION for Extension of Time to File Responsive Pleading by Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson. (Attachments: # 1 Text of Proposed Order re Extension of Time to Respond to Plainitff's Complaint)(Craigmyle, Bradley) (Entered: 03/06/2020) |
| 03/08/2020 | 26 | RESPONSE in Opposition re: 25 First MOTION for Extension of Time to File Responsive Pleading filed by Axon Enterprise Incorporated. (Petersen, Pamela) (Entered: 03/08/2020) |
| 03/09/2020 | 27 | REPLY to Response to Motion re: 25 First MOTION for Extension of Time to File Responsive Pleading filed by Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson. (Craigmyle, Bradley) (Entered: 03/09/2020) |
| 03/09/2020 | 28 | *MOTION for Expedited Consideration of 25 First MOTION for Extension of Time to File Responsive Pleading by Rohit Chopra, Federal Trade Commission, Noah Phillips, Joseph Simons, Rebecca Slaughter, Christine Wilson (Craigmyle, Bradley) *Modified to correct event on 3/10/2020 (WLP). (Entered: 03/09/2020) |
| 03/10/2020 | 29 | NOTICE OF TENTATIVE RULING: A hearing limited to the issue of subject matter jurisdiction is set for April 1, 2020. (Doc. 24 .) In advance of that hearing, the Court wishes to provide the parties with its tentative ruling. This is, to be clear, only a tentative ruling. The point of providing it beforehand is to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize the parties' ability to address any perceived errors in the Court's logic [see attached Order for details]. Signed by Judge Dominic W Lanza on 3/10/20. (MAW) (Entered: 03/10/2020) |
| 03/10/2020 | 30 | ORDER: IT IS ORDERED that the FTC's motion for expedited consideration (Doc. 28 ) is granted. IT IS FURTHER ORDERED that the FTC's motion for an extension of time to file a responsive pleading (Doc. 25 ) is granted. If such a pleading is necessary, the FTC will have 14 days from the date the Court enters its order on the jurisdictional question [see attached Order for details]. Signed by Judge Dominic W Lanza on 3/10/20. (MAW) (Entered: 03/10/2020) |
| 03/13/2020 | 31 | ORDER: A motion hearing is scheduled for April 1, 2020, concerning the Court's subject matter jurisdiction (Doc. 24 ), and the Court has now issued a tentative order concerning that issue (Doc. 29 ). Due to the pandemic and the fact that some counsel in this case are not based in Arizona, this will be reset as a telephonic hearing. Counsel are directed to call (866) 390-1828; Access Code: 9667260 five minutes prior to the scheduled hearing. Counsel are advised that speaker phones and cell phones are not permitted. Additionally, because the Court was able to issue the tentative order more quickly than originally anticipated, the Court is amenable to accelerating the hearing date at the joint request of the parties. If the parties jointly desire such an acceleration, they are directed to send an email to lanza_chambers@azd.uscourts.gov proposing alternative times and dates. Absent joint agreement, the current hearing date will stand. Ordered by Judge Dominic W Lanza on |

