**No. 20-15662**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Axon Enterprise, Inc.,
Plaintiff-Appellant,
v.
Federal Trade Commission, et al.,
Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
(CV 20-00014-DWL)

## PLAINTIFF-APPELLANT'S *CORRECTED* OPENING BRIEF

Pamela B. Petersen
Axon Enterprise, Inc.
17800 N. 85th Street
Scottsdale, AZ 85255
Tel. No: (623) 326-6016
Fax No: (480) 905-2027
Email: ppetersen@axon.com

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Axon Enterprise, Inc. ("Axon") states that it has no parent corporation and BlackRock Institutional Trust Company, N.A. owns 10% or more of Axon's stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES........................................................2

STATUTORY PROVISIONS ........................................................3

INTRODUCTION ........................................................3

STATEMENT OF THE CASE........................................................4

    A.    Factual and Procedural History ........................................................4

    B.    The District Court's Ruling ........................................................8

SUMMARY OF THE ARGUMENT ........................................................10

STANDARD OF REVIEW ........................................................12

ARGUMENT ........................................................13

I.    THE DISTRICT COURT HAS SUBJECT MATTER JURISDICTION TO HEAR AXON'S CONSTITUTIONAL STRUCTURE AND PROCESS CLAIMS. ........................................................13

    A.    Distinguishing the "Trilogy" Cases—Constitutional Entanglement With Administrative Merit ........................................................14

    B.    Ninth Circuit Precedent Finds Jurisdiction Over System-Wide Process Claims Unrelated To Individual Merits ........................................................20

    C.    No Discernible Jurisdiction-Stripping Intent In FTC Review Scheme For Structural and Process Constitutional Claims ........................................................25

        1.    Clearance Process Challenge Is Pattern and Practice Claim Outside the FTC Act and Unrelated To Any Commission Action or Order ........................................................29

a.    Clearance Claim Falls Outside Review Statute's Provisions. ........................................................31

b.    Wholly Collateral To Antitrust Merits ............................33

c.    No Commission Expertise or Competence To Decide Collateral Constitutional Issues .....................................34

d.    Eventual Review Is *Not* Meaningful Review. ................35

2.    Review Scheme Does Not Preclude Due Process Challenge To FTC Structure Combining Investigatory, Prosecutorial, Adjudicative, and Appellate Functions In Single Agency Resulting In Undisputed 25-Year Win Rate ..............................39

3.    Article II Separation-of-Powers Claim Is Controlled By *Free Enterprise* and Within the District Court's Jurisdiction ............45

a.    Article II Claim Is "Wholly Collateral" To the Commission's Ordinary Review Process ......................47

b.    Article II Claim Is Outside the FTC's "Competence and Expertise." ....................................................................48

c.    Declining Jurisdiction Would Deprive Axon of Any *Meaningful* Avenue of Relief .........................................50

d.    District Court Failed To Distinguish Between Structural Constitutional Claim and Antitrust Merits Claim. .........52

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................59

STATEMENT OF RELATED CASES ..................................................................60

CERTIFICATE OF COMPLIANCE......................................................................60

CERTIFICATE OF FILING AND SERVICE .......................................................61

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Abrams v. SSA*, 703 F.3d 538 (Fed. Cir. 2012)........................................49

*Animal Legal Defense Fund v. USDA*, 935 F.3d 858 (9th Cir. 2019) ....................13

*Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015) ...................................... 53, 54

*Bell v. Hood*, 327 U.S. 678 (1946)..........................................46

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ..........................................52

*Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868 (2009)........................................43

*Center for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019)..........13

*Chicago Bridge & Iron C. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008)...................42

*City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865 (9th Cir. 2009) .. 21, 22, 23

*Cochran v. SEC*, No. 19-10396 (5th Cir. Sept. 24, 2019) .......................................52

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012).................................................. passim

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................ 35, 58

*Fashion Originators Guild of Am. v. FTC*, 114 F.2d 80 (2d Cir. 1940)...................36

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*,

   561 U.S. 477 (2010) ........................................................................ passim

*FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018) ....................................28

*FTC v. Standard Oil*, 449 U.S. 232 (1980)....................................... 57, 58

*Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018) .................................................21

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ...................................................35

*Grolier Inc. v. FTC*, 615 F.2d 1215 (9th Cir. 1980) .................................................41

*Guerrero-Lasprilla v. Barr*, 140 S.Ct. 1062 (2020) ................................................22

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004) ...................................................43

*Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016) ...................................................... 52, 54

*Humphrey's Executor v. U.S.*, 295 U.S. 602 (1935)................................................46

*In re Complaint of Judicial Misconduct*, 816 F.3d 1266 (9th Cir. 2016)...............44

*In re Murchison,* 349 U.S. 133 (1955).......................................................44

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)..........................................................53

*Johnson v. Robison,* 415 U.S. 361 (1974) ...............................................................20

*Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012)........................................... 12, 28, 31

*Long v. SSA*, 635 F.3d 526 (Fed. Cir. 2011) ...........................................................49

*Louisiana Real Estate Appraisers Bd. v. Fed. Trade Comm'n*, 917 F.3d 389

  (5th Cir. 2019) ...................................................................................................27

*Mace v. Skinner,* 34 F.3d 854 (9th Cir. 1994) ........................................................23

*Malone v. Department of Justice,* 13 MSPB 81 (1983)...........................................36

*Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980).......................................................44

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991).................. 19, 20, 21

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ................................... 35, 44, 58

*Montana Chapter of Ass'n of Civilian Technicians, Inc. v. Young*, 514 F.2d 1165

    (9th Cir. 1975) ........................................................................... 36, 43

*New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350 (1989) ..................... 11

*Oestereich v. Selective Ser. System Local Bd. No. 11*, 393 U.S. 233 (1968) .......... 20

*Polypore., Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012) ........................................ 42

*Recinto v. U.S. Dept. of Veterans Affairs*, 706 F.3d 1171 (9th Cir. 2013) ............. 21

*Selia Law LLC v. Consumer Financial Protection Bureau S.Ct. No.19-7* ............. 46

*Stivers v. Pierce,* 71 F.3d 732 (9th Cir. 1995) ....................................................... 44

*Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994) ................................. passim

*Tilton v. SEC*, 824 F.3d 276 (2d Cir. 2016) ................................................. 52, 54, 56

*Trustees of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*,

    572 F.3d 771 (9th Cir. 2009) ................................................................. 46

*U.S. v. Litton Indus., Inc.*, 462 F.2d 14 (9th Cir. 1972) ......................................... 42

*Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) ....... passim

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,* 379

    U.S. 411 (1965) .................................................................................. 13

*Wilkins v. U.S.*, 279 F.3d 782 (9th Cir. 2002) ....................................................... 13

*Williamson & Co., Inc. v. Bd. of Assessment and Appeals No. 3 ex rel. Orange*

    *County and State of Cal.*, 695 F.3d 960 (9th Cir. 2012) ............................... 42, 44

*Withrow v. Larkin,* 421 U.S. 35 (1975) .......................................................... 42, 44

**Statutes**

U.S. Const. Art. III ................................................................. passim

U.S. Const. Amend. V ........................................................... passim

5 U.S.C. § 1202 ................................................................. 45, 49

5 U.S.C. § 3328 ........................................................................14

5 U.S.C. § 7521 ........................................................................45

5 U.S.C. § 7703 ........................................................................27

8 U.S.C. § 1160 ........................................................................22

15 U.S.C. § 41 ..........................................................................46

15 U.S.C. § 45 ................................................................... passim

15 U.S.C. § 78y ................................................................. passim

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 .............................................................. 1, 3, 10

28 U.S.C. § 2107 ........................................................................1

28 U.S.C. § 2201 ......................................................................10

30 U.S.C. § 801 ........................................................................16

30 U.S.C. § 816 ........................................................................27

38 U.S.C. § 511 ........................................................................23

## Rules

16 C.F.R. § 3.1 ...............................................................................39

16 C.F.R. § 3.54 .............................................................................39

9th Cir. R. 28-2.7. ...........................................................................3

Fed. R. App. P. 4(a)(1)(B)(ii) .........................................................1

## Other Authorities

11A Wright & Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995) .....58

Andrew N. Vollmer, *Accusers as Adjudicators in Agency Enforcement*

    *Proceedings*, 52 U. Mich. J. L. Ref. 103 (2018) ........................... 40, 41

Joshua D. Wright, *Section 5 Revisited: Time for the FTC to Define the Scope of Its*

    *Unfair Methods of Competition Authority* (2015)........................................ 40,41

S.  Rep. 95-969 at 63, U.S. Cong. Admin. News 1978, p.2785 .............................16

## JURISDICTIONAL STATEMENT

The district court has original subject matter jurisdiction over Axon's constitutional challenges arising from Article II separation-of-powers and Fifth Amendment due process and equal protection violations, pursuant to 28 U.S.C. § 1331. On April 8, 2020, the district court dismissed the action, without prejudice, for lack of jurisdiction (ER5-33) and entered final judgment (ER4).[1] This Court has jurisdiction under 28 U.S.C. § 1291. Axon timely filed its Notice of Appeal on April 13, 2020 (ER1), pursuant to 28 U.S.C. § 2107(b)(2) and Fed. R. App. P. 4(a)(1)(B)(ii).

---

[1] "ER" references are to Axon's Excerpts of Record filed simultaneously herewith. "Doc." references are to the district court's docket.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred as a matter of law in holding the FTC Act stripped its jurisdiction where Axon's substantive constitutional claims do not depend on the antitrust merits in the FTC Part 3 administrative proceedings, including whether the district court lacks jurisdiction to determine:

    a.    The constitutionality of the *uncodified*, black box "clearance" process by which the FTC and the DOJ divvy up merger investigations—thereby arbitrarily subjecting similarly situated companies to vastly different rights, standards, and consequences—in violation of Fifth Amendment due process and equal protection guarantees;

    b.    The constitutionality of the FTC's structure—combining investigative, prosecutorial, adjudicative, and appellate functions—together with its undisputed 25-year win streak in its own administrative forum, in violation of Fifth Amendment due process; and

    c.    The authority of the FTC's Administrative Law Judge to preside over the Part 3 proceedings in the first instance based on impermissible dual-layer for-cause removal protections, in violation of Article II of the U.S. Constitution.

**STATUTORY PROVISIONS**

The full text of the relevant constitutional and statutory provisions is set forth in the addendum included at the end of this brief. *See* 9th Cir. R. 28-2.7.

**INTRODUCTION**

Plaintiff-Appellant Axon Enterprise, Inc. ("Axon") appeals from the district court's April 8, 2020 dismissal of its constitutional challenges to certain Federal Trade Commission ("FTC" or "Commission") structures and processes for lack of jurisdiction (ER5). This ruling subjects Axon to the very forum it contends is unconstitutional before having its claims—acknowledged by the district court as "substantial and topical"—decided by an Article III court. This is true despite the fact that Axon's constitutional claims are separate from and do not depend on the antitrust merits, do not challenge any FTC order, do not require agency interpretation of any statute or rule it is charged with enforcing, do not seek any remedy under the FTC Act, and apply equally to all Part 3 merger respondents.