## ER 159

| | | |
|---|---|---|
| | | 3/13/20. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 03/13/2020) |
| 03/27/2020 | 32 | MOTION to File Amicus Curiae *Brief (UNOPPOSED)* by New Civil Liberties Alliance. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Amicus Brief)(Dynar, Aditya) (Entered: 03/27/2020) |
| 03/27/2020 | 33 | ORDER: IT IS ORDERED that New Civil Liberties Alliance's motion to file amicus brief (Doc. 32 ) is granted. New Civil Liberties Alliance may file their amicus brief. Ordered by Judge Dominic W Lanza on 3/27/20. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 03/27/2020) |
| 03/30/2020 | 34 | ORDER: The Court received a telephone call from Amicus New Civil Liberties Alliance requesting telephonic appearance at the April 1, 2020 hearing. IT IS ORDERED that Amicus may call in. Counsel shall adhere to the Court's March 13, 2020 Order (Doc. 31 ). Ordered by Judge Dominic W Lanza on 3/30/20. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 03/30/2020) |
| 03/30/2020 | 35 | TRANSCRIPT REQUEST by Axon Enterprise Incorporated for proceedings held on April 1, 2020, Judge Dominic W Lanza hearing judge(s). (Petersen, Pamela) (Entered: 03/30/2020) |
| 03/31/2020 | 36 | NOTICE TO FILER OF DEFICIENCY re: 35 Transcript Request filed by Axon Enterprise Incorporated. Document not in compliance with LRCiv 5.5(g) ELECTRONIC FILING - Documents signed by an attorney shall be filed using that attorney's ECF log-in and password and shall not be filed using a log-in and password belonging to another attorney. *FOLLOW-UP ACTION REQUIRED:* Please refile with sections 1 & 19 matching the name of the ECF registered user under whose log-in and password the document will be re-submitted under. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 03/31/2020) |
| 03/31/2020 | 37 | ORDER: The Court has received inquiries from several media organizations and other non-party entities who wish to listen to the April 1, 2020, motion hearing via teleconference. Although the usual rule is that federal district courts may not broadcast their proceedings, the Executive Committee of the Judicial Conference issued a guidance document this morning that "approve[s] a temporary exception to the policy to allow a judge to authorize the use of teleconference technology to provide the public and the media audio access to court proceedings while public access to federal courthouses generally, or with respect to a particular district, is restricted due to health and safety concerns during the Coronavirus Disease (COVID-19) pandemic." Given this development, public access to tomorrow's hearing via teleconference will be permitted. Those seeking access are directed to call (866) 390-1828; Access Code: 9667260 at least five minutes before the scheduled hearing. Ordered by Judge Dominic W Lanza on 3/31/20. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 03/31/2020) |
| 03/31/2020 | 38 | AMENDED TRANSCRIPT REQUEST pursuant to 36 Notice of Deficiency by Axon Enterprise Incorporated for proceedings held on April 1, 2020, Judge Dominic W Lanza hearing judge(s). (Petersen, Pamela) (Entered: 03/31/2020) |
| 04/01/2020 | 39 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Telephonic Oral Argument re: subject matter jurisdiction held on 4/1/2020. Argument held. IT IS ORDERED taking this matter under advisement.<br><br>APPEARANCES: Jonathan Direnfeld, Thomas King-Sun Fu, Antony Kim and Garrett Rasmussen (all appearing telephonically) and Pamela Petersen (present in the courtroom) for Plaintiff. Bradley Craigmyle and Rebecca Cutri-Kohart (both appearing telephonically) for Defendants. Aditya Dynar (telephonically) for Amicus. (Court Reporter Candy Potter) Hearing held 10:06 AM to 11:26 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this |

**ER 160**

| | | entry. (MAW) (Entered: 04/01/2020) |
|---|---|---|
| 04/02/2020 | 40 | NOTICE re: of Filing Supplemental Exhibits by Axon Enterprise Incorporated re: 15 MOTION for Preliminary Injunction *and Supporting Memorandum of Points and Authorities* . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Petersen, Pamela) (Entered: 04/02/2020) |
| 04/06/2020 | 44 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *TELEPHONIC ORAL ARGUMENT* proceedings for date of 04/01/2020 before Judge DOMINIC W. LANZA re: 43 Notice of Appeal. [Court Reporter: Candy L. Potter, RMR, CRR, Telephone number (602) 322-7246]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/27/2020. Redacted Transcript Deadline set for 5/7/2020. Release of Transcript Restriction set for 7/6/2020. (RAP) (Entered: 04/14/2020) |
| 04/08/2020 | 41 | ORDER: Axon's 1 Complaint is dismissed without prejudice due to a lack of subject matter jurisdiction. Axon's 15 Motion for Preliminary Injunction is denied as moot. The Clerk of the Court shall enter judgment accordingly and terminate this action. Signed by Judge Dominic W Lanza on 4/8/20. (GMP) (Entered: 04/08/2020) |
| 04/08/2020 | 42 | CLERK'S JUDGMENT - IT IS ORDERED AND ADJUDGED that pursuant to the Court's order filed April 8, 2020, Plaintiff to take nothing, and the complaint and action are dismissed without prejudice. (GMP) (Entered: 04/08/2020) |
| 04/13/2020 | 43 | NOTICE OF APPEAL to 9th Circuit Court of Appeals re: 42 Clerks Judgment, 41 Order on Motion for Preliminary Injunction by Axon Enterprise Incorporated. Filing fee received: $ 505.00, receipt number 0970-18174255. (Petersen, Pamela) (Entered: 04/13/2020) |
| 04/15/2020 | 45 | USCA Case Number re: 43 Notice of Appeal. Case number 20-15662, Ninth Circuit. (DXD) (Entered: 04/15/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/22/2020 11:43:06 | | | |
| **PACER Login:** | ti063201:3048315:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-00014-DWL |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**ER 161**

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that, on May 1, 2020, I electronically filed the foregoing Appellant's

Excerpts of Record with the Clerk of Court for the United States Court of Appeals

for the Ninth Circuit by using the appellate CM/ECF System, which will send notice

of such filing to all registered users.


*/s/ Pam Petersen*