This appeal presents issues of first impression in this Circuit. In fact, no federal court has held that the FTC's statutory review scheme, 15 U.S.C. § 45(c)-(d), strips district courts of 28 U.S.C. § 1331 jurisdiction over constitutional challenges to the Commission's structure and processes. In other contexts, this Court has expressly confirmed district court jurisdiction of such "pattern and practice" claims, even in the face of agency statutes with express jurisdiction-stripping

3

language (which does not exist here). Nor has any federal court ever considered Axon's FTC/DOJ clearance-process challenge—an extra-statutory non-public practice simply made up between two agencies with concurrent enforcement jurisdiction. And no court has analyzed a party's potential for meaningful review against an agency's uncontroverted, unbroken 25-year win streak in its own home court—a fact this Court can and should take judicial notice of. Indeed, it is this inherently biased institutional process that strongly incentivizes FTC settlements and prevents weighty constitutional issues from ever reaching an Article III court. The district court's overbroad no-jurisdiction ruling here all but ensures this outcome and should be reversed.

## STATEMENT OF THE CASE

### A.    Factual and Procedural History.

On May 3, 2018, Axon acquired a failing competitor, Vievu LLC ("Vievu"), from Safariland LLC ("Safariland") for approximately $13 million in cash and stock (ER133, ¶ 24 & n.6). At the time of the acquisition, Vievu was essentially insolvent with substantial debt, *monthly* losses of nearly $1 million, and less than three days' operating cash (*Id*.). Axon and Vievu both sold body-worn cameras ("BWC") and digital evidence management systems ("DEMS") to law enforcement.

In June 2018, the FTC began what became an 18-month investigation of the Vievu acquisition (*Id*., ¶ 25). Axon cooperated in extensive discovery at a cost of

more than $1.6 million (*Id.*, ¶ 26; Doc.15-2, ¶¶ 4-5). In December 2019, Axon offered to divest all assets it acquired from Vievu and all Axon improvements to Vievu's products and to infuse the divestiture buyer with $5 million in working capital (ER125-26, ¶ 3). But the FTC demanded more—a "blank check" license to all of Axon's independently created BWC and DEMS intellectual property and technology, to stand up a virtual "clone" of Axon far stronger than Vievu ever was or ever could have become without impermissible government regulation (ER125, ¶ 3; ER134, ¶ 27). This unprecedented ultimatum, tantamount to a Fifth Amendment taking of Axon's intellectual property without due process, resulted in this lawsuit.

On January 3, 2020, Axon brought the underlying action against the FTC in the District of Arizona (ER124-152). The complaint sought declaratory and injunctive relief regarding three constitutional challenges: (1) the uncodified, black box "clearance" process by which the FTC and the Department of Justice Antitrust Division ("DOJ") divvy up merger investigations—thereby arbitrarily subjecting similarly situated companies to vastly different rights, standards, and consequences—in violation of Fifth Amendment due process and equal protection guarantees; (2) the FTC's combined functions of investigator, prosecutor, judge, jury and first line appeal, which have resulted in an undisputed, unprecedented 25-year win streak for the agency, in violation of fundamental Fifth Amendment due process; and (3) the impermissible dual-layer for-cause removal protections afforded the

FTC's Administrative Law Judge ("ALJ"), in violation of Article II of the U.S. Constitution (ER149-50, Counts 1-2).

Axon's complaint, filed *before* any FTC enforcement action, also included a Count 3 merits-based declaratory claim that the Vievu acquisition did not violate antitrust laws (ER150-51, ¶¶ 62-69). After the FTC filed its administrative case separately challenging the antitrust merits, Axon agreed its Count 3 merits claim here should be severed and dismissed (ER38 at 5:15-20; ER40-41 at 7:15-8:13).

Also on January 3, 2020 (but much later in the day), the FTC filed its administrative enforcement action against Axon and Safariland, FTC Docket 9389, seeking to unwind the Vievu acquisition (1-3-20 Administrative Part 3 Complaint).[2] The FTC alleges the merger was anticompetitive and adversely affected the BWC and DEMS market for "large, metropolitan police departments." (*Id*., ¶ 21). The Commission set the administrative hearing for the earliest possible date—May 19, 2020 (*Id*. at 11).[3]

---

[2] Public versions of the parties' pleadings and motions, as well the Commission and ALJ decisions and orders in the administrative case, may be found at https://www.ftc.gov/enforcement/cases-proceedings/1810162/axonvievu-matter. Safariland has since settled with the FTC (4-17-20 Decision and Order).

[3] A series of Commission orders dated March 13, March 19 and April 13, 2020 related to the public health emergency have resulted in a stay of the administrative proceedings until early June and a new hearing date of September 9, 2020.

On January 9, 2020, Axon filed a motion for preliminary injunction (Doc.15) in the district court to enjoin the administrative proceedings until such time as the court ruled on Axon's constitutional claims.[4] The following day, on January 10, 2020, Axon filed a motion to stay the administrative case until, at a minimum, the district court ruled on the preliminary injunction (1-10-20 Respondent's Motion to Stay Administrative Proceeding). The Commission denied the stay request on February 27, 2020 (2-27-20 Commission Order Denying Respondent's Motion for Stay).

On January 23, 2020, the FTC opposed Axon's preliminary injunction motion solely on jurisdictional grounds (Doc.19). On January 30, 2020, Axon filed its reply (Doc.21). The district court thereafter set the motion for oral argument on April 1, 2020, limited to the issue of subject matter jurisdiction (Doc.24). In advance of the hearing and to allow for a more focused argument, on March 10, 2020 the court issued a Notice of Tentative Ruling (Doc.29) favoring dismissal. On March 27, 2020, the New Civil Liberties Alliance ("NCLA") filed a motion for leave to submit an amicus brief in support of Axon (Doc.32), which the court granted (Doc.33).

---

[4] The preliminary injunction motion expressly excluded Axon's antitrust claim as a basis for injunctive relief, relying only on the Count 1-2 constitutional claims (Doc.15 at 11 n.4). Axon's constitutional claims are unrelated to, and do not turn on, the antitrust merits.

On April 1, 2020, the district court heard oral argument limited to its jurisdiction (Doc.39; ER37-92). Due to the significant public interest in the case and restrictions on attendance imposed by the Covid-19 pandemic, the court authorized live hearing access to the parties, media and public via teleconference (Doc.37). On April 8, 2020, the district court dismissed Axon's complaint, without prejudice, for lack of jurisdiction, and denied its motion for preliminary injunction as moot (ER4, 33). Axon promptly filed this appeal on April 13, 2020 (ER1).

### B.    The District Court's Ruling.

In dismissing Axon's complaint, the district court held that "[i]t is 'fairly discernable' from the FTC Act that Congress intended to preclude district courts from reviewing the type of constitutional claims Axon seeks to raise here—instead, Axon must raise those claims during the administrative process and then renew them, if necessary, when seeking review in the Court of Appeals." (ER6).

"The issue," according to the district court, "is whether Congress, *by enacting the FTC Act*, intended to require constitutional challenges to the FTC's structure and processes to be brought via the FTC Act's adjudicatory framework." (ER8, emphasis added). The court acknowledged that "[n]othing in the FTC Act expressly divests district courts of jurisdiction to entertain constitutional claims of the sort raised by Axon in this action." (ER13). The court further noted the FTC's failure to cite any relevant legislative history supporting congressional intent to strip district court

jurisdiction over structural constitutional claims, and expressed "doubt" that "it is possible to draw any meaningful conclusions" from the FTC Act's legislative history, which focused only on adopting a deferential standard of review but is "otherwise silent." (ER16). The court concluded, however, that Congress may *implicitly* preclude such jurisdiction simply "through the enactment of an administrative review scheme." (ER13; *see also* ER23-24 stating: "Here, the question isn't whether Axon's claims fall within some provision of the FTC Act that attempts to strip district courts of jurisdiction over certain categories of claims. Instead, the question is whether the *existence of the regulatory scheme itself* evinces an implicit judgment by Congress that district court jurisdiction should be precluded." (emphasis added)).

The district court then held that because the FTC regulatory scheme provides a "vehicle" by which Axon "ultimately [can] receive judicial review of its constitutional claim[s]," the administrative route is the exclusive road Axon must travel to obtain Article III review (ER27). In so holding, the court collapsed the Supreme Court's 3-part "meaningful review" test into a singular "eventual review" standard stating, "eventual review in an appellate court *is* meaningful review." (ER22, emphasis added). Under the district court's analysis, *all* constitutional claims that can be preserved for eventual appellate review—regardless of the agency's authority, expertise or competence to decide them—must await conclusion of the

administrative process, even if that process is the subject of the constitutional challenge. And *no* constitutional claim that can be preserved for eventual appellate review can ever be considered "wholly collateral" to the individual merits pending in that proceeding. This is not and cannot be the law and must be reversed.

## SUMMARY OF THE ARGUMENT

The district court's finding of implicit jurisdiction-stripping intent based on the mere "existence of the regulatory scheme itself" simply cannot be squared with Supreme Court and Ninth Circuit precedent affirming district court jurisdiction over constitutional challenges to administrative "structure" and "pattern and practices" untethered to individual merits determinations. Indeed, in *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), which challenged the very "existence" of the PCAOB, the Supreme Court examined the regulatory review scheme of 15 U.S.C. § 78y [the SEC counterpart to § 45 here] and determined there was no explicit *or implicit* limitation on district court jurisdiction. 561 U.S. at 489 (finding § 78y did <u>not</u> provide "an exclusive route to review" and that its "text does not expressly limit the jurisdiction that other statutes confer on districts courts. ***Nor does it do so implicitly.***" (emphasis added, internal citation to 28 U.S.C. §§ 1331 and 2201 omitted). Thus, the existence of an administrative review scheme itself is not outcome determinative  or even instructive on the issue of congressional intent.

Instead, the proper analytical framework must evaluate the substance of Axon's constitutional claims against the issues to be decided on the antitrust merits in the administrative case. If the constitutional substance is inextricably intertwined with the merits, as in *Thunder Basin* and *Elgin*, there is no district court jurisdiction. But where, as here, and in *Free Enterprise* and *McNary*, the constitutional claim is divorced from the individual merits of any agency statute or order, and goes instead to the constitutionality of the presiding officer or to an agency's general pattern or practice that violates the constitutional rights of all similarly situated parties, district courts are not stripped of federal question jurisdiction to decide those claims and in fact have a duty to do so. *See New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 358-59 (1989) (where federal jurisdiction is present, courts cannot decline it in favor of another tribunal).

Unlike the district court, this Court has not strained to harmonize the teachings of the so-called *Thunder Basin, Free Enterprise* and *Elgin* "trilogy," but has consistently assessed whether a constitutional challenge is directed to a "system-wide" process failure rather than evaluation of individual merits claims. *E.g., Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1033 (9th Cir. 2012) (en banc) ("*VCS*") (finding jurisdiction over facial constitutional challenge to the Veterans' Judicial Review Act ("VJRA") based on an alleged statutory *absence* of procedures necessary to safeguard veterans' rights). Thus, where, as here, a claim

11

challenges "the constitutionality of the procedures in place, *which frame the system by which a [party] presents his claims to the [agency]*," *Id.* at 1034 (emphasis added), district court jurisdiction is proper. *See also Latif v. Holder*, 686 F.3d 1122, 1129 (9th Cir. 2012) (no preclusion of district court jurisdiction under *Elgin* where plaintiffs raised "broad constitutional claims" that did "not require review of the merits" of individual grievances).

Axon's constitutional claims address FTC process and structure without regard to the antitrust merits at issue in the administrative case. Axon does not challenge any Commission order. It challenges, like *VCS*, an agency practice— uncodified in any statute, rule or regulation—that applies to all merger parties and arbitrarily subjects similarly situated companies to vastly different rights, standards, and consequences. And it challenges, like *Free Enterprise,* the very structure of the agency and the authority of its ALJ to preside over the Vievu acquisition at all, regardless of the ultimate determination of the lawfulness of that transaction. Because the substance of Axon's constitutional claims is not intertwined with the antitrust merits, the district court retains subject matter jurisdiction over these claims, and its judgment to the contrary should be reversed.

## STANDARD OF REVIEW

This Court reviews jurisdictional questions, including a district court's conclusion that it lacks subject matter jurisdiction, de novo. *Center for Biological*

*Diversity v. Bernhardt*, 946 F.3d 553, 559 (9th Cir. 2019) (reversing district court's

dismissal for lack of jurisdiction after analyzing jurisdiction-stripping statute);

*Animal Legal Defense Fund v. USDA*, 935 F.3d 858, 866 (9th Cir. 2019). When a

case is dismissed for lack of subject matter jurisdiction, the Court must accept the

facts alleged in the complaint as true. *Wilkins v. U.S.*, 279 F.3d 782, 784 n.1 (9th Cir.

2002).

## ARGUMENT

## I.   THE DISTRICT COURT HAS SUBJECT MATTER JURISDICTION TO HEAR AXON'S CONSTITUTIONAL STRUCTURE AND PROCESS CLAIMS.

Provisions for agency review do not restrict judicial review unless the

statutory scheme displays a "fairly discernible" intent to limit jurisdiction, <u>and</u> the

claims at issue "are of the *type* Congress intended to be reviewed within th[e]

statutory structure." [5] *Free Enterprise,* 561 U.S. at 489 (quoting *Thunder Basin Coal

Co. v. Reich,* 510 U.S. 200, 207, 212 (1994) (emphasis added)). Generally, when

Congress creates procedures "designed to permit agency expertise to be brought to

bear on particular problems," those procedures "are to be exclusive." *Id*. (quoting

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,* 379

U.S. 411, 420 (1965)). But courts are to "presume" that Congress does <u>not</u> intend to

---

[5] Thus, the question is <u>not</u> whether the FTC Act creates an exclusive review scheme for *some* types of claims. It does. The question is whether Axon's constitutional claims fit the type.  They don't.

limit jurisdiction if "'a finding of preclusion could foreclose all meaningful judicial review'"; if the suit is "'wholly collateral to a statute's review provisions'"; and if the claims are "'outside the agency's expertise.'" *Id*. (quoting *Thunder Basin,* 510 U.S. at 212-13). As in *Free Enterprise*, these considerations point *against* any limitation on district court jurisdiction here.

## A. Distinguishing the "Trilogy" Cases—Constitutional Entanglement With Administrative Merits.

At the outset, it is important to properly characterize the constitutional claims at issue in *Thunder Basin, Free Enterprise*, and *Elgin*, which the district court treated as a "trilogy" that it tried to harmonize (ER9, 27-28, 30-31) without recognizing the issue on which each case turned:  whether the substance of the claims presented was inextricably intertwined with the administrative merits.

*Elgin v. Dep't of Treasury*, 567 U.S. 1, 7-8 (2012), involved a former federal employee discharged for failing to register for the military draft under 5 U.S.C. § 3328. Elgin appealed his termination to the Merit Systems Protection Board ("MSPB"), arguing that a registration requirement applicable only to men is facially unconstitutional and operates as a bill of attainder. *Id*. at 8. When the MSPB rejected his claim, Elgin did not seek further review in the Federal Circuit, as was his immediate right, but instead joined others in a federal district court lawsuit raising the same sex discrimination challenge and requesting various forms of equitable

14

relief, including reinstatement and back pay under the Civil Service Reform Act ("CSRA") of 1978. *Id*. at 7-8.

The district court concluded it had jurisdiction to resolve the constitutional claim (*Id*. at 8), but the Supreme Court reversed because the substance of the constitutional claim was inextricably intertwined with the merits of the termination decision. The Supreme Court explained:

> [P]etitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment, and to receive the compensation they would have earned but for the adverse employment action. A challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme. Likewise, reinstatement, backpay, and attorney's fees are precisely the kinds of relief that the CSRA empowers the MSPB and the Federal Circuit to provide. Far from a suit wholly collateral to the CSRA scheme, the case before us is a challenge to CSRA-covered employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords.

*Id*. at 22 (internal citations omitted). Accordingly, in substance, Elgin's constitutional claim was in fact merits-based, and for this reason the Supreme Court concluded the CSRA review scheme precluded district court jurisdiction over *his* claims. *Id*. at 23.

Critically, the court in *Elgin* did <u>not</u> hold that *all* facial constitutional challenges are barred under the CSRA or any other agency review scheme. It simply refused to adopt a blanket exemption for facial constitutional claims, which must

15

continue to be analyzed based on the "*type* of the employee and the challenged employment action." *Id*. at 13, 15 (emphasis added).[6]

In *Thunder Basin*, a mine operator brought a pre-enforcement action[7] in district court challenging an order of the Mine Safety and Health Administration ("MSHA") that it post a designation of its miners' representative entitled to exercise walk-around inspection rights. 510 U.S. at 205. The operator refused, claiming the designations compromised its rights under the National Labor Relations Act ("NLRA"). *Id*. The district court issued an injunction preventing enforcement, but the court of appeals reversed, finding the challenge must be channeled through the administrative-review scheme of the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. § 801 *et seq.* 510 U.S. at 206. The court also rejected the mine operator's contention that requiring it to challenge MSHA's statutory

---

[6] This ruling is not surprising given the "floodgate" potential such an exemption would create if federal employees could circumvent the MSPB by simply alleging prohibited discrimination as a basis for an employment action. Such a reading would also have contravened the CSRA's legislative history, which made clear that Congress was specifically trying to eliminate district court actions by employees. S. Rep. 95-969 at 63, U.S. Cong. Admin. News 1978, p.2785.

[7] To be clear, Axon has never contended its first-to-file status is jurisdiction dispositive. (Doc.21 at 3 n.3, citing *Hill* and expressly stating, "the 'critical fact' is whether respondents 'can seek full postdeprivation relief' regardless of the timing").

interpretation through the statutory-review procedures would violate its due process rights.[8] *Id*. at 216.

The Supreme Court affirmed, finding the claims related substantively to the agency's interpretation of its own statute:

> Petitioner's statutory claims **at root** require interpretation of the parties' rights and duties under § 813(f) and 30 CFR pt. 40, and as such arise under the Mine Act and fall squarely within the Commission's expertise.

510 U.S. at 214 (emphasis added) (further noting that Commission is charged with developing "a uniform and comprehensive interpretation" of the Mine Act and "has extensive experience interpreting the walk-around rights").

In stark contrast to both *Elgin* and *Thunder Basin*, Axon is not challenging any Commission order or regulation, and its constitutional claims do not require any interpretation of a statute the FTC is charged with enforcing. Axon's constitutional structure and process claims exist regardless of the ultimate resolution of the antitrust merits in the administrative case.

Only *Free Enterprise* presented a structural constitutional challenge, achieving very different jurisdiction results. Indeed, the Supreme Court's favorable

---

[8] Although the district court gave short shrift to *Thunder Basin*'s extensive legislative history discussion of the Mine Act (ER10), it is noteworthy that "Congress expressly eliminated the power of a mine operator to challenge a final penalty assessment *de novo* in district court." 510 U.S. at 209-11.

jurisdiction decision was *unanimous* where the substance of the separation-of-powers constitutional claim did not arise under any agency order or statute, but challenged instead the very existence of the Public Company Accounting Oversight Board ("PCAOB" or "Board").

*Free Enterprise* addressed the constitutionality of the Board, created as part of a series of accounting reforms in the Sarbanes–Oxley Act of 2002. 561 U.S. at 484. The Board inspected the petitioner accounting firm, released a report critical of its auditing procedures, and began a formal investigation. *Id*. at 487. The firm filed a district court action during the ongoing investigation seeking a declaratory judgment that the Board was unconstitutional and an injunction preventing the Board from exercising its powers. *Id*. Like Axon's structural Article II claim here, the accounting firm's argument was that the Sarbanes-Oxley Act contravened the separation of powers by conferring executive power on a Board insulated from Presidential control by two layers of tenure protection, *i.e.*, Board members only removable for cause by the Securities and Exchange Commission ("SEC"), and SEC Commissioners who in turn could only be removed for cause by the President. *Id*. at 487, 496.

In affirming district court jurisdiction, the Supreme Court examined the statutory review scheme of 15 U.S.C. § 78y, which allows aggrieved parties to challenge "a final order of the Commission" or "a rule of the Commission" in a court

of appeals. *Id*. at 489 (citing § 78y(a)(1), (b)(1)). But § 78y provides "only for judicial review of *Commission* action, and not every Board action [such as the issuance of the negative report] is encapsulated in a final Commission order or rule." 561 U.S. at 490 (emphasis in original). Equally important, because petitioners "object[ed] to the Board's *existence*, not to any of its auditing standards," the court found this "general challenge to the Board is 'collateral' to any Commission orders or rules from which review might be sought." *Id*. at 490 (emphasis added) (citing *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 491-92 (1991) (upholding district court jurisdiction of "general collateral" challenge to INS "unconstitutional practices and policies" unrelated to individual amnesty determinations)).

The Supreme Court also expressly found that the structural constitutional claims presented in *Free Enterprise* were "outside the Commission's *competence and expertise*." 561 U.S. at 491 (emphasis added). In so holding, the court distinguished *Thunder Basin* where the petitioner's primary claims were "at root" statutory, arose under the Mine Act, and fell squarely within the agency's "extensive experience" and expertise. *Id*. In contrast, the *Free Enterprise* court found "[n]o similar expertise is required here, and the statutory questions involved do not require 'technical considerations of [agency] policy.'" *Id*. (citing *Johnson v. Robison,* 415

19

U.S. 361, 373 (1974)). Instead, the statutory questions are "standard questions of administrative law, which the courts are at no disadvantage in answering."[9] *Id*.

So too here, Axon is not challenging any ALJ ruling, but an impermissible "dual-layer of removal protection" that disqualifies him from presiding over Axon's administrative case at all. The Article II constitutional claim requires no statutory interpretation, factfinding or agency expertise, and is wholly collateral to the antitrust merits. Thus, as addressed further *infra*, the district court has jurisdiction over Axon's constitutional claims based on a proper substantive claim analysis.

## B.  Ninth Circuit Precedent Finds Jurisdiction Over System-Wide Process Claims Unrelated To Individual Merits.

This Court has upheld district court jurisdiction for constitutional challenges to agency practices and processes, or the lack thereof, despite an allegedly exclusive statutory review scheme, including in its en banc decision in *VCS*, 678 F.3d at 1033 (finding jurisdiction over facial constitutional challenge to VJRA based on alleged statutory *absence* of procedures necessary to safeguard veterans' rights). *See also McNary*, 498 U.S. at 483-84 (upholding district court jurisdiction over INS "pattern

---

[9] *See also Johnson*, 415 U.S. at 368 ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.") (quoting *Oestereich v. Selective Ser. System Local Bd. No. 11*, 393 U.S. 233, 242 (1968)). Although the court in *Thunder Basin* said this general rule disfavoring constitutional adjudication by agencies is not "mandatory," 510 U.S. at 204, it hardly endorsed the notion in the absence of constitutional entanglement with the administrative merits.

and practice" procedural due process challenge notwithstanding clear congressional intent to preclude *any* judicial review of amnesty determinations). Thus, district court jurisdiction is proper where, as here, a claim challenges "the constitutionality of the procedures in place, *which frame the system* by which a [party] presents his claims to the [agency]." *VCS,* 678 F.3d at 1034 (emphasis added). *See also Recinto v. U.S. Dept. of Veterans Affairs*, 706 F.3d 1171, 1175-76 (9th Cir. 2013) (discussing plaintiffs' due process and facial equal protection claims, citing *VCS*, and finding jurisdiction over equal protection claim).

In *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018), this Court explained that "we retain jurisdiction over challenges to an agency's "pattern and practice," but that phrase "is not an automatic shortcut to federal court jurisdiction." (quoting *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 872-73 (9th Cir. 2009)). No matter how an argument is characterized, the key to review is whether the claim challenges "a genuinely *collateral* action." *Id.* (emphasis in original) (affirming complaint dismissal where substance of claim involved individual merits determination).

*McNary* is often cited as the classic "collateral" action case, including in *Free Enterprise,* 561 U.S. at 490. In *McNary*, several refugee centers and unsuccessful individual special agricultural worker ("SAW") amnesty applicants challenged the arbitrary manner in which the INS conducted program interviews. 498 U.S. at 487.

The applicable review statute stated there "shall be no administrative or judicial review" of application determinations. *Id.* at 491 n.12 (citing 8 U.S.C. § 1160(e)). Yet, while Congress "could hardly have chosen clearer or more forceful language to express its intention," the Supreme Court found that the administrative appeals process only concerned "the denial of an individual application," not "general collateral challenges to unconstitutional practices and polices used by the agency in processing applications."[10] *Id.* at 491 n.12, 492.

Distilling "guiding principles" from *McNary*, the Ninth Circuit similarly assesses district court jurisdiction by asking "whether the claim challenges a 'procedure or policy that is collateral'" to the substance of the agency's determination. *City of Rialto*, 581 F.3d at 874.[11] When the relevant statute appears to vest jurisdiction exclusively in the appellate courts, this Court has held that claims "like those asserted in *McNary*" could proceed because they:

> are not based on the merits of [the plaintiff's] individual situation, but constitute a broad challenge to allegedly unconstitutional [agency] practices." We made clear that the district court lacks jurisdiction over

---

[10] The district court distinguished *McNary* (ER23-24) in part for predating the "trilogy." Yet, *McNary* remains oft-cited law in both the Supreme Court and Ninth Circuit. *See, e.g., Guerrero-Lasprilla v. Barr*, 140 S.Ct. 1062, 1069 (2020) (citing *McNary*'s "well-settled" and "strong presumption" of making available meaningful judicial review); *Free Enterprise*, 561 U.S. at 490 (citing *McNary* favorably).

[11] Although these cases generally involve judicial review provisions within immigration statutes, the Court clarified in *City of Rialto* that "the principles announced there apply more generally to **all statutes** that bar judicial review of *individual* agency actions." 581 F.3d at 875 (bold emphasis added).

> a challenge to the agency's "actions" or "conduct" "in adjudicating a
> specific individual claim," but district courts do have jurisdiction over
> "a broad challenge" to the agency's "procedures" or "practices."

*Id*. at 875 (discussing *Mace v. Skinner,* 34 F.3d 854, 856 (9th Cir. 1994) (finding district court subject matter jurisdiction over broad challenges to legitimacy of FAA revocation procedures)).

More recently in *VCS*, this Court addressed three constitutional due process challenges regarding (1) the delayed provision of mental health care, (2) the delayed adjudication of service-related disability benefits, and (3) the lack of adequate procedures when veterans filed claims for service-related disability benefits in Veterans Affairs ("VA") regional offices. 678 F.3d at 1026-33. Similar to the INS in *McNary* and the FTC here, the VA invoked the relevant jurisdiction-stripping statute, 38 U.S.C. § 511, which stated that the VA "shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans." *Id.* at 1022.

The Ninth Circuit addressed each claim separately and distinguished between claims aimed at "system-wide" process failures and those requiring evaluation of individual benefit requests. *Id.* at 1026. *See also City of Rialto,* 581 F.3d at 875-76 (addressing separately three distinct "pattern and practice" claims in complaint). The *VCS* Court determined that the district court lacked jurisdiction over the first two claims because the reasonableness of the delays turned on individual circumstances,

but found and exercised jurisdiction over the third claim based on the absence of procedures necessary to afford due process, *i.e.*, the fairness of the tribunal itself.[12]

*Id*. at 1034-35. The Court explained:

> A consideration of the constitutionality of the procedures in place, which frame the system by which a veteran presents his claims to the VA, is different than a consideration of the decisions that emanate through the course of the presentation of those claims. In this respect, VCS does not ask us to review the decisions of the VA in the cases of individual veterans, but to consider, in the "generality of cases," the risk of erroneous deprivation inherent in the existing procedures….

*Id*. at 1034.

Thus, the district court erred in failing to apply *Free Enterprise*, *McNary*, *VCS*, and other relevant Ninth Circuit precedent to 15 U.S.C. § 45(c)-(d) and Axon's constitutional claims. As addressed below (and as the district court failed to do despite Axon's urging, ER38-39 at 5:15-6:9),[13] the Court must analyze the substance of each of Axon's constitutional claims and whether they are intertwined with the

---

[12] Accordingly, jurisdiction is not an all or nothing proposition. The Court can sever and dismiss claims entangled with the administrative merits, like Axon's Count 3, and accept jurisdiction of the Count 1-2 claims relating to extra-statutory clearance practices and structural due process and ALJ authority issues affecting all Part 3 proceedings.

[13] While the district court dropped a footnote stating that it "conduct[ed] an independent preclusion analysis as to each of [Axon's] three constitutional claims," this analysis appears nowhere in the opinion nor does the opinion acknowledge Axon's severance of Count 3 at oral argument (ER20 n.5; ER38 at 5:15-20; ER40-41 at 7:15-8:13).

antitrust merits of the Vievu acquisition. This review clearly demonstrates that Axon's constitutional challenges are pure FTC process and procedure claims applicable in every Part 3 administrative case, without implicating any FTC order or remedy under the FTC Act.

### C. No Discernible Jurisdiction-Stripping Intent In FTC Review Scheme For Structural and Process Constitutional Claims.

In an effort to discern jurisdiction-stripping congressional intent from the text, structure and purpose of the administrative review scheme set forth in the FTC Act, 15 U.S.C. § 45, the district court curiously focused on the Mine Act at issue in *Thunder Basin,* saying it "closely resemble[s]" the FTC Act (ER13-15).[14] But while the Mine Act (and CSRA) may be jurisdiction-stripping for the merits-based claims in *Thunder Basin* (and *Elgin*), the FTC Act is undeniably closer to the SEC Act than to either of those other agencies or statutory schemes. Indeed, the FTC admitted in its opposition (Doc.19 at 5) that the statutory review scheme examined in *Free Enterprise*, 15 U.S.C. § 78y, is "largely the same" as the FTC Act. And the district court elsewhere acknowledged that the "review provisions of the FTC Act are

---

[14] The court apparently accepted Axon's significant distinction of the CSRA at issue in *Elgin* at Doc.21 at 4-5 (ER14 n.3). The Mine Act, of course, created "mandatory" standards "to protect the health and safety of the Nation's coal and other miners," who were being killed and disabled at staggering daily rates. 510 U.S. at 202, 207-09.

'materially indistinguishable' and 'nearly identical' to those contained in 15 U.S.C. § 78y." (ER15 n.4, internal citations omitted).

Thus, instead of the Mine Act, the focus should be on § 78y, which the Supreme Court in *Free Enterprise* unequivocally found does not expressly *or implicitly* limit district court jurisdiction. 561 U.S. at 489 (finding § 78y did <u>not</u> provide "an exclusive route to review" and that its "text does not expressly limit the jurisdiction that other statutes confer on districts courts. ***Nor does it do so implicitly.***") (internal citation omitted)). Accordingly, nothing in the text of § 45 demonstrates "fairly discernible" congressional intent to limit district court jurisdiction.

15 U.S.C. § 45 provides in pertinent part (see addendum for full text):

**(c) Review of order; rehearing**
Any person, partnership, or corporation required by **an order of the Commission to cease and desist** from using any method of competition or act or practice **may obtain a review of such order in the court of appeals** … by filing in the court … a written petition praying that the order of the Commission be set aside. … Upon such filing of the petition **the court** … **shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission** … .

**(d) Jurisdiction of court**
*Upon the filing of the record* with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

(Emphasis added).

Based on the plain language of the text, appellate review is limited to Commission "cease and desist" orders. This language is "narrower" than § 78y and the review provisions in the Mine Act and CSRA, as shown below:

| MSHA | Sarbanes-Oxley Act | CSRA | FTC Act |
|---|---|---|---|
| 30 USC § 816(a) | 15 USC § 78y | 5 USC § 7703 | 15 USC § 45(c) |
| Allows appeals from **any order** of the Commission | Allows appeals from any **final order** of the Commission | Allows appeals from any **final order or decision** | Only allows appeals from **cease and desist orders** |

As recently stated by the Fifth Circuit in *Louisiana Real Estate Appraisers Bd. v. FTC*, 917 F.3d 389, 393 (5th Cir. 2019):

> **The FTCA's language is narrower** than the above examples, only authorizing the courts of appeals to review "cease and desist" orders. 15 U.S.C. § 45(c). This language is **plainly more restrictive than those statutes authorizing judicial review of "final decisions," "final agency action," or "an order."**

(Emphasis added). Moreover, as with § 78y in *Free Enterprise,* § 45 here provides "only for judicial review of *Commission* action, and not every [challenged FTC practice or procedure] is encapsulated in a [cease-and-desist order]." 561 U.S. at 490 (emphasis in original).

Section 45(c)-(d) further limits the jurisdiction of the court of appeals to "affirming, modifying, or setting aside the [cease-and-desist] order of the Commission." This Court has held that an appellate court's jurisdiction is limited by

the authority granted in the agency review statute, and that district court jurisdiction is not stripped for matters falling outside of that grant. *See Latif*, 686 F.3d at 1128-29 (finding "no jurisdiction to grant other remedies," including plaintiffs' requested injunctive relief, when statute only granted appellate jurisdiction "to affirm, amend, modify, or set aside" TSA's orders).

Moreover, nothing about the purpose of the FTC Act to grant the Commission "broad enforcement powers" to "police unfair business conduct" (ER15, citing *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018)), has any bearing on the express limitation on appellate authority in § 45(c)-(d). And as for legislative history, as the district court acknowledged, it contains nothing illuminating on the question of jurisdiction-stripping intent, and the FTC certainly didn't cite any (ER16). This is contrasted, of course, with express legislative history for both the Mine Act and CSRA that Congress intended to exclude district court actions. (*See, supra*, nn.6, 8). For all these reasons, there simply is no discernible intent that § 45 was intended to strip district courts of jurisdiction over Axon's constitutional structural and process claims unrelated to the antitrust merits. There is also no potential for meaningful judicial review of Axon's wholly collateral constitutional claims, as discussed below on a claim-by-claim basis.

> **1.    Clearance Process Challenge Is Pattern and Practice Claim Outside the FTC Act and Unrelated To Any Commission Action or Order.**

It is undisputed that the FTC and DOJ share overlapping jurisdiction to review mergers and enforce antitrust laws (ER134-35, ¶ 29). Axon "is not challenging the mere fact of concurrent jurisdiction, but rather the arbitrary way in which the agencies determine which of two vastly different (and often outcome-determinative) procedures will be applied to a particular company." (ER6 n.1; Doc.21 at 2 n.1). As alleged in the complaint and presumed true on a motion to dismiss for lack of subject matter jurisdiction, to divvy up cases, the two agencies engage in a black box "clearance process" that is uncodified in any statute, rule or regulation (ER135, ¶ 30). Clearance criteria and procedures used to make these decisions are "arbitrary," without "rational basis," and "secretly negotiated between the agencies themselves" without public insight or comment and free from congressional scrutiny (ER127, ¶ 6; ER135, ¶ 30; ER138, ¶ 35). Indeed, at least one senator has commented that the clearance decision is made "by a coin flip. Seriously." (Doc.15 at 12 & Ex. 1D).

This clearance decision, however, has significant and enduring consequences for merging parties (ER136-37, ¶ 32; *see also* Doc.15 at 9-12, detailing stark differences in procedures and protections afforded DOJ and FTC cases). The DOJ must bring its merger challenges in federal district court to be decided by an Article III impartial fact-finder who owes no allegiance to the DOJ. These cases are

governed by the Federal Rules of Evidence and Civil Procedure, require a more rigorous "substantially lessens competition" burden of proof, and are directly appealable to a circuit court with more favorable review standards (ER136-37, ¶ 32).

The FTC, on the other hand, always brings its merger challenges in its own administrative home court where the federal rules don't apply and Complaint Counsel enjoy a less onerous "unfair competition" standard (*Id*.). The hearing is presided over by an FTC Commissioner or an ALJ appointed by the Commission and on the FTC's payroll (*Id*.). Adverse decisions must first be appealed to the same Commissioners who voted out the complaint in the first instance, who can (and do) completely change the evidentiary findings and merits decision *before* any circuit court appellate rights kick in, only to have that court apply a highly deferential standard of review (*Id*.). *See also* 15 U.S.C. § 45(c) ("The findings of the Commission as to the facts, if supported by evidence, shall be *conclusive*.") (emphasis added).

The determination of which agency bucket a merging party lands in, and thus which rights, procedures and standards apply to it, turns on one thing: the clearance process. Because this informal process is arbitrary, lacks transparency and accountability, and subjects similarly situated companies to vastly different rights, standards, and consequences, it violates Fifth Amendment due process and equal protection guarantees (ER149, Count I, ¶¶ 57-60).

a. **Clearance Claim Falls Outside Review Statute's Provisions.**

Axon's constitutional clearance-process claim falls wholly outside of § 45's review provisions. Section 45 only relates to *Commission* action and is limited on its face to "cease and desist" orders issued *by the Commission*. The clearance process, which occurs well before the Commission ever votes out a complaint or appoints an ALJ, does not involve any formal Commission action or order. It is an informal practice between FTC and DOJ *staff.* As such, the clearance decision is not subject to judicial review under § 45. *See Free Enterprise*, 561 U.S. at 490 (finding § 78y provides "only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule.") (emphasis added). Axon's clearance-process claim is "wholly collateral to [the] statute's review provisions" for this same reason. *See Id.* at 489.

Because the statute, on its face, does not include the pre-suit clearance claim, the district court erred as a matter of law in dismissing this claim as within § 45(c) appellate jurisdiction. *See Latif*, 686 F.3d at 1127-28 (district court jurisdiction only preempted "as to those classes of claims reviewable under § [45]," and is retained when § 45 "does not explicitly allow us to hear them.").

The district court's opinion repeatedly emphasizes that Axon can, and already has, raised its constitutional challenges in the administrative case (ER18 & n.6, 20, 28). However, Axon's appearance in the administrative case was expressly made

"under protest," "solely to avoid default," and "subject to the constitutional arguments and objections it has asserted in [the district court case]." (1-21-20 Axon Answer and Defenses at 1; 3-2-20 Amended Answer and Defenses at 1). Moreover, as stated by Axon's counsel at oral argument: "The fact that Axon has been forced to raise its constitutional challenges as affirmative defenses in the administrative case so as not to waive them if this Court does not accept jurisdiction, is not an admission that they can or will be decided in that forum [ ] in a way that's meaningful at the end of the day." (ER46 at 13:2-7). No affirmative defense can vest an appellate court with jurisdiction it does not otherwise have by statute.[15]

The analysis of this claim can really stop here, but Axon discusses the three "meaningful review" prongs below should the Court for any reason disagree that § 45 claims are limited to *Commission* orders (not *staff* actions). Either way, the result is the same.

---

[15] The district court also suggests it might have jurisdiction over a claim challenging the FTC's *initiation* of an *investigation*, but seemingly criticizes Axon for waiting to file suit until "mere hours" before the FTC initiated an administrative proceeding (ER20). But if the court had jurisdiction back in June 2018, it has it now. Challenging a government investigation at the very outset is fundamentally at odds with good public policy encouraging cooperation—as Axon did—in the best interests of the business and its shareholders. Moreover, to have standing early on would have required willful disobedience of the CID, subjecting Axon to the very sanction *Free Enterprise* condemns, as well as extraordinary reputational harm with Axon's law enforcement customer base (ER66-68 at 33:18-35:2).

### b.    Wholly Collateral To Antitrust Merits.

As discussed above, Axon's clearance-process claim, which does not relate to any *Commission* action or order, is wholly collateral to the plain language of § 45's review provisions. It is also wholly collateral to the antitrust merits. While the clearance decision was a necessary prerequisite for the now-initiated administrative enforcement action, the clearance process itself is wholly unrelated to the lawfulness of the Vievu acquisition.

Indeed, FTC Complaint Counsel has objected across the board to all clearance-related discovery, taking the position that the pre-suit clearance process is "irrelevant" to the allegations in the administrative complaint, to the relief sought (*i.e.*, a cease-and-desist order), <u>and</u> to Axon's defenses (Doc.40 at 2, Notice of Filing Supplemental Exhibits).[16] Certainly the administrative process cannot be the exclusive path to resolution of Axon's clearance-process claim, and at the same time be irrelevant to the administrative merits. Thus, by definition and admission, Axon's clearance-process challenge is wholly collateral to, and not entangled with, the antitrust issues to be decided in the administrative case.

---

[16] While the district court notes that motion practice relating to Complaint Counsel's refusal of all clearance-related discovery in the administrative case is not complete (ER20 n.7), it is not difficult to discern that no discovery regarding the FTC's "secret" clearance process will be forthcoming until an Article III court orders it, and, as discussed below, may be quite limited in scope.

**c.  No Commission Expertise or Competence To Decide Collateral Constitutional Issues.**

The district court did not find that the FTC has competence to decide Axon's constitutional claims. It doesn't. Nor did the court find that the FTC possesses any expertise specific to the constitutional issues presented here. Instead, the court merely found that the Commission could bring its expertise to bear in resolving the *unrelated* antitrust merits and, if resolved in Axon's favor, avoid the constitutional issues altogether. (ER30-32). This overreads *Elgin*, which only found agency expertise because the constitutional claim was inextricably intertwined with the administrative merits, 567 U.S. at 22-23, which is not true here. Without a merits connection, the district court's rule means agency expertise would be present in *every* case, which conflicts with *Free Enterprise*. 561 U.S. at 491 (finding structural constitutional claims were "outside the Commission's competence and expertise").

Because Axon's clearance claim is not substantively related to the antitrust merits or any statute the FTC is charged with enforcing or interpreting, there simply is no relevant agency expertise to be brought to bear on an unconstitutional extra-statutory clearance process never even contemplated by Congress.

### d.    Eventual Review Is *Not* Meaningful Review.

The district court erred as a matter of law in collapsing the Supreme Court's 3-part "meaningful review" test into a singular "eventual review" standard stating that "eventual review in an appellate court *is* meaningful review." (ER22, emphasis added). Axon's constitutional claims present significant threshold challenges to the FTC's authority and procedures that, but for the Covid-19 stay, are in full swing in the administrative case. Being forced to submit to the very forum and processes alleged to be unconstitutional—which the FTC failed to address on the merits and which must be taken as true in reviewing a jurisdictional dismissal—creates ongoing constitutional harm that simply cannot be remedied in an after-the-fact appeal. **The constitutional violation *is* the harm, and the process *is* the penalty.** *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("it is 'well established' that deprivation of constitutional rights 'unquestionably constitutes irreparable injury'"); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (due-process and equal-protection case holding that "a prospective violation of a constitutional right constitutes irreparable injury").

The district court's decision would have Axon spend millions of non-recoupable dollars in an administrative forum without authority or competence to rule on its constitutional claims or grant its requested injunctive relief. "[I]t is well settled that administrative agencies are without authority to determine the

constitutionality of statutes." *E.g., Malone v. Department of Justice,* 13 MSPB 81, 83 (1983) (citing *Montana Chapter of Ass'n of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165, 1167 (9th Cir. 1975) ("[F]ederal administration agencies have neither the power nor competence to pass on the constitutionality of statutes."). And at the end of this arduous journey, the best Axon can hope for is a remand for a complete do-over.[17]

It is clear that, in the Part 3 proceeding, Axon cannot develop a meaningful factual record on its clearance process claim (Doc.40). The district court discounted this significant hurdle, stating that the appellate court "can take judicial notice of facts that bear upon Axon's constitutional claims," or "may order such additional evidence to be taken before the [FTC] and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper." (ER19, citing 15 U.S.C. § 45(c)). But because the entire clearance process is "secret" (ER127, ¶ 6; ER135, ¶ 30), there are no public facts to take judicial notice of.

Moreover, the Second Circuit in *Fashion Originators Guild of Am. v. FTC,* 114 F.2d 80, 81-82 (2d Cir. 1940), examined the "additional evidence" provision in

---

[17] *See* Doc.32-2 at 13-15, NCLA Amicus Brief detailing the extended, costly, multiple-round sagas of LabMD and Raymond Lucia that put them out of business and cannot be considered "meaningful" in any sense of the word.

15 U.S.C. § 45(c) and concluded it "is not directed to the correction of errors committed by the Commission" nor is the "exclusion of evidence" equivalent to a "'failure to adduce' it." [18] *Id.* Instead, any remand request is "analogous to a motion for a new trial upon newly discovered evidence." *Id.* at 82. Accordingly, contrary to the district court's assumption, § 45(c)'s remand provision is not designed to facilitate wide-ranging appellate fact discovery on issues the FTC concluded were irrelevant during the administrative hearing. Instead, it is limited to redressing Commission fact-finding based on *newly discovered*—not excluded or rejected—evidence.

But even if a greater remand scope were allowed, far from the Commission simply "taking" additional evidence, discovery would have to be completely reopened to adduce relevant facts—documentary and testimonial—now foreclosed by blanket relevance objections. And to what end? What kind of fact-finding regarding agency clearance practices alleged to be arbitrary and without rational

---

[18] The relevant § 45(c) language provides:

> If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence *is material and that there were reasonable grounds for the failure to adduce such evidence* in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission… . The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken… . [emphasis added].

basis can reasonably be expected from the heads of that same agency? The irony of Commissioners being entrusted to fairly find facts regarding their own processes should not be lost on anyone. The results are predetermined, including on further appeal where the court must accept the newly found facts as "conclusive" if supported by evidence. Such an inherently biased process is far from meaningful.

It also defies logic to suggest that in lieu of a regular lawsuit in federal district court, Congress intended to create "pinball procedural requirements" that require a party to assert its constitutional claims to the FTC, which must then kick the claims up to the court of appeals, which must then remand the claims back to the Commission, which must then develop the record and send the case back to the appellate court, which can only then consider the constitutional issues. *See Elgin*, 567 U.S. at 33-34 (Alito, J. dissenting). This is even more true here where, unlike *Elgin*, Axon's constitutional claims are wholly collateral to the administrative merits. And, critically, even if Axon is ultimately successful after such an ordeal, there is no remedy for the constitutional harm already suffered.

For all these reasons, the district court has federal question jurisdiction over the systematic due process and equal protection violations triggered by the FTC/DOJ uncodified, arbitrary clearance process. There is no possibility for *any* judicial review, let alone *meaningful* review, of this constitutional claim under the narrow review provisions of § 45(c)-(d), which is why the issue has evaded review for

decades and presents an issue of first impression here. The Court should vacate and remand the clearance claim to the district court for decision on the merits.

### 2. Review Scheme Does Not Preclude Due Process Challenge To FTC Structure Combining Investigatory, Prosecutorial, Adjudicative, and Appellate Functions In Single Agency Resulting In Undisputed 25-Year Win Rate.

Count I of Axon's complaint also contains a due process claim regarding the FTC's structure, which combines multiple critical functions—investigatory, prosecutorial, adjudicative, and appellate—in a single agency (ER127-28, ¶ 7; ER136-37, ¶ 32; ER149, ¶¶ 57-60). Commission staff investigate mergers and present their findings and recommendations to the FTC Commissioners, who vote to issue a Part 3 enforcement action (ER127-28, ¶ 7). The Commission then appoints an ALJ to preside over the case applying the FTC's own rules. 16 C.F.R. § 3.1. FTC staff prosecute the claims and the ALJ, after a hearing, issues findings of facts and conclusions of law. The first appeal is to the full Commission—the same Commissioners who voted to sue now have the right to review these findings de novo *and change them* (ER127-28, ¶ 7). Indeed, the Commission can ignore the ALJ's determinations in their entirety and substitute its own findings *prior* to any appeal to an Article III court. 16 C.F.R. § 3.54. The Commission's cease-and-desist order may then be appealed to a federal circuit court, which employs a highly deferential standard of review. 15 U.S.C. § 45(c).

Not surprisingly, this incestuous structure has produced an inherently "biased institutional process," **resulting in a 100% FTC win rate for the past quarter century**. *See* Joshua D. Wright, *Section 5 Revisited: Time for the FTC to Define the Scope of Its Unfair Methods of Competition Authority* at 6 (2015) (former FTC Commissioner presenting preceding 20-year statistics) (hereinafter, "Wright") (ER94, 99; Doc.15-2 at 6; ER128, ¶ 7); Declaration of Antony P. Kim & Ex. A Chart (identifying results of 36 FTC enforcement actions filed in the additional 5-year period Jan. 2015 to Jan. 2020) (ER116-123; Doc.15-3).[19]

"[I]n the past nearly twenty years," each time FTC Commissioners voted out a complaint, they vindicated that position 100% of the time:

> **In other words, in 100 percent of cases where the administrative law judge ruled in favor of the FTC staff, the Commission affirmed liability; and in 100 percent of the cases in which the administrative law judge [ ] found no liability, the Commission reversed. This is a strong sign of an unhealthy and biased institutional process.** By way of contrast, when the antitrust decisions of federal district court judges are appealed to the federal courts of appeal, plaintiffs do not come anywhere close to a 100 percent success rate—indeed, the win rate is much closer to 50 percent.

Wright (ER99, 128) (footnote omitted, emphasis added). *See also* Andrew N. Vollmer, *Accusers as Adjudicators in Agency Enforcement Proceedings*, 52 U.

---

[19] These 25-year win streak statistics were not disputed by the FTC in the district court and must be taken as true here.

Mich. J. L. Ref. 103, 145 (2018) (explaining in SEC context that when "Commissioners have a direct, personal role in critical decisions of initiating enforcement cases by the agency they head" it "create[s] an unconstitutional potential for bias") (Doc.15-2 at 71).

As the Ninth Circuit has noted, individuals who have previously weighed in on a case will "ha[ve] developed … a 'will to win,'" *i.e.*, to vindicate the position they have previously taken. *Grolier Inc. v. FTC*, 615 F.2d 1215, 1219 (9th Cir. 1980). For that reason, "Congress intended to preclude" such individuals "from decision-making." *Id.* at 1220. That result is warranted here where the FTC has made clear its "will to win" by demanding an unprecedented "blank check"—well beyond divesting Vievu's assets—to take Axon's independently-created intellectual property either voluntarily through settlement, or forcibly through its internal administrative process (ER125-26, ¶ 3; ER137-38, ¶ 33). This is exactly the kind of prejudging statement that due process abhors. *See* Wright (ER100; Doc.15-2 at 7) ("combination of institutional and procedural advantages" enables the FTC to "elicit a settlement even though the conduct in question very likely may not be anticompetitive" and "without any meaningful adversarial proceeding or substantive analysis of the Commission's authority").[20]

---

[20] Indeed, the FTC's leverage in its own internal process is so great that 12 of 36 parties in the last 5 years—a full third—simply abandoned their mergers after an

Although the mere combination of *investigative* and adjudicative functions in an agency do not *alone* violate due process, *Withrow v. Larkin,* 421 U.S. 35, 58 (1975); *U.S. v. Litton Indus., Inc.*, 462 F.2d 14, 16 (9th Cir. 1972),[21] Axon has alleged something "more"—an undisputed 25-year win streak in the FTC's administrative home court and an unprecedented settlement ultimatum by a regulator who clearly believes it cannot lose (ER137-38, ¶ 33). Accordingly, "special facts and circumstances" are alleged demonstrating the "risk of unfairness is intolerably high." *Withrow*, 421 U.S. at 58.

Having alleged a colorable constitutional due process claim, Axon now turns to the question of whether the § 45 review scheme of the FTC Act encompasses this claim and thereby strips the district court of jurisdiction. It doesn't.

First, this is a structural due process claim challenging the entirety of the FTC administrative process for Part 3 enforcement actions and the investigations leading to them. It applies equally to all Part 3 merger respondents, including Axon, but does

---

FTC administrative complaint was filed instead of enduring an expensive and futile effort of defending the merits (ER119-123). Seven more settled (*Id.*). Adverse liability rulings are rarely appealed. In the past 25 years, only two parties survived long enough to reach an Article III court, and both lost there, keeping the FTC 100% win rate intact even on appeal. *See Polypore., Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012); *Chicago Bridge & Iron C. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008).

[21] *Cf. Williamson & Co., Inc. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange County and State of Cal.*, 695 F.3d 960, 965 (9th Cir. 2012) (stating overlap between *prosecutorial* and adjudicative functions raises greater bias concern).

not depend on the individual antitrust merits of any case. It does not contest any specific ALJ or Commission order, focusing instead on the unfair and inherently biased institutional process that forecloses the "fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," as required by the Constitution. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004). As in VCS, Axon's claim here challenges "the constitutionality of the procedures in place, *which frame the system* by which a [party] presents his claims to the [agency]." 678 F.3d at 1034 (emphasis added). Accordingly, the substance of Axon's constitutional claim is wholly collateral to the antitrust merits of the Vievu acquisition.

Second, as discussed above, the FTC can bring no expertise to bear on wholly collateral constitutional issues it has no authority or competence to decide. *Free Enterprise,* 561 U.S. at 491 (holding structural constitutional claims were "outside the Commission's competence and expertise"). *See also, e.g., Young*, 514 F.2d at 1167 ("[F]ederal administration agencies have neither the power nor competence to pass on the constitutionality of statutes."). Moreover, although the FTC certainly has familiarity with the statutes and rules under which it operates, as with any judge with a vested interest in the outcome of a proceeding, its Commissioners must be disqualified from deciding it.

It is "axiomatic" that a "fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876 (2009). "This

applies to administrative agencies which adjudicate as well as to courts." *William Jefferson & Co.*, 695 F.3d at 964 (quoting *Withrow,* 421 U.S. at 465). Accordingly, due process mandates recusal where a judge has a direct, personal, or substantial connection to the outcome of a case or to its parties. *In re Complaint of Judicial Misconduct*, 816 F.3d 1266, 1267 (9th Cir. 2016) (citing *In re Murchison,* 349 U.S. 133, 136 (1955) (concluding that "no man is permitted to try cases where he has an interest in the outcome")). Moreover, "justice must satisfy the appearance of justice," *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 243 (1980), such that an adjudicator's personal interest in the outcome of the proceedings "may create an *appearance of partiality* that violates due process, even without any showing of actual bias." *Stivers v. Pierce,* 71 F.3d 732, 741 (9th Cir. 1995) (emphasis in original). Because the Commission is precluded from deciding whether its own multifunction structure creates inherent institutional bias in violation of due process, it cannot bring any expertise to the issue to be decided.

And third, eventual judicial review cannot be meaningful when a party asserts, as a threshold issue, the constitutionality of the very tribunal which seeks to prosecute it. Once a party is subjected to the administrative process it challenges, constitutional injury has occurred and cannot be remedied after-the-fact in any appeal. *E.g., Melendres*, 695 F.3d at 1002 (deprivation of constitutional rights

44

"unquestionably constitutes irreparable injury"). Again, the constitutional violation *is* the harm, and the process *is* the penalty.

Clearly, there is no discernible jurisdiction-stripping intent to be gleaned from § 45 itself. *See Free Enterprise*, 561 U.S. at 489 (finding "materially indistinguishable" statutory counterpart to § 45 did not explicitly *or implicitly* limit district court jurisdiction); *see also* ER15 n.4. And as established above, Axon's structural constitutional claim is wholly collateral to the antitrust merits, agency expertise cannot be brought to bear, and no meaningful judicial review is possible *after* the constitutional injury has occurred. The district court therefore erred in dismissing this system-wide structural claim.

### 3. Article II Separation-of-Powers Claim Is Controlled By *Free Enterprise* and Within the District Court's Jurisdiction.

Count II of Axon's complaint alleges that FTC ALJs enjoy an impermissible dual-layer of protection from Presidential removal, in violation of Article II of the U.S. Constitution (ER139-43, ¶¶ 36-43; ER150, ¶ 62). The Supreme Court in *Free Enterprise* held an almost identical type of dual-layer protection impermissibly restricts executive action and violates Article II. 561 U.S. at 495.[22] Far from a

---

[22] Like a member of the PCAOB, the Commission's ALJ can be removed only for cause and only by Officers who themselves cannot be removed by the President except in cases of inefficiency, neglect of duty, or malfeasance in office. 561 U.S. at 495, 496; 5 U.S.C. § 7521(a) (requiring MSPB establish "good cause" before a Commission ALJ may be removed); 5 U.S.C. § 1202(d) (establishing limited

45

"wrinkle", as the district court described it (ER29), Axon's Article II separation-of-powers claim here is on all fours with, and controlled by, *Free Enterprise.*[23]

The Supreme Court held—unanimously—that such claims are not "of the type that Congress intended to be reviewed within" an administrative-review regime. *Id.* at 489, 491 (quoting *Thunder Basin*, 510 U.S. at 216). The Commission has no expertise or competence in resolving such claims, which are wholly collateral to the antitrust merit issues the Commission is statutorily empowered to review. Congress did not intend that judicial review of such claims would come, if at all, only *after* the unconstitutional Officer had presided over the entire proceeding.

---

circumstances in which MSPB members may be removed). This regime "not only protects the [Commission's ALJ] from removal except for good cause, but withdraws from the President any decision on whether that good cause exists." 561 U.S. at 495. "That arrangement is contrary to Article II's vesting of the executive power in the President." *Id.* at 496.

[23] In addition, Axon claims that Article II is violated by the single-layer constraint on the President's removal of the FTC Commissioners (ER150). 15 U.S.C. § 41. The Solicitor General recently agreed in *Selia Law LLC v. Consumer Financial Protection Bureau,* that "[t]he reasoning for *Humphrey's Executor* [*v. U.S.*, 295 U.S. 602 (1935)]," which held that a single layer of good-cause protection is permissible under limited circumstances, "does not withstand careful analysis." *See* Br. for Respondent Supporting Vacatur, No. 19-7, 2019 WL 6727094, at *31, 45 (Dec. 9, 2019). The likelihood that Axon will overcome *Humphrey's Executor*—including, if necessary, through overruling by the Supreme Court—is a merits question that does not affect jurisdiction. *See, e.g.*, *Bell v. Hood*, 327 U.S. 678, 682 (1946); *Trustees of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc*., 572 F.3d 771, 775 (9th Cir. 2009). For convenience, this section focuses on the ALJ double-for-cause removal protection challenge, but jurisdiction also exists over the FTC Commissioner single-for-cause removal protection challenge for the same reasons.

### a. Article II Claim Is "Wholly Collateral" To the Commission's Ordinary Review Process.

Just like the accounting firm in *Free Enterprise*, Axon "objects to the [Commission ALJ's] *existence*" as an unconstitutional infringement on the President's constitutional prerogatives. *Id.* at 490 (emphasis added). Axon's Article II claim does not challenge the *substance* of any antitrust enforcement-related decision that the ALJ might make in its case. As such, Axon's claim is identical to *Free Enterprise* and also "wholly collateral" to the Commission's administrative enforcement regime. *Id.* at 489-91.

The *relief* Axon seeks is also "wholly collateral" to any relief it could obtain as to the merits of a Commission determination that Axon violated antitrust laws. Axon's Article II claim entitles it to exactly what the accounting firm in *Free Enterprise* received: "relief … to ensure that the [antitrust laws] w[ould] be enforced only by a constitutional [officer] accountable to the Executive." 561 U.S. at 513. By prevailing on the Article II claim, Axon would not obtain a ruling as to the legality of the transaction that the Commission challenges.[24] By contrast, the terminated employees in *Elgin* asked the district court to award them "reinstatement,

---

[24] In a separate Count 3, Axon's complaint initially sought declaratory relief as to its compliance with antitrust laws. That count was severed in light of the subsequently-filed administrative proceeding and is irrelevant to the existence of jurisdiction over the constitutional claims. (ER38 at 5:15-20; ER40-41 at 7:15-8:13).

backpay, and attorney's fees"—"precisely the kinds of relief that the CSRA empower[ed] the MSPB and the Federal Circuit to provide." 567 U.S. at 22.

> **b.    Article II Claim Is Outside the FTC's "Competence and Expertise."**

The Supreme Court has *already held* that Axon's challenge to the ALJ's double-for-cause removal protection—identical to the accounting firm's separation-of-powers challenges in *Free Enterprise*—is "outside the [agency's] competence and expertise." 561 U.S. at 491. No wonder. Few questions lie farther outside the Commission's bailiwick than the separation-of-powers issue presented here. There is a longstanding belief that striking down acts of Congress lies "beyond the jurisdiction of administrative agencies," *Elgin*, 567 U.S. at 16, and the Commission surely has no special ability to do so. The Commission was established to enforce the antitrust laws, not to ponder the separation of powers. That is for federal courts to do. *See Free Enterprise*, 561 U.S. at 491.

Here again, the contrast with *Thunder Basin* and *Elgin* is striking. The *Thunder Basin* petitioner claimed that a Mine Act requirement regarding "walk-around" rights was precluded by the NLRA, which "the Commission ha[d] no particular expertise in construing." 510 U.S. at 215; *see also Id.* at 203-05. But even though the challenge was based on the NLRA, "at root" it required interpretation of walk-around rights, arose under the Mine Act, and fell squarely within the agency's "expertise" and "extensive experience" in interpreting such rights. *Id.* at 214. *See*

48

*also Elgin*, 567 U.S. at 23 (explaining that in some cases "the challenged statute may be one that the MSPB regularly construes, and its statutory interpretation could alleviate constitutional concerns").

No such circumstances exist here. The ALJ and the Commission have no expertise with respect to the double-for-cause removal scheme being challenged. The MSPB, not the Commission, applies the ALJ-removal statute and receives judicial deference in doing so. *See, e.g.*, *Abrams v. SSA*, 703 F.3d 538, 543 (Fed. Cir. 2012); *Long v. SSA*, 635 F.3d 526, 535 (Fed. Cir. 2011). Nor does the Commission have competence, expertise, or experience as to the statute that allows the President's removal of MSPB members only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

In addition, one *Elgin* petitioner's constitutional claim required deciding the "threshold question" of whether to treat his resignation as a constructive discharge—an assessment "squarely within the MSPB's expertise." *Id.* Here, by contrast, there are no threshold antitrust questions. And there is no reason to believe that Congress shuttled separation-of-powers issues into administrative proceedings to be decided by agencies that cannot provide the necessary relief and lack any particular insight into constitutional law.

### c. Declining Jurisdiction Would Deprive Axon of Any *Meaningful* Avenue of Relief.

Declining jurisdiction in this case would deprive Axon of any "'*meaningful* avenue of relief'" in much the same sense that the accounting firm in *Free Enterprise* would have been so deprived. 561 U.S. at 491 (emphasis added). *Free Enterprise* establishes that the mere availability of eventual judicial review does not make that review "meaningful"; after all, the accounting firm there could have gotten its claims into court by challenging an order of the Board *or* by intentionally incurring a sanction. *See Id.* at 490–91. The question instead is whether Congress *intended* a challenger to jump through such administrative hoops.

Congress clearly would not have chosen the "odd procedure" that the Commission envisions here. *Id.* at 490. Consider the steps inherent in its proposed process. First, a litigant raises its structural challenge before the very ALJ whose legitimacy it disputes. Next, after the ALJ's decision adverse to the regulated party, the litigant must raise its structural challenge before the Commission, which lacks authority to remedy the violation by invalidating an act of Congress. Finally, when the Commission rules against the challenger on antitrust issues entirely separate from Article II, it must petition for review in a court of appeals, even though by then it has *already* suffered the constitutional injury in question—adjudication before an unconstitutionally insulated official. That procedure is at least as "odd" as forcing

50

regulated parties to bring their structural claims via a challenge to an unrelated agency rule. *See Id.*

The review here is also far *less* "meaningful" than the "odd" procedure *rejected* in *Free Enterprise*. 561 U.S. at 490. There, the accounting firm could have obtained review simply by challenging a "random" Board rule, and that review would have been *precisely the same* as the review it sought in district court—a straightforward legal challenge to the Board's constitutionality. By simply challenging any "auditing standard … or rule," the accounting firm would immediately proceed to an appellate court for determination of its constitutional claim without suffering through an expensive, risky, and time-consuming evidentiary hearing.

Here, the Commission inevitably will agree with its own allegations that Axon violated antitrust laws, and it intends to impose drastic relief including a "blank check" divestiture not only of the assets acquired in the challenged transaction, but also of Axon's independently developed intellectual property—"technology Axon has invested 10 years and over $200 million in building from the ground up" (ER126, ¶ 3). Without access to federal court now, Axon will not have its constitutional challenge heard by a competent adjudicator until it fully litigates all factual and legal antitrust issues in front of the unconstitutional ALJ and then twice appeals (first to the FTC, then to the appellate court). The only reasonable inference is that Congress

did not intend to strip district courts of jurisdiction over claims that go to the constitutionality of the Commission's ALJ, wholly apart from any substantive antitrust issues.

In short, all that *Elgin* and *Thunder Basin* suggest is that an agency's statutory administrative-review process applies to constitutional claims inextricably intertwined with the merits of the agency's charges. Nothing in those cases undermines *Free Enterprise*'s squarely applicable holding that separation-of-powers challenges to the constitutional *authority* of agency enforcement *officials*, separate and apart from questions regarding the merits of the agency action, may be adjudicated in district court.

> **d.** **District Court Failed To Distinguish Between Structural Constitutional Claim and Antitrust Merits Claim.**

The opinion below includes little analysis specific to the Article II separation-of-powers claim. To the extent it addresses that claim at all, the opinion rests on misconceptions and errors from out-of-circuit cases.[25] Most importantly, the opinion

---

[25] Notably, the Fifth Circuit recently granted a stay of an SEC administrative proceeding during the pendency of a constitutional challenge to the ALJ removal scheme. *See* Memorandum Order, *Cochran v. SEC*, No. 19-10396 (5th Cir. Sept. 24, 2019) (per curiam). Other SEC ALJ cases, which the district court cited here, include disagreements between the circuits, a persuasive dissent, district court decisions finding jurisdiction, and a separation-of-powers claim different than Axon's here. *See Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016); *Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016) (reversing district court); *Tilton v. SEC*, 824 F.3d 276, 283 (2d Cir. 2016)

fails to grapple with the fundamental differences between constitutional claims going to substantive *merits* and those challenging the legitimacy of decision-makers in an administrative *process* (ER38-39 at 5:15-6:9, addressing tentative ruling's failure (uncorrected in final ruling) to analyze the "substance of Axon's constitutional claims against the issues to be decided on the antitrust merits in the administrative case").

*"Wholly Collateral."* The district court's discussion of the Article II claim is a non sequitur, as it *ends* with the observation that a facial constitutional claim "is not, alone, enough to establish district court jurisdiction." (ER29). Yet, this observation marks the *beginning* of the analysis. The district court's opinion avoids the next critical question: whether Congress *intended* to strip jurisdiction over the *type* of facial constitutional challenge alleged here. The Article II claim here goes to the ALJ's constitutionality—not to the antitrust merits before him—and will not yield a ruling as to the legality of the Vievu transaction. Thus, the constitutional claim is wholly collateral.

---

("The appellants' argument is not without force, as demonstrated by its success in several district courts."); *Id.* at 292 (Droney, J., dissenting); *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) (non-delegation doctrine claim); *Bebo v. SEC*, 799 F.3d 765, 767 (7th Cir. 2015) (declining to conclude that claims not wholly collateral). The district court acknowledged that these decisions reflect the "'unsettled' nature" of an issue "the Ninth Circuit has not resolved," and that they are "not binding here." (ER15 n.4, 17).

Had the district court looked beyond the mere fact that the Article II claim is a facial constitutional challenge, it would have seen that "the nature of the constitutional claim presented in *Elgin* was entirely different." *Tilton*, 824 F.3d at 292 (Droney, J., dissenting). Axon "object[s] to the very existence of [FTC] administrative proceedings conducted by ALJs who" are unconstitutionally insulated from the President. *Id.* at 297. That is significant. *Elgin* "held only that a claim involving the substance of the very act entrusted to the agency for implementation and requesting the types of relief that the agency regularly gives … cannot be considered 'wholly collateral' to the administrative scheme." *Id.* at 295. Thus, *Elgin* is "a far cry from the present case, where the constitutional claim has no relation to the [antitrust] laws entrusted to the [FTC] and the requested remedy of disallowing the proceedings before the ALJ is obviously not a routine outcome." *Id.*[26] The district court erred by treating *all* facial constitutional claims alike, regardless of whether they concern the substantive prohibitions of the agency-administered statute.

---

[26] *See also Hill*, 825 F.3d at 1252 ("[T]he respondents' challenge is not a means to avoid liability altogether; . . . even if they prevail on their constitutional claims, they could face a civil enforcement action in federal district court. Thus, their constitutional arguments are not a 'vehicle by which they seek' to prevail on the merits." (quoting *Thunder Basin*, 510 U.S. at 215)); *Bebo*, 799 F.3d at 774 ("We … assume for purposes of argument that Bebo's claims are 'wholly collateral' to the administrative review scheme.").

**"*Agency Expertise.*"**  The district court also erred by relying on the mere possibility that the Commission—despite its 25-year history of *always* ruling against respondents—might resolve the antitrust merits in Axon's favor. This approach again fails to focus on the specific constitutional claim that Axon asserts. The "issue of federal jurisdiction or the appropriate composition of an adjudicative body—such as the Appointments Clause challenge presented in [*Tilton*]—logically *precedes* a merits adjudication." 824 F.3d at 295 (Droney, J., dissenting) (emphasis added). Even more important, only a *merits-based* challenge is truly resolved by a favorable merits decision in an administrative proceeding. A favorable merits decision does not turn back the clock and undo an administrative proceeding that itself is unconstitutional due to the role of an unconstitutional ALJ.

*Elgin* again is distinguishable on this point. Unlike here, a favorable determination by the agency on the merits would have brought the *same relief* as was sought in district court. 567 U.S. at 22. The court also only mentioned this possibility *in addition to* several other factors, *i.e.*, a threshold constructive discharge determination and the relationship between the constitutional question and the interpretation of a statute within the agency's expertise. *Id.* at 22-23. No court has suggested any analogous role for agency expertise in an Article II claim. There is none. Even if a Commission ruling for Axon on the merits were realistic (it's not)

and could provide full relief (it won't), this case at least lies far closer to *Free Enterprise* than to *Elgin* on "the spectrum they create." (ER31).

At bottom, the district court's analysis of the "wholly collateral" and "agency expertise" factors turned entirely on the fact that an administrative proceeding is underway. This left each of those factors "stripped … of any significance," by "turn[ing] a substantive factor into a purely procedural—and binary—one, which is inconsistent with … *Thunder Basin*, *Free Enterprise*, or *Elgin* itself." *Tilton*, 824 F.3d at 292, 296 (Droney, J., dissenting). While the Supreme Court's "trilogy" establishes that a proceeding within a comprehensive statutory scheme is the *first* step of the analysis, the district court failed to move past this initial step and analyze whether *petitioner's claims are of the type* Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin*, 510 U.S. at 212 (emphasis added).

**Lack of "Meaningful Review."** In analyzing the "meaningful review" factor, the opinion below makes no specific mention of the Article II claim. It therefore fails to acknowledge that with this type of claim, unlike a merits-based challenge, post-proceeding judicial review cannot remedy the harm. Making matters worse, the district court also mischaracterized *Free Enterprise.* The district court stated: "*Free Enterprise Fund* was driven by the fact that, for the accounting firm to obtain judicial review through the statutory scheme, *it would have had to* force the issue by willfully and intentionally violating a rule and then raising the only defense possible—that

the agency was unconstitutional. *Only then* would the accounting firm's claims be before the SEC and subject to judicial review." (ER31, emphasis added). This is wrong because voluntarily incurring a sanction was only *one* route to judicial review, and *Free Enterprise* clearly stated that the plaintiff had the alternative, low-cost avenue of challenging a "random" rule. 561 U.S. at 490. [27] As explained above, this is significant because the alternative was too "odd" for Congress to have required. *Id.* It is even clearer that Congress would not require—as a prerequisite to review in an Article III court—a high cost, structurally unconstitutional proceeding that generates irreversible harm.

The government nonetheless maintains that post-hearing appellate review is somehow "meaningful" because federal courts purportedly bless such structurally unconstitutional proceedings as just "part of the social burden of living under government." *FTC v. Standard Oil*, 449 U.S. 232, 244 (1980) (internal citation and quotation marks omitted). That case, however, did not address an *unconstitutional* proceeding. The basic rule is that being subject to an unconstitutional proceeding, like all constitutional violations, is quintessential irreparable injury. *See, e.g., Elrod,*

---

[27] Similarly, some of the out-of-circuit decisions cited by the district court emphasize the "bet the farm" option for the accounting firm in *Free Enterprise*, without acknowledging the alternative of challenging a random regulation. *Bennett*, 844 F.3d at 186; *Hill*, 825 F.3d at 1248.

427 U.S. at 373; *Melendres*, 695 F.3d at 1002; *see also* 11A Wright & Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995).

Moreover, the basis for the challenge to the FTC's *Standard Oil* proceeding—that the Commission issued a complaint without reason to believe that violations were occurring, 449 U.S. at 235—could not possibly have been more inextricably intertwined with the administrative merits *i.e.,* whether violations in fact *were* occurring. And the issuance of the complaint was agency action specific to the plaintiff's case, not a pattern, practice, or structural feature. It thus was eminently sensible and uncontroversial for *Standard Oil* to say that this was not "final agency action" under the APA until the agency issued a final decision on the merits. 449 U.S. at 242-43. Here, Axon's challenge relates neither to the antitrust merits nor to case-specific agency action; rather, Axon challenges agency *structure*. This is an extremely narrow type of challenge. By allowing this type of claim to proceed in district court, Congress did not create a situation where—even after these claims are decided—"every respondent to a Commission complaint" would be able to assert other claims of the same type. *Id.* at 242-43.

For all these reasons, the district court retains jurisdiction over Axon's Article II separation-of-powers claim. Any other result would deprive Axon of meaningful judicial review. Its constitutional injury—being subjected to a proceeding before an unconstitutional ALJ that will cost more than its actual

acquisition of Vievu—would be permanent and irreversible before it ever reaches an Article III court.  Congress had no such intent.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Axon respectfully requests that the Court vacate the district court's judgment and remand with instructions to decide Axon's constitutional challenges and preliminary injunction motion on the merits.

Dated: May 2, 2020

Respectfully submitted,

*/s/ Pam Petersen*
Pamela B. Petersen
AXON ENTERPRISE, INC.
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Phone: (623) 326-6016
Fax: (480) 905-2027
Email: ppetersen@axon.com

*Counsel for Plaintiff-Appellant*
*Axon Enterprise, Inc.*

## STATEMENT OF RELATED CASES

*Lucia v. SEC*, No. 19-56101 (appeal from S.D. Cal. ruling that it lacked subject-matter jurisdiction over Article II challenge to SEC ALJ dual-layer tenure protections).

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of 9th Cir. Rule 32-1. This brief contains 13,907 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14.


Dated: May 2, 2020                    */s/ Pam Petersen*
                                      *Counsel for Plaintiff-Appellant*
                                      *Axon Enterprise, Inc.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on May 2, 2020, I electronically filed the foregoing Appellant's *Corrected* Opening Brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System, which will send notice of such filing to all registered users.


*/s/ Pam Petersen*

# ADDENDUM TABLE OF CONTENTS

**Count I Provisions**

U.S. Const. Amend. V ............................................................1

Federal Trade Commission Act, 15 U.S.C. § 45 ...............................1

Sarbanes-Oxley Act, 15 U.S.C. § 78y ...............................................3

**Count II Provisions**

U.S. Const. Art II, § 1...........................................................4

U.S. Const. Art II, § 3...........................................................4

Civil Service Reform Act, 5 U.S.C. § 1202......................................4

Civil Service Reform Act, 5 U.S.C. § 7521......................................4

Federal Trade Commission Act, 15 U.S.C. § 41 ...............................4

# ADDENDUM

# COUNT I PROVISIONS

## U.S. Const. Amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

# FEDERAL TRADE COMMISSION ACT

## 15 U.S.C. § 45

### Unfair methods of competition unlawful; prevention by Commission

## (c) Review of order; rehearing

Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon such filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission until the filing of the record and shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgement

to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of title 28.

**(d) Jurisdiction of court**

Upon the filing of the record with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

# SARBANES-OXLEY ACT

## 15 U.S.C. § 78y

### Court review of orders and rules

**(a) Final Commission orders; persons aggrieved; petition; record; findings; affirmance, modification, enforcement, or setting aside of orders; remand to adduce additional evidence**

(1) A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

(2) A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated by the Commission for that purpose. Thereupon the Commission shall file in the court the record on which the order complained of is entered, as provided in section 2112 of title 28 and the Federal Rules of Appellate Procedure.

(3) On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the record, to affirm or modify and enforce or to set aside the order in whole or in part.

(4) The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive.

(5) If either party applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there was reasonable ground for failure to adduce it before the Commission, the court may remand the case to the Commission for further proceedings, in whatever manner and on whatever conditions the court considers appropriate. If the case is remanded to the Commission, it shall file in the court a supplemental record containing any new evidence, any further or modified findings, and any new order.

## COUNT II PROVISIONS

### U.S. Const. Art II, § 1

The executive power shall be vested in a President of the United States of America.

### U.S. Const. Art II, § 3

He shall from time to time give to the Congress information of the state of the union, and recommend to their consideration such measures as he shall judge necessary and expedient; he may, on extraordinary occasions, convene both Houses, or either of them, and in case of disagreement between them, with respect to the time of adjournment, he may adjourn them to such time as he shall think proper; he shall receive ambassadors and other public ministers; he shall take care that the laws be faithfully executed, and shall commission all the officers of the United States.


## CIVIL SERVICE REFORM ACT

### 5 U.S.C. § 1202

### Term of office; filling vacancies; removal

(d) Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office.

### 5 U.S.C. § 7521

### Actions against administrative law judges

(a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.


## FEDERAL TRADE COMMISSION ACT

### 15 U.S.C. § 41

### Federal Trade Commission established; membership; vacancies; seal

Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.